Mathew K. Higbee, SBN 11133
**HIGBEE & ASSOCIATES**
1504 Brookhollow Drive, Suite #112
Santa Ana, CA 92705
(714) 617-8373
mhigbee@higbeeassociates.com
*Attorneys for Plaintiff Trunk Archive*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH**

| | |
|---|---|
| GREAT BOWERY, d/b/a TRUNK ARCHIVE,<br><br>      Plaintiff,<br><br>v.<br><br>BEST LITTLE SITES, d/b/a www.comicbookmovie.com; NATHAN BEST; MARK CASSIDY; JOSHUA WILDING; and DOES 1 through 10, inclusive,<br><br>      Defendants. | Case No. 2:21-cv-00567-DBB<br><br>**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS** |

  Plaintiff Great Bowery, Inc., d/b/a Trunk Archive ("Trunk Archive") moves pursuant to 12(c) for partial judgment on the pleadings as to the Counterclaim filed by Defendant Best Little Sites d/b/a www.comicbookmovie.com ("CBM") and Defendant Nathan Best's ("Best").

  Now that the pleadings are closed, Trunk Archive seeks partial judgment as to CBM and Best's defense of "embedding" as well as their defense under the safe harbor provision of the DMCA. As discussed below, when viewing the pleadings in the light most favorable to Defendants CBM and Best, they cannot prevail on these defenses as a matter of law.

/ / /

1

I.     **INTRODUCTION**

The instant litigation involves the serial infringement of 18 photographs for which Trunk Archive holds the exclusive licensing rights. *See generally* Complaint at Dkt. #2 ("Complaint"). Trunk Archive is a full-service photography licensing agency representing some of the most prominent photographers and iconic images in the world. *Id*. at ¶12. One of Trunk Archive's most prominent clients is American portrait photographer Annie Leibovitz. *Id.* at ¶14.

Between 2014 and 2019, Leibovitz took a series of photographs of the cast and crew of *Star Wars: The Last Jedi* and *Star Wars: The Rise of Skywalker*, 18 of which make up the subject matter of this lawsuit ("Star Wars Photographs"). *Id.* at ¶¶17-20. Trunk Archive alleges that the Star Wars Photographs were displayed in 15 separate editorial articles on the CBM website which were authored by co-Defendants Mark Cassidy and Joshua Wilding[1]. *Id.* at ¶¶57-76.

On June 23, 2022, Defendants CBM and Best filed an Answer asserting 22 separate Affirmative Defenses and a Counterclaim[2] for declaratory relief. Dkt. #49. As relevant here, CBM and Best contend in their Counterclaim that the Star Wars Photographs "were displayed on CBM's website by embedding the image and linking back to a third-party server that was not owned or controlled by CBM" and that the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Counterclaim ¶¶ 23-24. Relatedly, as their 12th Affirmative Defense, CBM and Best contend that "Trunk Archive's claims are barred because the photographs at issue were not stored and/or did not reside on a system or network controlled or operated by CBM."

In addition to claiming an "embedding" defense, CBM and Best also claim protection via the Safe Harbor provisions of the Digital Millennium Copyright Act ("DMCA") asserting that

---

[1] Cassidy and Wiling have separately appeared and filed Answers, however those pleadings are not at issue in this Motion.

[2] The Answer and Counterclaim are both contained in the same document filed at Docket #49. However, both are separately labeled and contain consecutively number paragraphs beginning with paragraph 1. As such, the citations in this Motion will refer to both documents separately.

2

Trunk Archive's claims are barred "because the CBM is a service provider and the accused content was posted, stored, transmitted, or otherwise made available at the direction of a user."

## II. PARTIAL JUDMENT ON THE PLEADINGS IS APPROPRIATE HERE

"After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The court reviews a Rule 12(c) motion for judgment on the pleadings under the same standard that governs a Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. *See Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). That is, the court must accept all the well-pleaded allegations as true and must construe them in the light most favorable to the non-moving party. *David v. City and County of Denver*, 101 F.3d 1344, 1352 (10th Cir.1996). If, after viewing the pleadings in the light most favorable to the non-moving party, it appears that the non-moving party can prove no set of facts to support its legal theory, then judgment must be entered on the pleadings. *See Fernandez v. Mora San Mugyek Elec. Coop.*, 462 F.3d 1244, 1250 (10th Cir. 2006)

Here, the pleadings are closed. CBM and Best filed an Answer and Counterclaim, and Trunk Archive has filed its own Answer to the Counterclaim. The Court has not set a trial date, and discovery is not set to close until May of 2023. Dkt. #57. As such, there is no risk that trial in this matter will be delayed. Thus, the Court may entertain judgment on the pleadings at this stage.

Trunk Archive seeks only partial judgment on the pleadings against Best and CBM as to their affirmative defense of "embedding" and their affirmative defense of DMCA safe harbor pursuant to 17 U.S.C. § 512(c). Viewing the pleadings in the light most favorable to Best and CBM, the "embedding" alleged by Best and CBM is not a legal defense to infringement of a Trunk Archive's exclusive right to display the Star Wars Photographs.

Additionally, the pleadings also demonstrate that neither Best nor CBM qualify for safe harbor protection. Because DMCA safe harbor only applies to entities, Best does not qualify because he is an individual not an entity. As to CBM the "embedding" alleged in the Counterclaim and Affirmative Defenses does not fall under the purview of any of the safe harbor provisions.

A.   **Embedding Is Not A Defense To Violation Of The Display Right.**

At issue in this case is the practice of embedding. CBM and Best contend that they are not liable for infringement because the Star Wars Photographs "were displayed[3] on CBM's website by embedding the image and linking back to a third-party server that was not owned or controlled by CBM" and that the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Counterclaim ¶¶ 23-24. Similarly, as their 12th Affirmative Defense, CBM and Best contend that "Trunk Archive's claims are barred because the photographs at issue were not stored and/or did not reside on a system or network controlled or operated by CBM."

The court in *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018) provided the following explanation of the practice of "embedding" photographs on to a website:

> A webpage is made up of a series of instructions usually written by coders in Hypertext Markup Language ("HTML"). These instructions are saved to a server (a computer connected to the internet), and when a user wishes to view a webpage, his or her computer's browser connects with the server, at which point the HTML code previously written by the coder instructs the browser on how to arrange the webpage on the user's computer. The HTML code can allow for the arrangement of text and/or images on a page and can also include photographs. When including a photograph on a web page, the HTML code instructs the browser how and where to place the photograph. Importantly for this case, the HTML code could instruct the browser either to retrieve the photograph from the webpage's own server or to retrieve it from a third-party server.
>
> "Embedding" an image on a webpage is the act of a coder intentionally adding a specific "embed" code to the HTML instructions that incorporates an image, hosted on a third-party server, onto a webpage. To embed an image, the coder or web designer would add an "embed code" to the HTML instructions; this code directs the browser to the third-party server to retrieve the image. An embedded image will then hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website. The result: a seamlessly integrated webpage, a mix of text and images, although the underlying images may be hosted in varying locations. Most social media sites—Facebook, Twitter, and YouTube, for example—provide code that coders and web designers can easily copy in order to enable embedding on their own webpages.

*Goldman*, 302 F. Supp. 3d at 587.

The Copyright Act grants the owner of a copyright exclusive rights to, *inter alia*, "display the copyrighted work publicly." *See* 17 U.S.C. § 106(5). "To 'display' a work means to show a

---

[3] Notably, Best and CBM concede that the Star Wars Photographs were "displayed" on the CBM Website.

4

copy of it, either directly or by means of a film, slide, television image, or any other device or process . . . ." 17 U.S.C. § 101. With regard to the meaning of 'publicly', the Copyright Act provides, in relevant part, that:

> [t]o perform or display a work 'publicly' means - -
> . . .
>
> (2) to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101.

Cases interpreting this definition have held that a display occurs by "the projection of an image on a screen ... by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage retrieval system." *Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1279 (11th Cir. 2008). The definition's usage of the phrase "any other device or process" clearly brings showing a copy of a work through a computer within the statutory definition of "display." Thus, per the statutory definition, each unauthorized *showing* of a work through a computer infringes on the owner's right of public display.

Here, the pleadings contain copies of the articles from the CBM Website that displayed the Star Wars Photographs at issue. Complaint ¶ 74, Exhibit K. Best and CBM concede that the Star Wars Photographs "were displayed on CBM's website" but alleges that they are not liable for violation of the display right because the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Counterclaim ¶¶ 23-24. According to Best and CBM, the fact that the physical image file resides on a third-party server rather than a CBM server is enough to evade liability for infringement, regardless of the fact that this distinction is an "invisible, technical processes [that is] imperceptible to the viewer" since the viewer only sees the final integrated page on the CBM Website, which would appear identical whether or not

an image is stored on a CBM controlled server or embedded from a third-party source. *See Goldman*, 302 F. Supp. 3d at 595.

Notably, the text of the Copyright Act does not make actual *possession* of a copy of a work a prerequisite[4] for infringement of the display right. To "display" a work, someone need only *show* a copy[5] of the work via any device or process; a person need not actually physically possess the underlying copy to display it. *See* 17 U.S.C. § 101. And to display a work publicly, a person need only *transmit or communicate* a display to the public. *Ibid.* "The definition of 'transmit' is broad enough to include all conceivable forms and combinations of wired and wireless communications media." *Greenberg*, 533 F.3d at 1279-1280 citing H.R. Rep. No. 94-1476. Again, the person need not possess underlying copy in order unlawfully to transmit or communicate it to the public. *See Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, at *32 (N.D. Tex. Nov. 22, 2017).

Under the express statutory definition, a website that utilizes embedding to point to a third-party server where a file is stored, publicly displays that image because the underlying HTML code initiates a *process* whereby the user's browser *device* is instructed to *show* the copy of the image to the website's visitor from the third-party server by *communicating* it to the user via a seamlessly integrated webpage presentation. *See Goldman,* 302 F. Supp. 3d at 590-93 (discussing cases and concluding that on the facts at bar, "when defendants caused the embedded Tweets to appear on their websites, their actions violated plaintiff's exclusive display right."); *Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017) (by "framing the defendant's copyrighted works, the plaintiffs impermissibly displayed the works to the public.").

---

[4] Physical possession may be required in order to violate some exclusive rights such as the reproduction right (§106(1)) or distribution right (§106(3)). However physical possession of a work is clearly not a threshold requirement for violation of *all* the rights enumerated in section 106. For example, an infringer need not be in physical possession of a copy in order to create a derivative work (§106(2)) or to engage in a public performance (§106(6)) via an unauthorized rebroadcast. *See American Broadcasting Cos. v. Aereo, Inc.,* 573 U.S. 431 (2014).

[5] Notably the definition does not require that the copy shown be an *infringing* copy itself. Rather, the statute's use of the standalone word "show" without the qualifying word "infringing" further demonstrates that a prospective infringer can violate the display right by impermissibly appropriating what would otherwise be a lawfully stored copy of an image on a third-party server.

This reading of the statute is consistent with the Supreme Court's prior admonition that, to determine whether a work is infringed under the Copyright Act, a court must "focus on the [work] as presented to, and perceptible by" the public. *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001). In *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014) an Internet-based re-transmitter of over-the-air television signals argued that it did not "perform the copyrighted work publicly" because each transmission technically came from a miniature antenna assigned to each user and, therefore, was a "private" rather than "public" performance. *Id.* at 443-46. The Court rejected that argument, noting that the technical difference "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing. *Id.* at 444. "Viewed in terms of Congress' regulatory objectives," the Court asked rhetorically, "why should any of these technological differences matter?" *Id.* at 446. *Aereo* therefore provides that it is a practical, functional perspective, and not hyper technicalities, that determine whether a particular mode of content delivery is infringing or not.

Here, viewing the pleadings in the light most favorable to Best and CBM, it is uncontested that visitors to the CBM Website could view the Star Wars Photographs directly on the CBM Website in the articles at issue even though the Star Wars Photographs themselves were displayed via the practice of "embedding". *See* Complaint ¶ 74, Exhibit K; Counterclaim ¶¶ 23-24. Best and CBM also freely admit that they received advertising revenue from the articles on the CBM Website which displayed the Star Wars Photographs. *See* Answer ¶ 75 (admitting that the articles at issue "contained advertisements and generated limited revenue for CBM"); *see also* Counterclaim ¶ 31.

Simply because the Star Wars Photographs were viewable on the CBM Website as the result of "embedding" from a third-party server is not determinative of whether the Star Wars Photographs were "publicly displayed" on the CBM Website and therefore infringing. Indeed, allowing the invisible process of "embedding" to control the determination of liability would invite website publishers to abuse and circumvent copyright protection by simply adjusting a few lines of code. *See Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006) ("[S]omeone could

create a website entitled 'Infringing Content For All!' with thousands of in-line links to images on other websites that serve infringing content. That website, however, would be immune from claims of direct infringement because it does not actually *serve* the images." [emphasis in original]). By exploiting this hyper technical loophole, websites such as CBM would be able to retain all benefits of placing desirable copyrighted content on its Website --- increased visitor traffic which ostensibly would increase the potential to monetize the CBM Website via advertising – all the while avoiding legal liability or the obligation to pay the content creators the customary price for using their copyrighted content.

Thus, under the definition of "public display" enumerated in the Copyright Act, the mere "embedding" of the Star Wars Photographs onto the CBM Website is not a defense to liability. Therefore, the Court should enter judgment on the pleadings against Best and CBM as to their 12th Affirmative Defense of "embedding."

**B.     CBM And Best Cannot Invoke Any Of The DMCA Safe Harbor Provisions.**

The Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, established certain safe harbors to "provide protection from liability to service providers. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (citations omitted). These four safe harbors provide protection from liability for copyright infringement for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools." *Mavrix Photographs, Ltd. Liab. Co. v. LiveJournal, Inc.*, 853 F.3d 1020, 1027 (9th Cir. 2017). These safe harbors limit liability but "do not affect the question of ultimate liability under the various doctrines of direct, vicarious, and contributory liability," *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1174 (C.D. Cal. 2002) (citing H.R. Rep. 105-551 (II), at 50 (1998)).

Here, judgment on the pleadings may be properly entered against Best and CBM as to all four safe harbors. As to Defendant Best, as an individual, he does not meet the threshold definition of a "service provider" and therefore cannot qualify for any safe harbor protection as a matter of

law. Although Defendant CBM likely does meet the definition of a "service provider" under the DMCA, it also does not qualify for immunity because none of the safe harbor provisions apply to content that is "embedded" as are the Star Wars Photographs in this case,

Thus, judgment on the pleadings must be entered against Best and CBM as to their 5th Affirmative Defense for DMCA safe harbor.

### 1. Best Does Not Qualify For Safe Harbor Because He Is An Individual And Not An "Service Provider" As Defined By The DMCA.

In order to receive protection under the DMCA safe harbors, a party must meet a set of threshold criteria. *BWP Media USA Inc. v. Hollywood Fan Sites LLC*, 115 F. Supp. 3d 397, 399-400 (S.D.N.Y. 2015). Among these criteria are requirements that the party qualify as a "service provider," as defined in the statute. *Ibid.*

A "service provider" is defined as "*an entity* offering the transmission, routing, or providing connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." *See* 17 U.S.C. § 512(k)(1) (emphasis added). It is clear that "service provider" is intended to refer to commercial entities that provide network services to subscribers or account holders and not to individuals. *Malibu Media, LLC v. Doe*, 2013 U.S. Dist. LEXIS 55985, at *24 (E.D. Pa. Mar. 6, 2013) (citing statutory provisions and noting that "[t]he court is aware of no case where Section 512's safe harbor provision was extended to a private individual."); *See also Oppenheimer v. Scarafile*, 2020 U.S. Dist. LEXIS 213742, at *17 (D.S.C. Nov. 16, 2020) ("Recognizable examples of 'service providers' are common carriers such as Verizon, AT&T, Comcast, and other internet service providers. Here, neither Carolina One nor any of the Individual Defendants have shown that they are a "service provider" entitled to protection."); *Malibu Media, LLC v. Parsons*, 2013 U.S. Dist. LEXIS 202289, at *22 n.10 (D.D.C. May 31, 2013) ("the word 'person' is used throughout [the statute] to include reference to natural persons, but is not used in the definitional section. Rather, a different word—'entity'—is used in the definitional section and

9

is a signal that Congress intended the entities that could qualify as service providers to be more narrowly construed than 'persons' and to exclude natural persons.").

Viewing the allegations in the pleadings in the light most favorable to the non-moving party, Best does not meet the threshold qualification of being a "service provider" as defined by the DMCA because he is a natural person and not an entity. To the extent Best claims protection from individual liability by virtue of the DMCA this defense must fail. Thus, judgment on the pleadings should be entered against Best as to his 5th Affirmative Defense for DMCA safe harbor.

### 2. *The Transitory Digital Network Safe Harbor Does Not Apply To The Infringements Alleged Here.*

The "transitory digital network" safe harbor (17 U.S.C. § 512(a)) provides:

> (a) Transitory Digital Network Communications. — A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the provider's transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider, or by reason of the intermediate and transient storage of that material in the course of such transmitting, routing, or providing connections

17 U.S.C. § 512(a).

For purposes of this safe harbor only, "the term 'service provider' means an entity offering the transmission, routing, or providing of connections for digital online communications, between or among points specified by a user, of material of the user's choosing, without modification to the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A).

This safe harbor limits the liability of a service provider "when it merely acts as a conduit for infringing material without storing, caching, or providing links to copyrighted material." *Recording Indus. Ass'n v. Charter Communs., Inc.*, 393 F.3d 771, 776 (8th Cir. 2005) (noting that this safe harbor does not contain a notice and take down provision because "where an ISP merely acts as a conduit for infringing material - rather than directly storing, caching, or linking to infringing material - … the ISP has no ability to remove the infringing material from its system or disable access to the infringing material.").

Here CBM contends in its pleading that the Star Wars Photographs "were displayed on CBM's website by embedding the image and linking back to a third-party server." Counterclaim ¶ 23. Viewing the pleadings in the light most favorable to CBM, CBM is not acting as a mere "conduit" for the transmission of infringing material because the "embedding" of the Star Wars Photographs at issue requires the CBM Website to directly "link[] back to a third-party server." Counterclaim ¶ 23. Because "providing links to copyrighted material" is not covered by this safe harbor, *see Charter Communs., Inc.*, 393 at 776, the embedding at issue on the CBM Website cannot be covered by this safe harbor. As such, judgment on the pleadings must be entered against CBM as to "transitory digital network" safe harbor.

### 3. *The System Caching Safe Harbor Does Not Apply To The Infringements Alleged Here.*

The "system caching" safe harbor (17 U.S.C. § 512(b)) provides:

> (1) Limitation on liability. — A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider.

17 U.S.C. § 512(b).

Under the express language of the statute, this safe harbor only applies if the infringing material is "stor[ed]" on a system or network controlled or operated by or for the service provider. As relevant here, CBM contends that the Star Wars Photographs "were displayed on CBM's website by embedding the image and linking back to a third-party server that was not owned or controlled by CBM" and that the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Counterclaim ¶¶ 23-24.

Viewing the pleadings in the light most favorable to CBM, it cannot avail itself of this safe harbor because the Star Wars Photographs were not "stor[ed]" on a system or network controlled or operated by or for CBM. *See* Counterclaim ¶¶ 23-24. As such, judgment on the pleadings must be entered against CBM as to the "system caching" safe harbor.

/ / /

### 4. The User Generated Content Safe Harbor Is Inapplicable Because The Photographs Were Never Stored On CBM's System Or Network.

The "information residing on systems or networks at direction of users" safe harbor (17 U.S.C. § 512(c)) provides:

> (1) In general. A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider.

17 U.S.C. § 512(c).

Under the express language of the statute, this safe harbor only applies if the infringing material is "stor[ed]" or "resides" on a system or network controlled or operated by or for the service provider. As relevant here, CBM contends that the Star Wars Photographs "were displayed on CBM's website by embedding the image and linking back to a third-party server that was not owned or controlled by CBM" and that the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Counterclaim ¶¶ 23-24.

Viewing the pleadings in the light most favorable to CBM, it cannot avail itself of this safe harbor because the Star Wars Photographs were not "stor[ed]" nor did they "reside" on a system or network controlled or operated by or for CBM. It does not matter whether the "embedding" was done by CBM or by a third-party "user" of CBM services because in neither case were the Star Wars Photographs "stor[ed]" on a server owned or controlled by CBM. *See* Counterclaim ¶¶ 23-24.

Because this safe harbor only applies to materials "stor[ed]" at the direction of a user that "resides on a system or network controlled or operated by or for the service provider," judgment on the pleadings must be entered against CBM as to "information residing on systems or networks at direction of users" safe harbor because no such storage ever occured.

### 5. The Information Location Tools Safe Harbor Does Not Apply To The Infringements Alleged Here.

The "Information location tools" (17 U.S.C. § 512(d)) safe harbor provides immunity from liability "for infringement of copyright by reason of the provider referring or linking users to an

online location containing infringing material or infringing activity, by using information location tools" such as "a directory, index, reference, pointer, or hypertext link." 17 U.S.C. § 512(d).

According to the legislative history, an "information location tool" is a directory or index of online sites or material such as a search engine that identifies pages by specified criteria, a reference to other online material such as a list of recommended sites, a pointer that stands for an Internet location or address, or a hypertext link which allows users to access material without entering its address. S. Rep. No. 105-190 at 32 (1998)

The practice of "embedding" does not constitute an "information location tool" because it is not merely the act "referring or linking" users to third-party websites. Rather the "embedding" at issue here caused the Star Wars Photographs themselves to be publicly displayed by seamlessly integrating them directly on the CBM Website without need for a viewer to click through a link or directly reference a third-party website. This conduct does not fit within the definition of a "directory, index, reference, pointer, or hypertext link." *See Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 415 n.2 (9th Cir. 1997) ("A hypertext link allows a user to move directly from one web location to another *by using the mouse to click twice on the colored link*." (emphasis added).)

Regardless, even if the string of HTML code embedded into the CBM Website could be accurately categorized as an "information location tool," the act of publicly displaying the Star Wars Photographs directly on the CBM Website via the embedded HTML code rather than merely referring visitors via a link to view the Star Wars Photographs on a third-party website would remain outside the purview of § 512(d) safe harbor because the infringing conduct at issue is not the providing of the embedded link itself but the integrated display of the Star Wars Photographs directly onto the CBM Website. *See Perfect 10, Inc. v. CCBill LLC*, 481 F.3d 751, 766 (9th Cir. 2007) ("Even if the hyperlink provided by CCBill could be viewed as an 'information location tool,' the majority of CCBill's functions would remain outside of the safe harbor of § 512(d) . . . Perfect 10 does not claim that CCBill infringed its copyrights by providing a hyperlink; rather,

Perfect 10 alleges infringement through CCBill's performance of other business services for these websites.").

Viewing the pleadings in the light most favorable to CBM, the "embedding" practice at issue does not qualify as an "information location tool" and this safe harbor is not available. Thus judgment should be entered against CBM as to the "information location tools" safe harbor.

### III.  CONCLUSION

In conclusion, Plaintiff Great Bowery Inc. d/b/a Trunk Archive respectfully requests that the Court enter partial judgment on the pleadings as to Defendant CBM and Best's "embedding" defense, and as to their defense under each of the four DMCA safe harbor provisions.

Dated: November 29, 2022                    Respectfully submitted,

**/s/ Mathew K. Higbee**
Mathew K. Higbee, SBN 11133
**HIGBEE & ASSOCIATES**
(714) 617-8373
mhigbee@higbee.law

**/s/ Ryan E. Carreon**
Ryan E. Carreon, *pro hac vice*
**HIGBEE & ASSOCIATES**
(714) 617-8373
rcarreon@higbee.law
*Attorneys for Plaintiff Trunk Archive*