Robert E. Aycock (#8878)
William B. Chadwick (#16416)
KIMBALL ANDERSON
649 E. South Temple, 2nd Floor
Salt Lake City, UT 84102
Phone: (801) 359-3333
robert@kimballanderson.com
will@kimballanderson.com

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| GREAT BOWERY, d/b/a TRUNK ARCHIVE<br><br>　　　　Plaintiff,<br><br>vs.<br><br>BEST LITTLE SITES, d/b/a www.comicbookmovie.com; NATHAN BEST; MARK CASSIDY; JOSHUA WILDING; and DOES 1 through 10.<br><br>　　　　Defendants. | **BEST LITTLE SITES AND NATHAN BEST'S OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**<br><br>Case No. 2:21-cv-00567-DBP<br><br>District Judge: David Barlow<br><br>Magistrate Judge: Jared C. Bennett |

Defendant Best Little Sites, d/b/a www.comicbookmovie.com ("CBM") and Defendant Nathan Best ("Mr. Best") (collectively, the "CBM Defendants") oppose the motion for partial judgment on the pleadings as to the CBM Defendants' Fifth Affirmative Defense (user-generated content DMCA safe harbor) and Twelfth Affirmative Defense (inline linking) ("Motion," Dkt. 72) filed by Plaintiff Great Bowery, d/b/a Trunk Archive ("Plaintiff" or "Trunk Archive").

## I.  Introduction

CBM runs a website accessible at www.comicbookmovie.com ("Website"). *See* Dkt. 49 at Counterclaim ¶ 9. On the Website, fans and other users post text, images, and comments related to comic book movies and related genres. *See id.* CBM's Website is a prototypical user-created, niche content site. Trunk Archive contends that CBM should be liable for the actions of its end users. Trunk Archive's position is premised on the theory that the end users' actions—embedding images from a third party—constitute infringement but do not qualify CBM for protection under a DMCA safe harbor, despite CBM's obedience to all other safe harbor requirements. Trunk Archive's argument, if accepted, would mean that the Digital Millennium Copyright Act ("DMCA") has left a gaping and illogical chasm where otherwise compliant service providers could still be liable for the infringing actions of their users through no fault of their own. Under Trunk Archive's approach, a service provider would be better off having its users unquestionably infringe a work by copying it to its servers because the service provider would then qualify for the DMCA safe harbor. This is not how the law should function.

The DMCA was enacted to "facilitate the robust development and worldwide expansion of electronic commerce, communications, research, development, and education in the digital age." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 794 n. 2 (9th Cir. 2007) (quoting S. Rep.

105–190, at 1–2 (1998)). To advance that goal, the DMCA provides multiple "safe harbors" to shield service providers from the infringing actions of their end users. These safe harbors are not loopholes for providers to escape liability; they are an essential feature of the DMCA. The safe harbor protections empower service providers to offer online services critical to a robust internet without fear of liability for the actions of the site's users. In exchange for this protection, service providers must be good stewards by not engaging in infringement and generally removing violations once they have been made aware. In this way, "[t]he statute is meant to 'appropriately balance[ ] the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet.' " *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1090 (C.D. Cal. 2008). (quoting H.R. Rep. 105–551(II), at 21). Trunk Archive suggests a constricted interpretation of the DMCA safe harbor requirements that ignores the policy and which courts have explicitly rejected.

CBM operates its Website as the DMCA intends. CBM has provided a space for like-minded individuals to post content and engage in discussion. It has a designated agent to receive infringement allegations and immediately remove content that may violate someone's rights. It has policies against misusing copyrighted material, and all users must agree to these policies before posting any content. CBM explicitly instructs its users not to post or promote unauthorized copyrighted material. Punishing CBM under these circumstances contradicts the letter and spirit of the DMCA and the Copyright Act.

The DMCA anticipates the infringement allegations in this case. Here, Trunk Archive alleges that CBM's users posted articles that included links to allegedly copyrighted works. Neither

CBM nor Best—CBM's owner—posted any of the accused content. The users did not store, copy, or upload the alleged copyrighted images in these articles. Instead, the users "embedded" or included an "in-line link" to one of the many third-party locations where these images were hosted. Using this feature, a viewer's browser will show the publicly available image without storing or copying it on CBM's Website or servers. This is a common method for showing images on the internet.

For years, the Ninth Circuit has maintained that, under the plain language of the Copyright Act, showing an image without storing a copy is not infringement. *See Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). Trunk Archive does not rebut or even acknowledge this foundational precedent. Further, the only court within the Tenth Circuit to have addressed this issue has adopted the Ninth Circuit's reasoning and agreed that showing an image without storing a copy is not infringement. *See Grady v. Iacullo*, 2016 WL 1559134, Case No. 13-cv-00624 (D. Colo. Apr. 18, 2016). Trunk Archive also completely ignores and omits this authority from its Motion. Ultimately, there is no authority that the Tenth Circuit has rejected the Ninth Circuit's commonly accepted approach to inline linked images.

Trunk Archive's instant motion appears to be another in a long line of briefs intended to increase costs and extract a settlement. In this case, Trunk Archive ignores the streamlined efficiency of a DMCA takedown notice and instead opts for this lengthy and expensive litigation. CBM has removed access to the accused material from its Website, and CBM and Mr. Best only received minimal (if any) monetary benefit from the fact that users linked to the subject images. *See* Dkt. 49 at Counterclaim ¶¶ 29, 31. Even so, Trunk Archive continues to litigate and file motions on the same topics. Trunk Archive has already filed two unsuccessful challenges to the "embedded

image" defense. *See* Dkt. 64 at 15-16 (Motion to Strike CBM and Mr. Best's affirmative embedded image defense); *see* Dkt. 52 at 11 (Motion to Strike Cassidy and Wilding's affirmative embedded image defense); *see* Dkt. 70 (order denying motions to strike these affirmative defenses).[1] Trunk Archive has also stated that it "does not challenge the [DMCA user-generated safe harbor] as insufficiently pled," and it "does not challenge the affirmative defenses for failure to state a claim and statutory safe harbor." Dkt. 52 at 10, n.5; Dkt. 52 at 4, n.4. It now abruptly changes course with this Rule 12 motion regarding the sufficiency of the defenses that it explicitly did not challenge before and intentionally omits key authority in presenting its positions. Trunk Archive's arguments are unavailing, and its litigation conduct should not be rewarded.

Trunk Archive's Motion should be denied because (1) inline linking does not constitute copyright infringement in the Tenth Circuit, and (2) the "user-generated" DMCA safe harbor protects CBM from liability for the inline linking of its end users.

## II.    Legal Standard

A motion for judgment on the pleadings under Rule 12(c) "tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). As such, a Rule 12(c) motion "is reviewed under the same standard applicable to a motion under Rule 12(b)(6)." *Landmark American Ins. Co. v. VO Remarketing Corp.*, 619 Fed. Appx. 705, 708 (10th Cir. 2015). In evaluating the motion, the Court must "accept all facts pleaded by the non-moving party as true and grant all reasonable inferences from the pleadings in favor of the same." *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (10th Cir.

---

[1] Trunk Archive also filed multiple motions regarding the DMCA and inline linking defenses in the related cases between the parties before this Court. *See Best Little Sites v. Great Bowery*, Case No. 2:19-cv-00319 at Dkts. 20, 31, and 40.

2012) (internal quotation marks and citation omitted). "A motion for judgment on the pleadings should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law." *Id.*

### III. Partial judgment on the pleadings is not appropriate.

#### A. Inline linking is a defense to allegations of violations of the display right.

The Copyright Act outlines a copyright owner's exclusive right to "display the copyrighted work publicly." 17 U.S.C. § 106(5). Trunk Archive claims that CBM Defendants infringed this right by hosting a website upon which users embedded copyrighted images without uploading or storing them. In defense, CBM Defendants plead that "Trunk Archive's claims are barred because the photographs at issue were not stored and/or did not reside on a system or network controlled or operated by CBM." *See* Dkt. 49 at Affirmative Defense No. 12.

Trunk Archive argues that this defense should be dismissed because (1) embedding an image infringes the owner's right of public display; and (2) declining liability for embedded images violates the spirit of copyright law based on a technicality. To make these arguments, Trunk Archive relies on authority outside this Circuit without reconciling important differences in the underlying fact patterns. This does not meet Trunk Archive's high burden of proof to obtain relief under Rule 12(c).

##### 1. There is no authority that the Tenth Circuit has rejected the "server" test from the Ninth Circuit under which embedding an image without storing it does not infringe the owner's display right.

Evaluating whether embedding an image violates a copyright owner's exclusive right to display a work requires understanding the relevant terms. "To 'display' a work means to show a copy of it . . . ." 17 U.S.C. § 101. The Copyright Act, 17 U.S.C. § 101, *et seq.*, defines "[c]opies"

as "material objects . . . in which a work is <u>fixed</u> by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated either directly or with the aid of a machine or device." *Id.* at § 101 (emphasis added). "A work is 'fixed' in a tangible medium of expression when its embodiment in a copy . . . is sufficiently permanent or stable to permit to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." *Id.* The question, therefore, is whether a user embedding a link to an image without storing or copying it constitutes "fixing" or "copying" the work. The Ninth Circuit answered this question over fifteen years ago, and there is no indication that the Tenth Circuit has departed from this precedent. Trunk Archive ignores this authority and presents a misleading assessment of the state of the law.

a.   <u>*Perfect 10 v. Amazon.com, Inc.*</u>

In *Perfect 10, Inc. v. Amazon.com, Inc*, the Ninth Circuit defined the "server test" to determine whether displaying an image constitutes copyright infringement. 508 F.3d 1146, 1159-60 (9th Cir. 2007). In short, the server test finds infringement when a website "displays a photographic image by using a computer to fill a computer screen <u>with a copy of the photographic image fixed in the computer's memory</u>." *Id.* at 1160 (emphasis added). Conversely, a website "that does not store and serve the electronic information to a user is not displaying that information, even if such owner in-line links to or frames the electronic information." *Id.* at 1159.

In *Perfect 10*, Perfect 10 sued Amazon and Google for infringing its copyrights by displaying them on their websites. *Id.* at 1154. The Ninth Circuit found that Google's use of "online linking" (often referred to as "embedding" images) did not infringe the copyrights because Google had not created a copy of the photographs or stored it on its system. *Id.* at 1160-61. The Court also

6

found that inline linking did not display a copy of the pictures but merely used HTML code to show an image by directing a user's browser to the third-party host location of the image. *Id.* at 1161. As the court explained,  "Google transmits or communicates only an address which directs a user's browser to the location where a copy of the full-size image is displayed. Google does not communicate a display of the work itself." *Id.* at n.7. Ultimately, "[b]ecause Google's computers do not store the photographic images, Google does not have a copy of the images for purposes of the Copyright Act." *Id.* at 1160.

Under this framework, embedding images on CBM's Website without storing them would not infringe Trunk Archive's rights. As with Google, "[t]he Subject Images were displayed[2] on CBM's website by embedding the image and linking back to a third-party server that was not owned or controlled by CBM." Dkt. 49 at Counterclaim ¶ 23. The user who posted the content included HTML instructions that point to this third-party host, causing the end user's browser to show the image. "The Subject Images are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." *Id.* at Counterclaim ¶ 24; Dkt. 49 at Affirmative Defense No. 12.

> b.    *The Tenth Circuit has not rejected the server test.*

There is no controlling authority for this District or the Tenth Circuit that supports Trunk Archive's argument that inline linking or "embedding" an image from a third party without uploading it or storing it constitutes infringement. Indeed, the only authority from within the Tenth Circuit to address the issue has accepted the server test from *Perfect 10.* Trunk Archive does not

---

[2] The use of the word "display" in CBM Defendants' pleadings is not a concession that the works are "displayed" as defined in 17 U.S.C. § 101. When viewed in the light most favorable to CBM Defendants, this word choice simply means that an image is shown or made accessible. *See Seymour v. Garfield Cnty.*, 580 F. Supp. 3d 1039, 1048 (D. Utah 2022) ("All facts pleaded by the non-moving party are accepted as true as well as all reasonable inferences in favor of the same.").

mention this case in its Motion and instead asks the court to adopt reasoning from district courts from other Circuits.

In *Grady v. Iacullo*, the defendant objected to the magistrate judge's finding that sharing links to the plaintiff's photographs and videos without storing or copying them constituted copyright infringement. 2016 WL 1559134, Case No. 13-cv-00624 (D. Colo. Apr. 18, 2016), at *4. The court sustained the defendant's objection to the magistrate judge's report and recommendation, concluding: "[t]he problem for plaintiff is that merely because defendant, in some manner, shared plaintiff's photographs and videos does not necessarily mean that defendant copied the same in a way that infringes plaintiff's copyrights." *Id.* at *7. "In other words, plaintiff was required to present some evidence that its photographs and videos were placed on defendant's computer and remained placed there for a period of more than transitory duration." *Id.* Without this evidence, "it cannot be said that defendant had a copy of plaintiff's photographs and videos for purposes of the Copyright Act." *Id.*

In interpreting *Perfect 10*, the *Grady* court reasoned that a critical consideration in determining whether the image had been "fixed" "was whether the copyrighted image was *stored* on an alleged infringer's computer." *Id.* (emphasis in original). The *Grady* court then analyzed other precedent that likewise held that works were not "fixed" unless they had been copied or stored. *Id.*; *see MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511 (9th Cir. 1993) (transfer of software to computer's RAM constituted "copying" for purposes of the Copyright Act because the RAM copy was sufficiently "fixed"); *see Stenograph L.L.C. v. Bossard Assoc., Inc.*, 144 F.3d 96, 101-102 (D.C. Cir. 1998) (copying occurred when software was loaded into the RAM of the defendant's computers); *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 235-236 (7th Cir.

1995) (defendant did not copy plaintiff's software because the plaintiff produced insufficient evidence to support the inference that a printout of its source code originated from the defendant's computers); *Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338 Fed. Appx. 329, 336-337 (4th Cir. 2009) (plaintiff's software loaded onto the defendant's computers' RAM was sufficiently fixed for purposes of copyright infringement). The *Grady* court acknowledged that the Tenth Circuit Court of Appeals had not addressed this issue but ruled that it "sees no reason for departing from the holdings of the cases cited *supra*." *Grady*, 2016 WL 1559134 at *6.

The *Grady* court reasoned that the differentiating line is not whether a hyperlink shows a URL or an embedded image but whether the images were stored on the defendants' system. *See id.* at *6. The court explained that the Ninth Circuit treated those categories of links differently "because the images displayed by way of URL hyperlinks were *not* stored on Google's computers, while the images displayed by way of thumbnail *were* stored on Google's computers." *Id.*, citing *Perfect 10*, 508 F.3d at 1160-61. "That was the reason for the different treatment, not, as plaintiff appears to suggest, simply because thumbnails in and of themselves are inherently infringing copies." *Id.*

As in *Grady*, Trunk Archive "has presented no evidence that [the] photographs and videos were stored on defendant's computer." *Id.* at *7. Indeed, Trunk Archive argues in its Motion that "the photographs were never stored on CBM's system or network." Motion at 12. Trunk Archive has not met its burden to establish that this Court should reject the long-standing "server test," ignore precedent from other district courts in this Circuit, and adopt a standard that the Tenth Circuit Court of Appeals has not embraced.

### 2. *CBM's users' embedding of images is not a hyper-technical circumvention of the owner's display right.*

Trunk Archive argues that embedding images is a "hyper technical loophole" that allows "websites such as CBM [to] retain all benefits of placing desirable copyrighted content on its Website . . . while avoiding legal liability or the obligation to pay the content creators the customary price for using their copyrighted content." Motion at 8. However, this overstates the impact of embedding images and underappreciates the policies at play.

First, unlike the complicated technology at issue in *Am. Broadcasting Co., Inc. v. Aereo,* 573 U.S. 431 2014), embedding images is not a rare, sophisticated, or technical process and is not unique to CBM. Inline linking to images on a third-party server is a standard method for showing images on the internet and has been widely used for decades. The Copyright Act accounts for this method of showing an image, and the server test is an appropriate approach to determining infringement. For many years, this method has been considered by most of the country to not infringe the rights of a copyright holder for the reasons outlined herein.

Second, treating inline linking differently from hosting an image does not violate the spirit of the Copyright Act. The copyright owner still retains the exclusive right to display the work publicly. If, however, the copyright holder elects to have his works widely distributed across the internet without requiring a license, it is punitive to permit the copyright holder to capriciously demand settlement payments from internet users who had seen the pictures all over the internet and used simple tools to link to them. There are no allegations that the users passed the photos off as their own or received ad revenue because of the nature of the images. Every accused article contained independent text and creation from the respective author.

Third, Trunk Archive's "worst case" scenarios for the server test are overblown. Trunk Archive argues that, at its worst, the server test might permit a website to avoid liability even if it advertised "'Infringing Content For All!' with thousands of in-line links to images on other websites that serve infringing content." Motion at 7-8 (quoting *Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006)). However, this case concedes that such a website "might still be held liable for secondary infringement." *Id.* at 830, n.10. While the DMCA safe harbor protects a service provider from liability, the copyright owner may still potentially receive relief against the individual who posted the infringing content.[3] Moreover, much of the internet has operated under the server test for over a decade without these doomsday repercussions.

Fourth, holding that inline linking constitutes copyright infringement fundamentally changes the nature of interactions across the internet and exposes countless contributors to unsuspecting copyright infringement. Under Trunk Archive's theory, "any website that in-line links to or frames third-party content would risk liability for direct infringement (putting aside the availability of an affirmative defense) even if that website discloses the identity of the actual server of the image." *Perfect 10*, 416 F. Supp. 2d at 839-40. Treating each link to the same hosted image as a separate infringement will complicate copyright claims from online behavior, despite the DMCA's efforts to streamline disputes. The statutory damages associated with copyright infringement can also permit unscrupulous copyright owners to exploit benign links to an image to extract a windfall of improper gain.

---

[3] Defendants do not concede that Wilding and Cassidy, or any of its users, are liable for direct infringement. They are simply noting that applying the DMCA safe harbor as intended does not necessarily leave the copyright owner without a remedy if an infringement has indeed occurred.

Fifth, inline linking benefits copyright owners who want to remove content from the internet. With inline linking, the hosted location of the image is easily identifiable and, at least in this case, the users provided attribution. Removing the hosted image at its source (through a DMCA takedown or otherwise) will disable access to all images linked to that host across the internet. In this case, the linked images were widely accessible across the internet by others before they were shown on CBM's Website. This is significantly different than the privately shared Snapchat photo that went viral in *Goldman v. Breitbart News Network, LLC*, 302 Supp.3d 585 (S.D.N.Y. 2018). If inline linking has the same legal ramifications as uploading separate images to separate websites, there will inevitably be an increase in unconnected uploads. Removing each independent upload (rather than tracing it back and removing the image at a single host) will take incredible resources. By contrast, linking to one specific third-party host makes enforcement significantly easier and serves the purposes of the DMCA.

> B.   CBM has sufficiently plead facts to support a DMCA Safe Harbor defense.

To promote the DMCA's purpose, the safe harbors protect service providers, like CBM, under a wide array of circumstances. Trunk Archive tries to characterize CBM's Website as an unorthodox site that falls outside of any Safe Harbor. To do this, Trunk Archive takes conflicting positions and presents arguments rejected by courts. In reality, and taking the pleading in the light most favorable to the CBM Defendants, CBM's Website is a standard website with user-generated content. It falls squarely within the User-Generated Content safe harbor (17 U.S.C. § 512(c)). The CBM Defendants plead this defense in their Answer:

> Trunk Archive's claims are barred by the Safe Harbor provisions of the Digital Millennium Copyright Act because [] CBM is a service provider and the accused content was posted, stored, transmitted, or otherwise made available at the direction of a user.

Dkt. 49 at Affirmative Defense No. 5. In its Motion to Strike, Trunk Archive specifically stated that it "does not challenge the [DMCA user-generated safe harbor] as insufficiently pled," and it "does not challenge the affirmative defenses for failure to state a claim and statutory safe harbor." Dkt. 52 at 10, n.5; Dkt. 52 at 4, n.4. Trunk Archive does not explain why it has now changed course to challenge this defense with another Rule 12 motion. Regardless, Trunk Archive ignores substantial authority denying the same argument it raises here, and its motion should be denied.

### 1.   *CBM has plead facts that allow it to invoke the User-Generated Content safe harbor.*

The user-generated content safe harbor shields service providers from liability "for infringement of copyright by reason of the storage at the direction of a user . . . ." 17 U.S.C. § 512(c)(1). Trunk Archive argues that because the material is <u>posted and made accessible</u> but not <u>uploaded or stored</u> by CBM's users, CBM does not qualify for this safe harbor.[4] This position is antithetical to the purposes of the DMCA and has been rejected numerous times.

### a.   <u>17 U.S.C. § 512(c)</u>

To start, "the language of the statute recognizes that one is unlikely to infringe a copyright by merely storing material that no one could access, and so includes activities that go beyond storage." *UMG Recordings, Inc. v. Shelter Cap. Partners, LLC*, 718 F.3d 1006, 1019 (9th Cir. 2013). Section 512(c)(1)(A)(i) states, "the material <u>or an activity using the material</u> . . . is infringing." (Emphasis added). Section 512(c)(1)(A)(ii) similarly addresses

---

[4] Trunk Archive does not challenge CBM's compliance with any of the other requirements for this safe harbor, such as lack of actual knowledge of the infringing material, expeditiously disabling access to the material upon receiving notice, or having a proper designated agent. *See* 17 U.S.C. § 512(c). CBM Defendants reserve the right to establish their compliance with these requirements, if necessary.

"infringing <u>activity</u>." Section 512(c)(1)(A)(iii) requires the service provider "to remove, <u>or disable</u> <u>access to</u>, the material." All of this "suggest[s] that if the material were still being stored by the service provider, but was inaccessible, it might well not be infringing." *Shelter Cap*, 718 F.3d at 1019. In other words, the language and purposes of the DMCA anticipate that service providers will do more than merely store content—they may also provide access to it.  After all, "[t]he reason one has a website is so that others may view it." *Id.* at 1018. The safe harbor should protect this conduct.

### b.   *UMG Recordings v. Veoh Networks* (C.D. Cal. 2008)

In *UMG Recordings v. Veoh Networks,* UMG, like Trunk Archive, argued that the statute required users to store content, and not merely make it accessible or viewable, for the service provider to qualify for DMCA Safe Harbor protection. 620 F. Supp. 2d 1081 (C.D. Cal. 2008). The district court rejected this argument: "[u]nder UMG's interpretation, § 512(c) would apply only to operational features that provide or constitute storage—and nothing more. But there is no language in § 512(c) that so limits its applicability." *Id.* at 1089. "Instead, as the language makes clear, the statute extends to function other than mere storage." *Id.* The *UMG* court also confirmed that § 512(c) "does not require that the infringing conduct constitute storage in its own right" and "*presupposes* that the service provider will be providing access to the user's material." *Id.* at 1088-89 (emphasis in original).

The DMCA's policy and legislative history are especially important in this analysis. "[S]tatutory language must always be read in its proper context." *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991). To do this, "the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 289 (1988); *see also Crandon v. U.S.*, 494 U.S. 152, 158 (1990) ("In determining the meaning

of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy.").

As the *UMG* court noted, "Congress enacted the DMCA 'to facilitate the robust development and worldwide expansion of electronic commerce, communications, research, development, and education in the digital age.'" *UMG Recordings*, 620 F. Supp. 2d at 1090 (quoting S. Rep. 105–190, at 1–2 (1998)); *see also Visa,* 494 F.3d at 794 n. 2 (9th Cir. 2007). In this way, "[t]he statute is meant to 'appropriately balance[ ] the interests of content owners, on-line and other service providers, and information users in a way that will foster the continued development of electronic commerce and the growth of the Internet.' " *Id.* (quoting H.R. Rep. 105–551(II), at 21). Congress explained the need to limit service providers' liability by noting that:

> [i]n the ordinary course of their operations, service providers must engage in all kinds of acts that expose them to potential copyright infringement liability. . . . In short, by limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand.

*Id.* at 1090 (quoting S. Rep. 105-190, at 8).

The *UMG* court added, "[i]t is very difficult to see how the DMCA could achieve these goals if service providers otherwise eligible for limited liability under § 512(c) were exposed to liability for providing access to works stored at the direction of users." *Id.* at 1090. "Such liability would surely undercut the 'robust development and worldwide expansion of electronic commerce, communications, research, development, and education in the digital age.' " *Id.* "If providing access could trigger liability without the possibility of DMCA immunity, service providers would be greatly deterred from performing their basic, vital and salutary function-namely, providing access to information and material for the public." *Id.* at 1089.

Congress acknowledged the risks to copyright holders' interests that Trunk Archie is concerned about here. To protect those interests, the DMCA safe harbors were meant to "preserve[] strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." *Id.* (quoting S. Rep. 105–190, at 20, 40; H.R. Rep. 105–551(II), at 49–50). "The primary mechanism for cooperation in [the DMCA Safe Harbors], and in § 512(c) in particular, is the 'notice and take-down' procedure." *Id.* at 1090.

The notice and take-down process  "would be pointless if service providers who provide access to material stored on their systems at the direction of users were precluded from limiting their potential liability merely because their services <u>enabled users to access such works</u>." *Id.* at 1091 (emphasis added). Indeed, "[t]he threat of such liability would create an enormous disincentive to provide access, thereby limiting the 'variety and quality of services on the Internet.' " *Id.* Moreover, "absent such access copyright owners would find it difficult to located infringing material in order to provide notice in the first place." *Id.* The *UMG* court reasoned that "[t]he 'safe harbor' would in fact be full of treacherous shoals if the copyright owner still could recover damages because the service provider remained liable for having provided access to the stored material that had been removed." *Id.* at 1089-90.

In sum, the *UMG* court extensively analyzed the argument that Trunk Archive raises in its Motion and completely rejected it based on the statute's language, the policy supporting the DMCA, and the practical implications of this theory. Trunk Archive's position is not new, and it is not correct.

16

### c.   *Io Group, Inc. v. Veoh Networks* (N.D. Cal. 2008)

In *Io Group, Inc. v. Veoh Networks, Inc.*, the district court confirmed that facilitating user access to material also falls within the safe harbor because "the structure and language of [the DMCA safe harbor] indicate that service providers seeking safe harbor under § 512(c) are not limited to merely storing material." 586 F. Supp. 2d 1132, 1147 (N.D. Cal. 2008). In doing so, it rejected the same argument Trunk Archive makes here: the defendant did not qualify for safe harbor under § 512(c) because the materials in question were not stored on its system at a user's direction. *Id.* at 1146-48.

### d.   *Viacom Intern., Inc. v. YouTube, Inc.* (S.D.N.Y. 2010)

In *Viacom Intern. Inc. v. YouTube, Inc.*, Viacom argued that YouTube's replication, transmittal, and display of videos fell outside of the § 512(c) safe harbor because such actions were not "storage" by an end user. *See* 718 F. Supp. 2d 514, 526 (S.D.N.Y. 2010). The *Viacom* court rejected this argument, reasoning that such an interpretation "confines the word 'storage' too narrowly to meet the [DMCA's] purpose." *Id.*

As explained in *Viacom*, the DMCA defines a "service provider" for purposes of the § 512(c) safe harbor as "a provider of online services or network access, or the operator of facilities therefor," which includes, entities "offering the transmission, routing, or providing of connections for digital online communications." *Id.* (quoting 17 U.S.C. § 512(k)(1)(B)). "Surely the provision of such services, access, and operation of facilities are within the safe harbor when they flow from the material's placement on the provider's system or network: <u>it is inconceivable that they are left exposed to be claimed as unprotected infringements</u>." *Viacom*, 718 F. Supp. 2d at 526-27 (emphasis added); *see also Costar Group, Inc. v. LoopNet, Inc.* 164 F. Supp.2d 688, 702 (D. Md. 2001)

(finding the service provider was protected by the § 512(c) safe harbor because the photos were made available by the user and the service provider simply performed a "gateway" function that furthered the goals of the DMCA). The *Viacom* court described these additional actions under the § 512(c) safe harbor as the "collateral scope of 'storage' and allied functions." *Id.* at 527.

On appeal, the Second Circuit affirmed the district court's ruling that replication, playback, and the related video feature fell within the § 512(c) safe harbor and remanded for further fact-finding on a feature that is not germane to the case at hand. *See Viacom Intern. Inc. v. YouTube Inc.*, 676 F.3d 19 (2nd Cir. 2012). In affirming the district court's ruling, the Second Circuit confirmed that "the § 512(c) safe harbor extends to software functions performed for the purpose of facilitating access to user-stored material." *Id.* at 39 (citations omitted).

### 2.  Nate Best can still assert DMCA safe harbor defenses.

Nate Best is the owner and President of CBM, and Trunk Archive has sued him for copyright infringement. *See* Dkt. 49 at Counterclaim ¶ 26**.** Trunk Archive's complaint alleges that Best (along with all other Defendants) have "directly, vicariously, contributorily and/or by inducement willfully infringed the copyrights" without specifying the theory under which they are accusing Mr. Best. Dkt. 2 at ¶ 80. At times, Trunk Archive appears to argue that it is not pursuing an alter-ego theory of liability against Mr. Best and is only accusing him of vicarious liability. *See* Dkt. 17 at 9-11. But Trunk Archive has not explicitly clarified its infringement theory against Mr. Best. Until Trunk Archive does so, Mr. Best must be able to maintain all defenses that may be relevant. [5] Because "both contributory and vicarious infringements require someone to have directly infringed the

---

[5] Trunk Archive did not challenge Mr. Best's right to assert DMCA defense when it moved to strike Mr. Best's affirmative defenses. *See* Dkt. 52.

copyright," Mr. Best should be permitted to maintain affirmative defenses that go to the substance of the underlying direct infringement claims. *La Resolana Architects, PA v. Reno, Inc.* 555 F.3d 1171, 1181 (10th Cir. 2009).

## IV.     Conclusion

It is unreasonable to contend that there is infringement without storing the image but that this same action disqualifies an otherwise compliant service provider from DMCA safe harbor protection. Unsurprisingly, no court in the country has made these contradictory findings. *See Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 596 (S.D.N.Y. 2018) (if inline linking is infringement, "[t]here is also a very serious and strong fair use defense, a defense under the Digital Millennium Copyright Act, and limitations on damages from innocent infringement.").

Trunk Archive has not provided authority to meet its burden for judgment on the CBM's Defendants embedded images and DMCA safe harbor defenses. Its Motion should be denied in its entirety. In the alternative, CBM and Mr. Best respectfully request that they be granted an opportunity to amend their pleadings to address any deficiencies.

DATE: January 17, 2023

KIMBALL ANDERSON

*/s/ Robert E. Aycock*
Robert E. Aycock
William B. Chadwick

*Attorneys for Defendants and Counterclaim-Plaintiffs ComicBookMovie.com and Nathan Best*

19

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 17, 2023, I caused a true and correct copy of the foregoing **BEST LITTLE SITES AND NATHAN BEST'S OPPOSITION TO MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS** to be filed via the Court's CM/ECF system, which directed service by email on all counsel of record.

*/s/ Stephanie Hamilton*