Mathew K. Higbee, SBN 11133
**HIGBEE & ASSOCIATES**
1504 Brookhollow Drive, Suite #112
Santa Ana, CA 92705
(714) 617-8373
mhigbee@higbeeassociates.com
*Attorneys for Plaintiff Trunk Archive*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GREAT BOWERY, d/b/a TRUNK ARCHIVE,<br><br>　　　Plaintiff,<br><br>v.<br><br>BEST LITTLE SITES, d/b/a www.comicbookmovie.com; NATHAN BEST; MARK CASSIDY; JOSHUA WILDING; and DOES 1 through 10, inclusive,<br><br>　　　Defendants. | Case No. 2:21-cv-00567-DBB<br><br>**REPLY IN SUPPORT OF MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS** |

I.      EMBEDDING CONTRAVENES THE LANGAUGE OF THE COPYRIGHT ACT

A.      The "server test" is incompatible with the exclusive right to display a work.

With regards to its "embedding" defense, Defendants entire argument is premised on the Ninth Circuit's adoption of the so called "server test" outlined in *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007). Under the "server test" the question of whether a website publisher is directly liable for infringement turns entirely on whether the image is hosted on the publisher's own server, or is embedded or linked from a third-party server. *See Ibid.* Since its pronouncement in 2007, the 9th Circuit has not had a chance to revisit the viability[1] of the "server test," and at least one district court in the Ninth Circuit has expressly declined to apply it to violations of the display right for photographs displayed embedded links outside the context of search engines. *Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019) ("FSS cites no case applying the *Perfect 10* server test outside of the context of search engines. Indeed, subsequent cases have refused to apply the *Perfect 10* server test outside of that context.").

Under the Copyright Act, the rights holder is granted certain "exclusive rights" including, as relevant here, the right "to reproduce the copyrighted work in copies" and the right to "to display the copyrighted work publicly." 17 U.S.C. § 106(1), (5). At issue in this case is whether Defendants violated Trunk Archive exclusive right to publicly display the Star Wars Photographs. Trunk Archive does not seek to hold Defendants liable for violation of the reproduction right.

The physical location where the content is stored is the core inquiry that governs the applicability of the "server test." Trunk Archive agrees that the "server test" as applied to the *reproduction* right in § 106(1) would preclude liability for use of embedded content since the practice of embedding does not require the actual reproduction of a physical "copy" of a work. However, nowhere does the text of the Copyright Act suggest that physical possession[2] is

---

[1] There are at least two cases currently pending in the Ninth Circuit that seek to limit or completely overturn the "server test," *Hunley v. Instagram*, Case No. 22-15293, and *Miller v. 4Internet*, Case No. 22-16195.

[2] Physical possession may be required in order to violate other exclusive rights such as the reproduction right (§106(1)) or distribution right (§106(3)). However physical possession of a work is clearly not a threshold requirement for violation of *all* the rights enumerated in section 106. For example, an infringer need not be in physical possession of

1

necessary in order to violate the *display* right, which is the right at issue in this case. After all, the Copyright Act defines "display" as "to show a copy of" a work, 17 U.S.C. § 101, and not "to make and then show a copy of the copyrighted work." *McGucken v. Newsweek LLC*, 2022 U.S. Dist. LEXIS 50231, at *13 (S.D.N.Y. Mar. 21, 2022) quoting *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y. 2021). The Ninth Circuit's approach, under which no display is possible unless the alleged infringer has also stored a copy of the work on the infringer's computer, would seem to make the display right merely a subset of the reproduction right rather than as separate right as set forth in the statute. *See Nicklen*, 551 F. Supp. 3d at 195.

Congress did "not intend ... to freeze the scope of copyrightable technology" to then-existing methods of expression. *McGucken*, 2022 U.S. Dist. LEXIS 50231, at *14-15 (citing to legislative history at H.R. Rep. 94-1476, 47, 51 (1976)). Specifically, in considering the display right, Congress cast a very wide net, intending to include "[e]ach and every method by which the images ... comprising a ... display are picked up and conveyed," assuming that they reach the public. *Ibid*. Congress further noted that "'display' would include the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage and retrieval system." *Ibid.* Indeed, an infringement of the display right could occur "if the image were transmitted by any method (by closed or open circuit television, for example, or by a computer system) from one place to members of the public elsewhere." *Ibid;*

Under the server test, "a photographer who promotes his work on [the Internet] ... surrenders control over how, when, and by whom their work is subsequently shown — reducing the display right, effectively, to the limited right of first publication[3] that the Copyright Act of

---

an original copy in order to create a derivative work (§106(2)) or to engage in a public performance (§106(6)) via an unauthorized rebroadcast. *See American Broadcasting Cos. v. Aereo, Inc.,* 573 U.S. 431 (2014).

[3] Indeed, in order to exploit many of the exclusive rights of copyright, the copyright holder is required to disseminate the work publicly in some manner. *See* 17 U.S.C. § 106(3)(exclusive right to distribute); § 106(4)(exclusive right to publicly perform); § 106(5)(exclusive right to publicly display). Thus, it would be nonsensical to embrace a rule that effectively requires a copyright holder to give up control of its work by disseminating it publicly.

1976 rejects." *Nicklen*, 551 F. Supp. 3d at 196. "[I]t cannot be that the Copyright Act grants authors an exclusive right to display their work publicly only if that public is not online." *Id.* at 196.

Notably, Defendants concede in the pleadings that the Star Wars Photographs "*were displayed* on CBM's website" Counterclaim ¶ 23. Thus, even though Defendants' website utilized an "invisible, technical processes [that is] imperceptible to the viewer," as Defendants concede in the pleadings, the practical result was "a seamlessly integrated webpage" displaying the Star Wars Photographs to viewer of Defendants' Website even though "the underlying images may be hosted in varying locations." *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018); *see also Hard Rock Cafe Int'l (USA) Inc. v. Morton*, 1999 U.S. Dist. LEXIS 8340, 1999 WL 717995 (S.D.N.Y. Sept. 9, 1999) ("Because the Tunes material appears as a window within the original linking page, it is not clear to the computer user that she or he has left the Hard Rock Hotel web site … In light of this seamless presentation of the Tunes web page within the Hard Rock Hotel web site, the only possible conclusion is that the Hard Rock Hotel Mark is used or exploited to advertise and sell CDs.").

Because a court must "focus on the [work] as presented to, and perceptible by" the public to determining whether infringement has occurred, *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001), it is clear that the practice of embedding does not circumvent a violation of the display right. *See also ABC, Inc. v. Aereo, Inc.*, 573 U.S. 431, 444 (2014) (noting that the underlying techonolgy "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" into something non-infringing).

Defendants advance five separate arguments which will be briefly addressed here.

First, Defendants try and distinguish the "complicated" technology at issue in *Aereo,* claiming that embedding is "a standard method" for showing images that has "been considered by most of the country to not infringe." Opposition at p. 10. While it is doubtful that the alleged "complexity" of a certain technology has any bearing on whether such technology can be used to

infringe, as has been shown above, practically every court outside the Ninth Circuit (and even some within) have expressed doubt that the use of embedding is a defense to infringement.

Second, Defendants claim that it would be "punitive" to permit copyright holders to pursue infringement claims against "users who had seen the pictures all over the [I]nternet and used simple tools to link to them." Opposition at p. 10. However, just because pictures can be seen on the Internet does not mean they are not protected by copyright. *See Veeck v. S. Bldg. Code Cong. Int'l Inc.*, 241 F.3d 398, 409 (5th Cir. 2001) (Observing that "countless entities provide free access to materials on the Internet and still retain enforcement of their copyrights."[quotation omitted]); *see also Thornton v. J Jargon Co.*, 580 F. Supp. 2d 1261, 1281-82 (M.D. Fla. 2008) ("Defendants provide no authority for the proposition that the posting of the BBQE on Plaintiff's website granted an implied license to all [I]nternet users or that the work thereby entered the 'public domain.'"). Furthermore, embedding can hardly be described as linking *to* the Star Wars Photographs in question. Rather, the practice involves integrating the Star Wars Photographs *within* Defendants' website itself. Additionally, making an uploading a copy, as opposed to the practice of embedding, would not change whether a user had "seen the pictures all over the [I]nternet" despite that, according to Defendants, uploading would implicate liability whereas embedding would not.

Third, Defendants contend that Trunk Archive's concern that embedding would lead to widespread infringement is "overblown" because the DMCA protects service providers but not the underlying users. Defendants' DMCA arguments are misplaced since this part of Trunk Archive's argument has nothing to do with Defendants' DMCA defense and since Defendants Best, Cassidy, and Wilding, who are not protected by the DMCA, nonetheless allege that they are protected because the content was embedded. This case demonstrates why embedding as a defense presents a significant threat to copyright protection on the Internet. Defendants admit to having generated revenue from the articles that contained the Star Wars Photographs. Answer ¶75. Yet, by relying on embedding as a defense, Defendants clearly wish to reap the financial benefits associated with the use of the Star Wars Photographs while not being required to pay the customary licensing price.

4

Fourth, Defendants content that a finding that embedding constitutes infringement would "fundamentally change[] the nature of interactions across the [I]nternet." Opposition at p. 11. However, what Defendants fail to consider is that outside of the Ninth Circuit, the majority of courts to address embedding already consider the practice to be infringing. While the Tenth Circuit has yet to pass on the issue, should this Court follow the majority rule it would not "fundamentally" alter the functionality of the Internet since the practice of embedding is already illegal in many jurisdictions, and has been for some time.

Finally, Defendants posit that embedding actually benefits copyright owners because the hosted location is "easily identifiable" rendering a DMCA take down notification more effective and because, at least in this case, "the users provided attribution[4]." This argument is nonsensical because the source of a photograph that was displayed via embedding is not necessarily any more or less "easily identifiable" than a photograph that is stored directly on the website's own server. Additionally, the DMCA process would not necessarily be more streamlined because in many cases neither the content host or the embedding party comply with (or care to comply with) DMCA procedures, especially if one or both is located outside the United States. Additionally, it may be the case that the host of the content is authorized by the copyright holder whereas the embedding party is not. Thus, if embedding were to be considered non-infringing, a website could simply "piggyback" off of a licensed use by embedding on to their own website while avoiding having to seek a license.

In short, the practice of embedding is not a defense to infringement. As the pleadings concede, the Star Wars Photographs were displayed on Defendants' website notwithstanding that they were displayed as the result of embedding. Because such practice violated Trunk Archive's

---

[4] Defendants' admission that the Star Wars Photographs contained attribution is remarkable in that it likely demonstrates that Defendants had "red flag" knowledge which would disqualify it for safe harbor protection. *See* 17 U.S.C. § 512(c)(1)(A)(ii); *see also Columbia Pictures Indus. v. Gary Fung*, 710 F.3d 1020, 1043 (9th Cir. 2013). Furthermore, "acknowledgment does not in itself excuse infringement." *Narell v. Freeman*, 872 F.2d 907, 914 (9th Cir. 1989)

5

right to publicly display the Star Wars Photographs, judgment on the pleadings should be granted in favor of Trunk Archive.

### B. The singular district court case relied upon of Defendants is distinguishable.

As Defendants conceded in their Opposition, the Tenth Circuit has not passed on the question of embedding, and thus there is no binding precedent requiring this Court to adhere to the "server test." As support for their position, Defendants cite a single non-binding district court case, *Grady v. Iacullo*, 2016 U.S. Dist. LEXIS 51584, 2016 WL 1559134 (D. Colo. Apr. 18, 2016) for the proposition that the "server test" is applied in the Tenth Circuit. However, the unique procedural posture of *Grady* makes its application distinguishable to this case.

*Grady* arose from an appeal of a Report and Recommendation by a Magistrate Judge granting summary judgment. At issue in *Grady* was whether the defendant violated the plaintiff's right to reproduce and distribute certain photographs and video -- the right of public display was not implicated. Id. at *12, fn. 6 ("In the complaint, plaintiff alleges that defendant violated his exclusive rights to reproduce and distribute. . . both exclusive rights require that a plaintiff prove that "copies" were either reproduced or distributed, 17 U.S.C. § 106(1), (3), which, as discussed *infra*, is the main source of dispute in this case."); *Goldman*, 302 F. Supp. 3d at 592 ("In [*Grady*] the court considered the exclusive reproduction and distribution rights.").

In the original Report and Recommendation, the Magistrate Judge found that the defendant's "sharing of links to plaintiff's photographs and videos with other users of a website constituted copyright infringement." *Grady,* at *7. Citing *Perfect 10*, The defendant objected on the basis that "sharing" links did not violate the plaintiff's reproduction or distribution rights because he never actually copied the works on his computer. *Id.* at *13. After determining that, under *Perfect 10*, the plaintiff needed to show actual copying to implicate the reproduction and distribution rights at issue, the *Grady* court reopened discovery to allow the plaintiff to determine whether copyright had actually occurred. *Id.* at *22-26.

6

At issue in this case is whether the practice of embedding violates Trunk Archive's right to *publicly display* the Star Wars Photographs, and not whether embedding violates the r*eproduction* and *distribution* rights at issue in *Grady*. This distinction is critical because, as explained in Section I.A *supra*, physical possession is required to violate the reproduction and distribution rights, but is not required to violate the display right. Thus, the *Grady* court's application of the "server test" is inapposite because *Grady* did not consider the "server test" in connection with the display right, which is what is implicated in this case.

Because the reasoning in *Grady* is not applicable to this case, this Court should follow the reasoning of the myriad of court that have considered, and rejected, the application of the "server test" to embedded content that violates the display right. Thus, judgment on the pleadings should be entered in favor of Trunk Archive.

## II. BECAUSE THERE WAS NO STORAGE AT THE DIRECTION OF USERS, DEFENDANTS DO NOT QUALIFY FOR DMCA SAFE HARBOR

In its Opposition, Defendants do not dispute Trunk Archive's argument that they do not qualify for the "transitory digital network" safe harbor (17 U.S.C. § 512(a)), the "system caching" safe harbor (17 U.S.C. § 512(b)), or the "information location tools" safe harbor (17 U.S.C. § 512(d)). As such, the Court may properly enter judgment on the pleadings as to these three safe harbors. Rather, Defendants focus solely on the safe harbor that protects against "information residing on systems or networks at direction of users." 17 U.S.C. § 512(c).

According to the plain language of the statute, Defendants must show two elements in order to invoke this safe harbor. Assuming that the other statutory prerequisites[5] are met, Defendants must demonstrate the offending material "resides on a system or network controlled or operated by or for the service provider" and that the material was "stor[ed] at the direction of a user." 17 U.S.C. § 512(c).

---

[5] Although it disputes the factual accuracy of the pleadings, Trunk Archive concedes that Defendant CBM has properly pled that it is a "service provider" and that co-Defendants Cassidy and Wilding are "users" for purposes of the §512(c) safe harbor.

In Opposition, Defendants cite to three cases for the proposing that the §512(c) safe harbor is not limited to literal "storage" activities; *UMG Recordings, Inc. v. Veoh Networks, Inc.,* 620 F. Supp. 2d 1081 (C.D. Cal. 2008) ("*UMG*"); *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008) ("*Io Group*"); and *Viacom Int'l, Inc. v. YouTube, Inc.,* 718 F. Supp. 2d 514, 516 (S.D.N.Y. 2010) ("*Viacom I*"). Contrary to the Opposition's assertion, Trunk Archive agrees that the §512(c) safe harbor encompasses more than mere "storage" activities, however Trunk Archive disagrees that §512(c) encompasses the embedding practices alleged by Defendants in the pleadings. As discussed below, the guiding principles articulated in *UMG*, *Io Group*, and *Viacom I*, clearly demonstrate that the embedding alleged in the pleadings, standing alone, falls outside the scope of the §512(c) safe harbor.

To start, the court in *Viacom I*, articulated the guiding principle that infringing activities are only covered by the §512(c) safe harbor "when they flow from the material's placement on the provider's system or network." *Viacom I,* 718 F. Supp. 2d at 526. Logically, the inverse must also be true: activities that do not flow from a user's placement of materials on the service provider's system or network do not fall within the scope of DMCA safe harbor protection. As the court in *Viacom I* explained:

> To the extent defendants' activities go beyond what can fairly be characterized as meeting the above-described collateral scope of "storage" and allied functions, and present the elements of infringements under existing principles of copyright law, they are not facially protected by § 512(c). Such activities simply fall beyond the bounds of the safe harbor and liability for conducting them must be judged according to the general law of copyright infringement. That follows from the language of § 512(c)(1) that 'A service provider shall not be liable . . . for infringement of copyright by reason of the storage . . . .'

*Viacom I*, 718 F. Supp. 2d at 527 (S.D.N.Y. 2010) judgment affirmed at *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 42 (2d Cir. 2012) ("The District Court correctly held that three of the challenged YouTube software functions—replication, playback, and the related videos feature— occur 'by reason of the storage at the direction of a user' within the meaning of 17 U.S.C. § 512(c)(1), and the judgment is AFFIRMED insofar as it so held; the cause is REMANDED for

8

further fact-finding regarding a fourth software function, involving the syndication of YouTube videos to third parties.") ("*Viacom II*").

This principle also comports with the express statutory language that the § 512(c) safe harbor only applies to infringing acts that occur "*by reason of* the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(c). The language "by reason of" indicates that while the §512(c) safe harbor is not limited solely to literal acts of storage, a predicate act of user storage is required for the safe harbor to apply at all. Thus, where there is an initial act of user directed storage of material on the system or network controlled by or for the service provider, the service provider may still invoke the protections of the §512(c) safe harbor if it engages in certain non-storage related acts that flow therefrom. In contrast, where the predicate act of user directed storage on the service provider's system or network is not present, the material at issue falls outside the scope of the §512(c) safe harbor and is subject to general principles of copyright law.

This principle articulated in *Viacom I* can also be found in the decisions *UMG* and *Io Group* cases. In both cases[6] it was not disputed that users initially uploaded content to be stored directly on the defendant's website. *UMG*, 620 F. Supp. 2d at 1083 ("UMG does not dispute that the initial storage of the uploaded files is accomplished at the direction of users."); *Io Group*, 586 F. Supp. 2d at 1138 (describing the process by which users upload content directly to the defendant's website.). Rather, at issue in *UMG* and *Io Group* was the defendant's automated process of converting user uploaded content into flash files and screencaps – acts over which users had no participation or control. *Ibid.* Thus, while the acts at issue in those cases were not strictly user facilitated storage activities, the acts were nonetheless protected by the §512(c) safe harbor because it was not disputed that the material was initially uploaded by users or that the material was stored "on a system or network controlled or operated by" the defendant.

---

[6] Both *UMG* and *Io Group* involved the same defendant, Veoh Networks, and both cases were decided within four months of each other. As such, the functionality of the technology at issue in both cases is identical.

9

In contrast to *Viacom I*, *UMG* and *Io Group*, the pleadings in this case clearly state that the Star Wars Photographs "were displayed on CBM's website by embedding the image and linking back *to a third-party server that was not owned or controlled by CBM*" and that the Star Wars Photographs "*are not and were not stored* on servers belonging to or controlled by CBM or Nathan Best." Counterclaim ¶¶ 23-24 (emphasis added). In addition to being stored on third-party servers outside of Defendant's operation and control, the pleadings do not even suggest that the Star Wars Photographs were stored on those third-party servers at the direction of one of Defendants' users. Thus, the pleadings expressly show that Defendants cannot establish the requisite predicate act of storage of the Star Wars Photographs "on a system or network controlled or operated by" Defendants at the direction of one of Defendants' users required to invoke the §512(c) safe harbor.

Defendants also suggest that if Trunk Archive's arguments were to be adopted it would create a "gap" in the DMCA safe harbor scheme. However, Defendants' concerns are overblown. A finding that Defendants are not protected by the DMCA does not necessarily mean Defendants are infringers. The DMCA does not supplant common law principles of liability, and a finding that such a protection is unavailable does not necessarily mean that liability for infringement on the system is proper. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1039-40 (9th Cir. 2013). Thus, while Defendants might not qualify for wholesale safe harbor protection, they are nonetheless entitled to advance any additional defenses[7] to copyright infringement that may apply.

Thus, judgment on the pleadings should be entered in favor of Trunk Archive as to Defendants' DMCA defense.

### III.  CONCLUSION

In conclusion, Plaintiff Great Bowery Inc. d/b/a Trunk Archive respectfully requests that the Court enter partial judgment on the pleadings as to Defendant CBM and Best's "embedding" defense, and as to their defense under each of the four DMCA safe harbor provisions.

---

[7] Defendants asserted 22 affirmative defenses in their Answer.

Dated: January 31, 2023　　　　　　　　　　Respectfully submitted,

**/s/ Mathew K. Higbee**
Mathew K. Higbee, SBN 11133
**HIGBEE & ASSOCIATES**
(714) 617-8373
mhigbee@higbee.law

**/s/ Ryan E. Carreon**
Ryan E. Carreon, *pro hac vice*
**HIGBEE & ASSOCIATES**
(714) 617-8373
rcarreon@higbee.law
*Attorneys for Plaintiff Trunk Archive*