THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| GREAT BOWERY d/b/a TRUNK ARCHIVE,<br><br>　　　　　　　　Plaintiff,<br><br>v.<br><br>BEST LITTLE SITES d/b/a www.comicbookmovie.com; NATHAN BEST; MARK CASSIDY; and JOSHUA WILDING,<br><br>　　　　　　　　Defendants. | **MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART PLAINTIFF'S [72] MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS AND DENYING [80] DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Case No. 2:21-cv-00567-DBB-JCB<br><br>District Judge David Barlow |

Before the court are two motions for judgment on the pleadings. Plaintiff Great Bowery, doing business as Trunk Archive ("Trunk Archive"), moves for partial judgment on the pleadings as to the counterclaim filed by Defendants Best Little Sites, doing business as comicbookmovie.com ("CBM"), and Nathan Best ("Mr. Best") (collectively "CBM Defendants").[1] CBM Defendants, Mark Cassidy ("Mr. Cassidy"), and Joshua Wilding ("Mr. Wilding") (collectively "Defendants") move for judgment on the pleadings.[2] Having considered the briefing and relevant law, the court finds that oral argument would not materially assist the court in reaching a decision.[3] For the reasons below, the court denies in part and grants in part Trunk Archive's motion and denies Defendants' motion.

---

[1] Mot. for Partial J. on the Pleadings ("Trunk Archive Mot. for J."), ECF No. 72, filed Nov. 29, 2022.
[2] Defs. Mot. for J. on the Pleadings ("Defs. Mot. for J."), ECF No. 80, filed Feb. 1, 2023.
[3] *See* DUCivR 7-1(g).

## BACKGROUND

Trunk Archive represents certain photographers.[4] It licenses their photographs and images.[5] CBM operates a website where third-party users create and post articles.[6] CBM does not direct users as to article content, quality, or timing.[7] The site has a copyright policy that allows users to submit DMCA ("Digital Millennium Copyright Act") take-down requests.[8] It also contains community guidelines that prohibit the posting of infringing content.[9] Users must consent to these policies before posting.[10]

At issue are eighteen photographs taken by Annie Leibovitz ("Ms. Leibovitz").[11] The photographs originally appeared in the publication *Vanity Fair*.[12] Ms. Leibovitz granted Trunk Archive the exclusive right to license the photographs.[13] In February 2019, Trunk Archive discovered articles on CBM's website containing unlicensed copies of the photographs.[14] Trunk Archive asserts that CBM paid Mr. Cassidy and Mr. Wilding to create these articles.[15] It also asserts that Mr. Best "has the ability to supervise and control [site] content."[16]

---

[4] Answer & Countercl. ("Countercl.") 15–16, ECF No. 49, filed June 23, 2022; Compl. ¶¶ 12–13, ECF No. 2, filed Sept. 27, 2021.
[5] Compl. ¶ 13.
[6] Countercl. 16.
[7] *Id.* at 17.
[8] *Id.* The safe harbor provision of the DMCA "absolves an Internet Service Provider . . . of liability for infringing material posted by a user as long as the [provider] takes down the allegedly infringing copyrighted material in response to a notice of claimed infringement." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1069 n.1 (10th Cir. 2008).
[9] Countercl. 17.
[10] *Id.*
[11] *Id.* at 17–18.
[12] Compl. ¶ 21.
[13] *Id.* ¶¶ 22–24.
[14] *Id.* ¶¶ 57–72.
[15] *Id.* ¶ 76.
[16] *Id.* ¶ 30.

CBM Defendants assert that neither CBM nor Mr. Best directed anyone to post the images ("Subject Images") on the website.[17] The Subject Images were not "stored on servers belonging to or controlled by CBM or [Mr.] Best."[18] They "were displayed on CBM's website by embedding the image[s] and linking back to a third-party server that was not owned or controlled by CBM."[19] Mr. Best and CBM disclaim actual knowledge that the Subject Images were allegedly infringing or even posted to the website until they received notice of the litigation.[20] CBM removed the images once the instant litigation began.[21]

On September 27, 2021, Trunk Archive filed its Complaint.[22] CBM Defendants filed their Answer and Counterclaim on June 23, 2022.[23] Trunk Archive moved to dismiss the counterclaim and strike certain affirmative defenses.[24] The court granted in part and denied in part the motion on October 13, 2022.[25] On November 29, 2022, Trunk Archive filed an answer and its Motion for Judgment on the Pleadings.[26] CBM Defendants filed an opposition on January 17, 2023,[27] and Trunk Archive replied on January 31, 2023.[28] On February 1, 2023, Defendants filed their Motion for Judgment on the Pleadings.[29] Trunk Archive responded on February 2, 2023.[30] Defendants filed their reply one week later.[31]

---

[17] Countercl. 18.
[18] *Id.*
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *See* Compl.
[23] *See* Countercl.
[24] ECF No. 52; ECF No. 58.
[25] ECF No. 70.
[26] Trunk Archive Mot. for J.
[27] Opp'n to Mot. for Partial J. on the Pleadings ("CBM Defs. Opp'n"), ECF No. 78, filed Jan. 17, 2023.
[28] Reply in Support of Mot. for Partial J. on the Pleadings ("Trunk Archive Reply"), ECF No. 79, filed Jan. 31, 2023.
[29] *See* Defs. Mot. for J.
[30] Opp'n to Mot. for J. on the Pleadings ("Trunk Archive Opp'n"), ECF No. 81, filed Feb. 2, 2023.
[31] Defs. Reply in Support of Mot. for J. on the Pleadings ("Defs. Reply"), ECF No. 82, filed Feb. 9, 2023.

## STANDARD

Rule 12(c) of the Federal Rules of Civil Procedure permits a party to move for judgment on the pleadings after pleadings are closed.[32] The motion "should not be granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to judgment as a matter of law."[33] Such a motion is evaluated by "the same standard that applies to a Rule 12(b)(6) motion" to dismiss for failure to state a claim.[34] The "[p]laintiff must provide 'enough facts to state a claim to relief that is plausible on its face[.]'"[35] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"[36] "[A]ll well-pleaded factual allegations, as distinguished from conclusory allegations, are accepted as true and viewed in the light most favorable to . . . the nonmoving party."[37]

## DISCUSSION

The parties collectively raise three issues. Trunk Archive moves for partial judgment on the pleadings as to CBM Defendants' affirmative defenses of "embedding" and the DMCA safe harbor provision. For their part, Defendants move for judgment on the pleadings on Trunk Archive's copyright infringement claim. The court addresses each issue in order.

---

[32] *See* Fed. R. Civ. P. 12(c).
[33] *Colony Ins. v. Burke*, 698 F.3d 1222, 1228 (10th Cir. 2012) (citation omitted).
[34] *Crane v. Utah Dep't of Corr.*, 15 F.4th 1296, 1302 (10th Cir. 2021) (citation omitted).
[35] *NHN Holdings, LLC v. U.S. Small Bus. Admin.*, No. 2:22-cv-00647, 2023 WL 22229, at *1 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).
[36] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).
[37] *Imaginarium LLC v. United States Small Bus. Admin.*, 618 F. Supp. 3d 1225, 1229 (D. Utah 2022) (citing *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997)).

4

**I.    "Embedding" Affirmative Defense**

Trunk Archive moves for judgment on the pleadings on CBM Defendants' "embedding" affirmative defense. "Embedding allows a website coder to incorporate content, such as an image, that is located on a third-party's server, into the coder's website."[38] When a user "visits a website that includes an 'embed code,' the user's internet browser is directed to retrieve the embedded content from the third-party server and display it on the website."[39] "As a result of this process, the user sees the embedded content on the website, even though the content is actually hosted on a third-party's server, rather than on the server that hosts the website."[40]

Trunk Archive argues that since the act of displaying a work publicly means to "transmit or communicate a display to the public,"[41] "each unauthorized showing of a work through a computer infringes on the owner's right of public display."[42] It likens the act of embedding to an intentional process where the images are communicated to users "via a seamlessly integrated webpage program."[43] As such, the mere fact that CBM embedded the images—instead of uploading them from their own servers—is not determinative of whether the images were "publicly displayed."[44] Trunk Archive contends that the court should focus on the "practical functional perspective"—the display of copyrighted images—instead of letting an "embedding" "hyper[-]technical loophole" excuse liability.[45]

---

[38] *McGucken v. Newsweek LLC*, No. 19 Civ. 9617, 2022 WL 836786, at *2 n.2 (S.D.N.Y. Mar. 21, 2022) (citation omitted).

[39] *Id.* (citation omitted).

[40] *Id.* (citation omitted).

[41] Trunk Archive Mot. for J. 6 (emphasis removed) (citing 17 U.S.C. § 101).

[42] *Id.* at 5 (emphasis removed).

[43] *Id.* at 6 (emphases removed).

[44] *Id.*

[45] *Id.* at 7–8.

In response, CBM Defendants cite the "server" test as set forth in *Perfect 10, Inc. v. Google, Inc.* and later affirmed by the Ninth Circuit.[46] In *Perfect 10*, the Ninth Circuit addressed whether Google's unauthorized display of thumbnail and full-sized images violated the copyright holder's rights. The court first defined an image as a work "that is fixed in a tangible medium of expression . . . when embodied (i.e., stored) in a computer's server (or hard disk, or other storage device)."[47] The court defined "display" as an individual's action "to show a copy . . . , either directly or by means of a film, slide, television image, or any other device or process . . . ."[48] "The image stored in the computer is the 'copy' of the work for purposes of copyright law."[49] Thus, the "computer owner shows a copy 'by means of a . . . device or process' when the owner uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer."[50] Importantly, "the owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner inline links to or frames the electronic information."[51] Simply put, if a party displayed a copyrighted image that it had stored on its own systems, then it had infringed; if it displayed an image by merely linking or framing content from other websites, then it had not infringed.

The Ninth Circuit found that Google infringed with the thumbnail images because Google's computers had stored copies of Perfect 10's images and then communicated the copies

---

[46] *Perfect 10, Inc. v. Google, Inc.*, 416 F. Supp. 2d 828, 843–44 (C.D. Cal. 2006), *aff'd in part, rev'd in part, remanded in part, Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146 (9th Cir. 2007).
[47] *Perfect 10*, 508 F.3d at 1160 (internal quotation marks omitted).
[48] *Id.* (quoting 17 U.S.C. § 101).
[49] *Id.*
[50] *Id.* (quoting 17 U.S.C. § 101).
[51] *Id.* at 1159.

to users.[52] But Google had not displayed copies of the full-size images when it merely framed inline linked images appearing on the users' screens.[53] The court reasoned that Google had only provided HTML instructions that "direct a user's browser to a website publisher's computer that stores the full-size photographic images."[54] Google had not stored the images. "[T]he owner of a computer that does not store and serve the electronic information to a user is not displaying that information, even if such owner inline links to or frames the electronic information."[55] "[S]uch assistance . . . does not constitute direct infringement of the copyright owner's display rights."[56] By the same token, CBM Defendants contend that the "server" test applies here.

Addressing the "server" test, Trunk Archive argues that a party could still be liable for infringement through the process of embedding. It contends that the Copyright Act does not require physical possession to violate the Act's "display" right. In consequence, a requirement for a party to have stored the images before infringement would turn the "display" right into a subset of the "reproduction" right.[57] Trunk Archive argues that Congress did not intend to "'freeze the scope of copyrightable technology' to then-existing methods of expression."[58] In essence, it contends that it is immaterial whether a provider displays an image by embedding it or by uploading it from its own server.[59]

---

[52] *Id.* at 1160.
[53] *Id.*
[54] *Id.*
[55] *Id.* at 1159.
[56] *Id.* at 1161.
[57] Trunk Archive Reply 2.
[58] *Id.* (quoting *McGucken*, 2022 WL 836786, at *14–15).
[59] *Id.* at 3 (citing *ABC, Inc. v. Aereo, Inc*., 573 U.S. 431, 444 (2014)).

The relevant facts are not in dispute. CBM Defendants did not store the Subject Images on servers that they owned or controlled.[60] They "embed[ed] the image[s] and link[ed] back to a third-party server."[61] The question is whether CBM Defendants' act of embedding provides a defense to their liability. If the "server" test applies, the "embedding" affirmative defense survives Trunk Archive's motion for judgment on the pleadings.[62] If not, then the defense fails as a matter of law. The parties agree that there is no controlling authority.[63] The court must therefore determine whether the Ninth Circuit's "server" test is persuasive.

The Ninth Circuit considers the "server" test settled law.[64] Other circuit courts have upheld the test or acknowledged it for its proposition that infringement arises when copies were loaded onto a computer server and then posted.[65] In particular, the Seventh Circuit overturned a district court that declined to apply *Perfect 10*. The lower court had distinguished users' selection and submission of videos for "inline linking/embedding" from Google's automated process of inline linking.[66] It reasoned that "a website's servers need not actually store a copy of a work in

---

[60] Countercl. 18.

[61] *Id.*

[62] *Id.* at 12 (Affirmative Def. No. 12).

[63] *See* Trunk Archive Mot. for J. 4–8 (not citing any Tenth Circuit case); Trunk Archive Reply 1–6, (same); CBM Defs. Opp'n 7–9 (citing a District of Colorado case approving of the "server" test and other circuit cases).

[64] *See, e.g.*, *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1072–73 (9th Cir. 2021). One California district court has questioned the "server" test. *See Free Speech Sys., LLC v. Menzel*, 390 F. Supp. 3d 1162, 1172 (N.D. Cal. 2019) (noting that the parties had cited no cases applying *Perfect 10* outside of the search engine context). The issue is on appeal to the Ninth Circuit in two cases. *See Miller v. 4Internet, LLC*, No. 2:18-cv-02097, 2022 WL 2438815 (D. Nev. July 5, 2022), *appeal filed*, Aug. 9, 2022; *Hunley v. Instagram*, No. 21-cv-03778, 2022 WL 298570 (N.D. Cal. Feb. 1, 2022), *appeal filed*, Mar. 1, 2022.

[65] *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 757–58 (7th Cir. 2012) (Posner, J.); *Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 698 F.3d 29, 55 (1st Cir. 2012). Other circuits have tied infringement to possession. *See Quantum Sys. Integrators, Inc. v. Sprint Nextel Corp.*, 338 F. App'x 329, 336–37 (4th Cir. 2009) (unpublished); *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 127–29 (2d Cir. 2008); *Stenograph L.L.C. v. Bossard Assoc.*, 144 F.3d 96, 101–02 (D.C. Cir. 1998); *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 235–36 (7th Cir. 1995).

[66] *Flava Works, Inc. v. Gunter*, No. 10 C 6517, 2011 WL 3876910, at *3 (N.D. Ill. Sept. 1, 2011), *vacated by Flava Works*, 689 F.3d 754.

order to 'display' it."[67] The Seventh Circuit reversed. It found that the video's uploader had potentially infringed—not the provider who simply "provide[d] a connection between the server that host[ed] the video" and the user's computer.[68] The court noted that the provider's action "[wa]s a bad thing to do . . . [,] but it [wa]s not copyright infringement" because the provider had not copied the video onto its system.[69]

Several district courts have endorsed the test including one from this circuit.[70] In *Grady v. Iacullo*, the District of Colorado addressed whether a defendant's sharing of links to a copyright holder's photographs and videos was infringement. The defendant argued that he never possessed the images or videos and so he had not infringed pursuant to the "server" test.[71] The court declined to adopt the copyright holder's invitation to distinguish *Perfect 10*, concluding that "[t]he problem for plaintiff is that merely because defendant, in some manner, shared plaintiff's photographs and videos does not necessarily mean that defendant copied the same in a way that infringes plaintiff's copyrights."[72] "[P]laintiff was required to present some evidence that its photographs and videos were placed on defendant's computer . . . ."[73] Here, Trunk Archive tries to minimize *Grady* because that case related to a party's right to reproduce and distribute images and video—not the right to display publicly.[74] But even if the facts in *Grady*

---

[67] *Id.* at *4.
[68] *Flava Works*, 689 F.3d at 757.
[69] *Id.*
[70] *See Bell v. Merchants Bank of Indiana*, 456 F. Supp. 3d 1046, 1050 (S.D. Ind. 2020); *MidlevelU, Inc. v. ACI Info. Grp.*, No. 18-80843, 2019 WL 7371835, at *4 (S.D. Fla. Sept. 10, 2019); *Microsoft Corp. v. Softicle.com*, No. 16-2762, 2017 WL 5517379, at *2 (D.N.J. Sept. 29, 2017); *Grady v. Iacullo*, No. 13-cv-00624, 2016 WL 1559134, at *7 (D. Colo. Apr. 18, 2016).
[71] *Grady*, 2016 WL 1559134, at *4.
[72] *Id.* at *7.
[73] *Id.*
[74] Trunk Archive Reply 6.

implicated "reproduction" or "distribution" rights, the court cited favorably the "server" test, which does pertain to the "display" right.[75]

To be sure, some district courts have questioned the "server" test's applicability to embedding. In *Goldman v. Breitbart News Network LLC*, the court found that embedding a Tweet onto a website was infringement. Distinguishing *Perfect 10*, the court noted that the "defendant itself took active steps to put a process in place that resulted in a transmission of the photos so that they could be visibly shown."[76] The court in *Leader's Institute, LLC v. Jackson* also rejected the "server" test. In *Jackson*, the defendant's website directed a user's browser to display the copyright holder's website; the defendant did not have reproductions of the copyrighted material. Even so, the court found that the defendant "displayed [the copyright holder]'s content as if it were its own."[77] The court compared the defendant's actions to a person live-streaming a movie in a theater without permission.[78] The Southern District of New York has also found that *Perfect 10* does not apply to embedding.[79] In *Nicklen v. Sinclair Broadcasting Group, Inc.*, the court reasoned that the "server" test applied only for search engines where users could see an image once they clicked a hyperlink.[80] The court concluded that to "'show a copy' is to display it[,]" even if a party did not store it.[81]

Notwithstanding those decisions, the parties have not cited and the court cannot find any appellate authority rejecting the Ninth Circuit's "server" test. *Perfect 10* offers a straightforward,

---

[75] *See Perfect 10*, 508 F.3d at 1159–62 (discussing the "server" test in the context of the "display" right).

[76] *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 594 (S.D.N.Y. 2018).

[77] *Leader's Inst., LLC v. Jackson*, No. 14-cv-3572, 2017 WL 5629514, at *11 (N.D. Tex. Nov. 22, 2017).

[78] *Id.*

[79] *McGucken*, 2022 WL 836786, at *6; *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y. 2021).

[80] *Nicklen*, 551 F. Supp. 3d at 195.

[81] *Id.*

bright-line test for determining whether images displayed on a website violate the Copyright Act. Applied here, if the Subject Images were not stored on CBM Defendants' servers or on servers that they controlled, then CBM Defendants have a possible defense to infringement.

The court is not persuaded by Trunk Archive's arguments to reconsider the "server" test as to embedding in light of statutory text and legislative history.[82] In *Perfect 10*, the court concluded that "based on the plain language of the [Copyright Act], a person displays a photographic image by using a computer to fill a computer screen with a copy of the photographic image fixed in the computer's memory."[83] The court found that Google had infringed the plaintiff's display right when it stored versions of the plaintiff's copyrighted images.[84] Yet Google had not infringed when it framed inline linked images that were displayed on users' computer screens.[85] The court reasoned that Google did "not have any 'material objects . . . in which a work is fixed . . . and from which the work c[ould] be perceived, reproduced, or otherwise communicated' and thus c[ould not] communicate a copy."[86] Applying the court's logic here, the images were not stored on CBM Defendants' systems. They were fixed on a third-party server and displayed on users' computer screens. For this reason, the "display" of the images on CBM's website—even through the process of embedding—did not automatically create infringement.

---

[82] *See* Trunk Archive Reply 2 ("Congress did 'not intend . . . to freeze the scope of copyrightable technology' to then-existing methods of expression." (quoting *McGucken*, 2022 WL 836786, at *6)).

[83] *Perfect 10*, 508 F.3d at 1160; *see also Logan v. Meta Platforms, Inc.*, No. 22-cv-01847, 2022 WL 14813836, at *4–5 (N.D. Cal. Oct. 25, 2022) (citing favorably *Perfect 10*); *Hunley*, 2022 WL 298570, at *2 (same).

[84] *Perfect 10*, 508 F.3d at 1160.

[85] *Id.*

[86] *Id.* at 1160–61 (quoting 17 U.S.C. § 101).

Trunk Archive offers several policy rationales it believes undermine the "server" test. It argues that by "exploiting th[e] hyper[-] technical loophole [of embedding], websites . . . would be able to retain all benefits of placing desirable copyrighted content on [their] Website[s,] . . . all the while avoiding legal liability."[87] It claims that "practically every court outside the Ninth Circuit (and even some within) have expressed doubt that the use of embedding is a defense to infringement."[88] Next, it argues that embedding is different from linking and protection exists regardless of whether images are linked, embedded, or uploaded. As to a concern about widespread infringement claims, Trunk Archive notes that DMCA only protects service providers and that CBM Defendants' "DMCA arguments are misplaced since this part of [the] argument has nothing to do with Defendants' DMCA defense."[89] It also contends that treating embedding as infringement would not fundamentally alter how the Internet works.[90] Last, Trunk Archive argues that "if embedding were to be considered non-infringing, a website could simply 'piggyback' off of a licensed use by embedding on to their own website while avoiding having to seek a license."[91]

In response, CBM Defendants describe embedding images as a "standard method for showing images on the internet [that] has been widely used for decades."[92] They argue that the copyright owner still holds the exclusive right to display their work; the owner should not be able to allow other sites to freely link to his work and then demand payment from all who have seen the images. Next, CBM Defendants discount Trunk Archive's slippery slope argument. They

---

[87] Trunk Archive Mot. for J. 8.
[88] Trunk Archive Reply 4–5.
[89] *Id.* at 4.
[90] *Id.* (quoting CBM Defs. Opp'n 11).
[91] *Id.*
[92] CBM Defs. Opp'n 10.

note that a copyright owner could seek relief even against individuals and servers. CBM

Defendants contend that equating all inline linking to infringement would "expose[] countless

contributors to unsuspecting copyright infringement."[93] And they argue that the inline linking, as

opposed to individual uploads, makes it easier for the copyright owner to enforce copyright law.

The court finds Trunk Archive's policy arguments insufficient to put aside the "server"

test. Contrary to Trunk Archive's claims, "practically every court outside the Ninth Circuit" has

*not* "expressed doubt that the use of embedding is a defense to infringement."[94] *Perfect 10*

supplies a broad test. The court did not limit its holding to search engines or the specific way that

Google utilized inline links.[95] Indeed, Trunk Archive does not elucidate an appreciable

difference between embedding technology and inline linking.[96] "While appearances can slightly

vary, the technology is still an HTML code directing content outside of a webpage to appear

seamlessly on the webpage itself."[97] The court in *Perfect 10* did not find infringement even

though Google had integrated full-size images on its search results.[98] Here, CBM Defendants

also integrated (embedded) the images onto their website.

Besides, embedding redirects a user to the source of the content—in this case, an image

hosted by a third-party server. The copyright holder could still seek relief from that server. In no

---

[93] *Id.* at 11.

[94] Trunk Archive Reply 4. In support of this claim, Trunk Archive cites to the Southern District of New York, the Northern District of Texas, and the Northern District of Illinois. But at least two courts outside of the Ninth Circuit have endorsed the "server" test. *See Flava Works*, 689 F.3d at 757–58 ("But unless those visitors copy the videos they are viewing on the infringers' websites, myVidster isn't increasing the amount of infringement."); *Grady*, 2016 WL 1559134, at *5 (reasoning that the "plaintiff was required to present some evidence that its photographs and videos were placed on defendant's computer").

[95] *See Perfect 10*, 508 F.3d at 1159.

[96] *See* Cheng Lim Saw, *Linking on the Internet and Copyright Liability—A Clarion Call for Doctrinal Clarity and Legal Certainty*, 49 Int. Rev. Intell. Prop. Compet. L., 536, 538 (2018).

[97] Michael P. Goodyear, *The Server Test Quandary and Embedding Permission Culture*, 75 Okla. L. Rev. 263, 288 (2023); *see Perfect 10*, 508 F.3d at 1161.

[98] *Perfect 10*, 508 F.3d at 1157.

way has the holder "surrender[ed] control over how, when, and by whom their work is subsequently shown."[99] To guard against infringement, the holder could take down the image or employ restrictions such as paywalls.[100] Similarly, the holder could utilize "metadata tagging or visible digital watermarks to provide better protection."[101]

In sum, Trunk Archive has not persuaded the court to ignore the "server" test. Without more, the court cannot find that CBM Defendants are barred from asserting the "embedding" defense. The court denies in part Trunk Archive's motion for partial judgment on the pleadings.

## II.    "Safe Harbor" Affirmative Defense

Trunk Archive next argues that CBM Defendants cannot utilize the DMCA safe harbor affirmative defense. "The DMCA established four safe harbors to 'provide protection from liability for: (1) transitory digital network communications; (2) system caching; (3) information residing on systems or networks at the direction of users; and (4) information location tools.'"[102]

CBM Defendants assert that the safe harbor provision bars Trunk Archive's claims "because . . . CBM is a service provider and the accused content was posted, stored, transmitted, or otherwise made available at the direction of a user."[103] In their opposition, CBM Defendants

---

[99] Trunk Archive Reply 2.
[100] *See* Jane C. Ginsburg & Luke Ali Budiardjo, *Embedding Content or Interring Copyright: Does the Internet Need the "Server Rule"?*, 42 Colum. J.L. & Arts 417, 425 (2019). A paywall is a method by which a site requires users to pay to access full content. *See* Andrew Steele, *Is It Reasonable to Block Unreasonable Advertisements? An Examination of the Legality of Ad-Blockers*, 37 Cardozo Arts & Ent. L.J. 835, 837 (2019).
[101] Goodyear, *supra* note 97, at 296.
[102] *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1052 (9th Cir. 2017) (citation omitted); 17 U.S.C. § 512(a)–(d).
[103] Countercl. 11 (Affirmative Def. No. 5).

address only 17 U.S.C. § 512(c)—"information residing on systems or networks at direction of users."[104] As such, they have effectively conceded the other three safe harbor defenses.[105]

"To be eligible at the threshold for the § 512(c) safe harbor, a service provider must show that the infringing material was stored 'at the direction of the user.'"[106] "If it meets that threshold requirement, the service provider must then show that (1) it lacked actual or red flag knowledge of the infringing material; and (2) it did not receive a 'financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity.'"[107] "Because the § 512(c) safe harbor is an affirmative defense, [CBM Defendants] must establish beyond controversy every essential element, and failure to do so will render [them] ineligible for the § 512(c) safe harbor's protection."[108]

Trunk Archive contends that the Subject Images were not stored on a "system or network controlled or operated by or for the service provider."[109] CBM Defendants respond that the relevant safe harbor provision protects more than just those who store copyrighted material.[110] In particular, protection ostensibly extends to collateral functions such as providing access, transmission, routing, or connections.[111]

---

[104] 17 U.S.C. § 512(c); *see* CBM Defs. Opp'n 12 ("CBM's Website . . . falls squarely within the User-Generated Content safe harbor . . . .").

[105] *See David v. Midway City*, No. 2:20-cv-00066, 2021 WL 6930939, at *16 (D. Utah Dec. 14, 2021), *appeal dismissed*, No. 22-4009, 2022 WL 3350513 (10th Cir. Aug. 3, 2022) (citation omitted) ("Failure to respond to arguments in opposition Memorandum means that non-movant has conceded those matters.").

[106] *Mavrix Photographs*, 873 F.3d at 1052 (quoting 17 U.S.C. § 5129(c)).

[107] *Id.* (quoting 17 U.S.C. § 512(c)).

[108] *Id.* (internal quotation marks omitted).

[109] 17 U.S.C. § 512(c)(1).

[110] CBM Defs. Opp'n 13 (quoting *UMG Recordings, Inc. v. Shelter Cap. Partners, LLC*, 718 F.3d 1006, 1019 (9th Cir. 2013)).

[111] *See id.* at 13–19 (citing *UMG Recordings, Inc. v. Veoh Networks*, 620 F. Supp. 2d 1081 (C.D. Cal. 2008); *Viacom Intern., Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010), *aff'd in part, vacated in part, remanded*, 676 F.3d 19 (2d Cir. 2012); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132 (N.D. Cal. 2008)).

Courts have held that "storage" for purposes of the safe harbor provision extends beyond the storage itself.[112] Yet such activities must still relate in some way to the material's storage. "[R]ather than requiring 'that the infringing conduct be storage,' the statutory language allows for infringement '*by reason of the storage* at the direction of a user.'"[113] "The § 512(c) safe harbor focuses on the service provider's role in making material stored by a user publicly accessible on its site."[114] Simply put, the safe harbor defense requires an underlying act of user-directed storage. For example, in a Ninth Circuit case about users posting allegedly infringing photographs on a social media site, the "inquiry turn[ed] on the role of the moderators in screening and posting users' submissions and whether their acts may be attributed to [the social media platform]."[115] Even though the court deemed "public accessibility" as the "critical inquiry[,]" the matter directly related to stored material—in that case, the users' submissions.[116]

To rely on the third DMCA safe harbor defense, a service provider must also show that the activity was "at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider."[117] Here, CBM Defendants assert that the Subject Images were displayed "by embedding the image and linking back to a third-party server that was not owned or controlled by CBM."[118] But the images "are not and were not stored on servers belonging to or controlled by CBM or [Mr.] Best."[119] Because they disclaim ownership

---

[112] *See, e.g.*, *Mavrix Photographs*, 873 F.3d at 1052 ("We have held that storage 'encompasses the access-facilitating processes' in addition to storage itself." (quoting *UMG Recordings*, 718 F.3d at 1016)).
[113] *Id.* at 1052–53 (citation omitted).
[114] *Id.* at 1053.
[115] *Id.*
[116] *Id.*
[117] 17 U.S.C. § 512(c)(1).
[118] Countercl. 18.
[119] *Id.*

and control over the systems containing the Subject Images, CBM Defendants cannot now rely on the safe harbor defense.

Cases cited by CBM Defendants are not contrary. The court in *Viacom International, Inc. v. YouTube, Inc.* found that activities—"transmission, routing, or providing of connections"—must "flow from the material's placement on the provider's system or network[.]"[120] The court noted that a service provider maintains a safe harbor when it "facilitat[es] user access to material on its website."[121] In *Io Group, Inc. v. Veoh Networks, Inc.*, users registered and then uploaded material directly to the defendant's website.[122] Section 512(c) safe harbor thus applies when users upload material or the material is stored on systems controlled by the provider.

CBM Defendants offer several policy-based arguments. They argue that expansive liability would undercut Congress' goal of enacting the DMCA "to facilitate the robust development and worldwide expansion of electronic commerce, communications, research, development, and education in the digital age."[123] Further, they contend that holding service providers liable for having provided access would create an "illogical chasm" where providers would be responsible for others' actions "through no fault of their own."[124] Last, CBM Defendants argue that a failure to fully promote the safe harbor provision would render moot the DMCA's notice-and-take-down procedures.[125]

---

[120] *Viacom Intern.*, 718 F. Supp. 2d at 526.
[121] *Id.* at 527 (quoting *Io Grp.*, 586 F. Supp. 2d at 1148).
[122] *See Io Grp.*, 586 F. Supp. 2d at 1138. *UMG Recordings* involved the same software and automated processes. *See UMG Recordings*, 620 F. Supp. 2d at 1088.
[123] CBM Defs. Opp'n 15 (quoting *UMG Recordings*, 620 F. Supp. 2d at 1090).
[124] *Id.* at 1.
[125] *Id.* at 16.

These arguments do not overcome the fact that CBM Defendants have not shown that they are entitled to a safe harbor defense. Courts have recognized Congress' intent to provide balance in the copyright sphere.[126] And the DMCA's notice-and-take-down provision creates "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements" occurring online.[127] Even so, the DMCA safe harbor defense is not unlimited. Section 512(c) defenses are available only when storage—or activities related to storage—"flow from the material's placement on the provider's system or network"[128] "at the direction of a user of material that resides on a system . . . controlled or operated by . . . the provider."[129] That is not the case here.

For these reasons, CBM Defendants' safe harbor affirmative defense fails as a matter of law.

## III.  Copyright Infringement Claim

Defendants move for judgment on the pleadings on Trunk Archive's claim for copyright infringement. They argue that Trunk Archive lacks standing to assert a violation of the right to publicly display the Subject Images and that it has not pleaded sufficient facts to show a violation. Specifically, Defendants contend that Trunk Archive alleges only a right to distribute copies of the images to the public—not a right to display publicly.[130] They contend that even in

---

[126] *Mavrix Photographs*, 873 F.3d at 1051–52 (The DMCA balances . . . interests by requiring service providers to take down infringing materials when copyright holders notify them of the infringement and by limiting service providers' liability for unintentional infringement through several safe harbors."); *see also Chamberlain Grp., Inc. v. Skylink Techs., Inc.*, 381 F.3d 1178, 1196 (Fed. Cir. 2004) ("The importance of 'rebalancing' interests in light of recent technological advances is manifest in the DMCA's legislative history.").

[127] *UMG Recordings*, 620 F. Supp. 2d at 1090.

[128] *Viacom Intern.*, 718 F. Supp. 2d at 526.

[129] 17 U.S.C. § 512(c)(1).

[130] Defs. Mot. for J. 1–2.

the best light, the Complaint alleges only a violation of the exclusive right to license or distribute.[131] Last, they argue that Trunk Archive cannot hold the exclusive right to display the images since the publication *Vanity Fair* could also display them.[132]

Trunk Archive contends that it has standing to pursue a violation of the Copyright Act and that its pleadings are plausible. It argues that its "exclusive right to license" included the "right to grant licenses for exploitation of any of the six statutorily created exclusive rights, including the right of public display."[133] As to *Vanity Fair*, Trunk Archive contends that the publication was not given any exclusive rights, or, even if it held rights to first publication, Trunk Archive had standing to sue for later infringements.[134]

"Anyone who violates any of the exclusive rights of the copyright owner as provided by section[] 106 . . . is an infringer of the copyright or right of the author, as the case may be."[135] "The legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it."[136] The owner "has the exclusive rights to do and to authorize any of the following: (1) to reproduce the copyrighted work in copies or phonorecords; (2) to prepare derivative works based upon the copyrighted work; (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending; (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; (5) in the case of literary, musical,

---

[131] *Id.* at 5; Defs. Reply 9.
[132] Defs. Reply 5–6.
[133] Trunk Archive Opp'n 3.
[134] *Id.* at 4.
[135] 17 U.S.C. § 501(a).
[136] *Id.* § 501(b).

dramatic, and choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly; and (6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."[137]

The Copyright Act allows for transfer of copyright ownership.[138] "A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license."[139] "The Copyright Act recognizes that an exclusive license is effectively a transfer of ownership over the rights licensed."[140] "[A] license is an authorization by the copyright owner to enable another party to engage in behavior that would otherwise be the exclusive right of the copyright owner, but without transferring title in those rights."[141]

Here, the issue is whether the "exclusive right to license" includes the right to display publicly. Section 106 of the Copyright Act directs that the copyright owner has "the exclusive right[] to do and to authorize any of the following [six actions.]"[142] Trunk Archive does not assert that it was the original copyright owner of the Subject Images. It asserts instead that Ms. Leibovitz granted it the exclusive right to license the images. As such, Trunk Archive has plausibly pled that it held all six rights under Section 106. Among them was the right to "display

---

[137] *Id.* § 106; *see DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 983 (9th Cir. 2017).
[138] *See* 17 U.S.C. § 204.
[139] *Id.* § 101.
[140] *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016); *see also DPK Photo*, 870 F.3d at 983 ("[A]n *exclusive license* (which transfers an exclusive permission to use to the transferee) qualifies as a 'transfer' of a right in a copyright for the purposes of the Act." (citation omitted)).
[141] *F.B.T. Prods., LLC v. Aftermath Recs.*, 621 F.3d 958, 965 (9th Cir. 2010).
[142] 17 U.S.C. § 106.

the copyrighted work publicly[.]"[143] Since Trunk Archive plausibly alleges that it held the exclusive right to display the work publicly, it also plausibly alleges that Defendants violated that right by displaying the Subject Images without its authorization.[144]

Accepting Defendants' argument would mean that Trunk Archive would have had to plead with specificity that Ms. Leibovitz transferred each of the six exclusive rights under Section 106. But this ignores a plain reading of the Copyright Act. If a copyright owner by definition has an exclusive right over all Section 106 subsets,[145] and granting an exclusive license means for purposes of the statute transferring copyright ownership,[146] then a party has a full set of exclusive rights when that party receives an exclusive license. That is what Trunk Archive alleges here: that because it had an exclusive right to license, it owned the resulting exclusive rights. For this reason, it has pleaded sufficient facts to obtain standing.

Defendants' argument that Trunk Archive had a non-exclusive license because of *Vanity Fair* falters. Trunk Archive does not plead that *Vanity Fair* ever held an exclusive license for the Subject Images. It pleads only that *Vanity Fair* "originally published exclusively . . . in print and online" the Subject Images.[147] The act of publishing does not automatically mean that the publication is the copyright owner for purposes of the Copyright Act. But even if *Vanity Fair* had been granted an exclusive right to publish, that does not mean that it held rights concurrently with Trunk Archive. Ms. Leibovitz "subsequently granted Trunk Archive the exclusive right to license" the images.[148]

---

[143] *Id.* § 106(5).
[144] *See* Compl. ¶¶ 80–81.
[145] 17 U.S.C. § 106.
[146] *Id.* § 101.
[147] Compl. ¶ 21.
[148] *Id.* ¶ 24.

Finally, Trunk Archive has not pleaded that it is "merely the licensing agent for the works."[149] On the contrary, it pleaded that it held the exclusive right to license the Subject Images. That means it had the right to display the images publicly or to authorize others to do so. "[T]the default rule is that only those who owned an exclusive right in a registered copyright at the time of the infringement may bring suit."[150] Owning the exclusive right to license, Trunk Archive has plausibly pled that it can pursue an infringement claim against Defendants.

In sum, Trunk Archive plausibly pled that Defendants infringed the Copyright Act by publicly displaying the Subject Images without authorization. The court denies Defendants' motion for judgment on the pleadings.

## ORDER

Accordingly, the court DENIES IN PART AND GRANTS IN PART Plaintiff's Motion for Partial Judgment on the Pleadings.[151] The court denies the motion as to the "embedding" affirmative defense. The court grants the motion as to the "safe harbor" affirmative defense. The court DENIES Defendants' Motion for Judgment on the Pleadings.[152]

Signed May 2, 2023.

BY THE COURT

David Barlow
United States District Judge

[149] *See* Defs. Reply 6–8.
[150] *See Joe Hand Promotions, Inc. v. Griffith*, 49 F.4th 1018, 1022 (6th Cir. 2022).
[151] ECF No. 72.
[152] ECF No. 80.