Mathew K. Higbee, SBN 11133
Ryan E. Carreon, *Pro Hac Vice*
**HIGBEE & ASSOCIATES**
1504 Brookhollow Drive, Suite #112
Santa Ana, CA 92705
(714) 617-8373
mhigbee@higbee.law
rcarreon@higbee.law
*Attorneys for Plaintiff Trunk Archive*

---

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| GREAT BOWERY, d/b/a TRUNK ARCHIVE,<br><br>          Plaintiff,<br><br>v.<br><br>BEST LITTLE SITES, d/b/a www.comicbookmovie.com; NATHAN BEST; MARK CASSIDY; JOSHUA WILDING; and DOES 1 through 10, inclusive,<br><br>          Defendants. | Case No. 2:21-cv-00567-DBB<br><br>**MOTION FOR SUMMARY JUDGMENT** |

i

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................... 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS .................................... 1

    A.   Annie Leibovitz Created The Star Wars Photographs. ...................................... 1

    B.   Trunk Archive Is The Exclusive Licensor Of The Star Wars Photographs. ................. 2

    C.   Defendants Engaged In Mass Infringement Of The Star Wars Photographs. ............... 3

III. SUMMARY JUDGMENT STANDARD ........................................................... 7

IV.  SUMMARY JUDGMENT SHOULD BE ENETERED AGAINST DEFENDANTS ..... 7

    A.   As The Exclusive Licensor Of The Photographs, Trunk Archive Has Standing To
Pursue A Copyright Infringement Claim Against Defendants. ............................... 8

    B.   The Photographs Qualify For The Statutory Presumption Of Validity. ....................... 9

    C.   Defendants Are Liable For Violation Of The Rights To Create Derivative Works And
Public Display. ...................................................................................... 11

V.   SUMMARY JUDGMENT MUST BE ENETERED FOR THE COUNTERCLAIM .. 17

    A.   Embedding Is Not A Defense To Violation Of The Display Right. ........................... 17

    B.   Even If Embedding Is A Defense To Violation Of The Display Right, Defendants
Could Still Be Liable For Creating An Unauthorized Derivative. ............................ 22

VI.  DEFENDANTS AFFIRMATIVE DEFENSES ALSO FAIL ................................. 26

    A.   Failure To State A Claim. ........................................................................... 26

    B.   No Damages. .......................................................................................... 26

    C.   Public Policy. ......................................................................................... 27

    D.   Failure To Mitigate. ................................................................................. 27

    E.   DMCA Safe Harbor. ................................................................................ 27

    F.   Res Judicata. .......................................................................................... 27

    G.   Lack Of Actual Knowledge. ....................................................................... 28

    H.   Lack Of Material Contribution. ................................................................... 28

    I.   Lack Of Intent. ....................................................................................... 28

    J.   Expeditious Removal. ............................................................................... 28

    K.   No DMCA Takedown Notification. ............................................................... 29

    L.   Embedding. ........................................................................................... 29

    M.   No Proximate Damages. ............................................................................ 29

    N.   Bad Faith. ............................................................................................. 29

    O.   Unjust Enrichment. .................................................................................. 30

P.   Lack Of Malice. ........................................................................................... 30

Q.   Unclean Hands. ......................................................................................... 30

R.   Good Faith. ............................................................................................... 30

S.   Infliction Of Own Harm. ........................................................................... 31

T.   No Ability To Supervise Or Control. ......................................................... 31

U.   No Financial Benefit. ................................................................................ 31

V.   Laches And Waiver. .................................................................................. 32

W.   Copyright Misuse. .................................................................................... 32

X.   First Amendment. ..................................................................................... 34

Y.   Fair Use .................................................................................................... 34

Z.   Invalid Copyrights. ................................................................................... 38

AA.  Speculative Damages. ............................................................................... 38

BB.  De Minimis Use. ....................................................................................... 38

**VII. TRUNK ARCHIVE IS ENTITLED TO SEEK STATUTORY DAMAGES** ............... 39

**VIII. CONCLUSION** ....................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252, (1986) .......................................................... 7

*Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1274 (2023) ........ 34

*Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) ..... 36

*Bell v. Mowad Group, LLC*, 326 F. Supp. 3d 918 (9th Cir. 2018) ................................................ 32

*Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2nd Cir. 2006) .............. 37

*Bourne v. Walt Disney Co*., 2003 U.S. Dist. LEXIS 2818, at *10; 2003 WL 721405, at *4
(S.D.N.Y. Mar. 3, 2003) ................................................................................................................ 33

*Broad. Music, Inc. v. Carey-On Saloon, LLC*, 2014 U.S. Dist. LEXIS 16312, *13-14 (D. Col.,
Feb. 7, 2014) ............................................................................................................................ 14, 16

*Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53 (1884) ................................................. 11

*Campbell v. Acuff-Rose Music, Inc*., 510 U.S. 569, 579, (1994) ................................................. 34

*Cariou v. Prince*, 714 F.3d 694, 708 (2nd Cir. 2013) .................................................................. 37

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ...................................................................... 7

*Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013) ...................................................... 13

*DRK Photo v. McGraw-Hill Global Education Holdings, LLC*, 870 F.3d 978, 983 (9th Cir. 2017)
........................................................................................................................................................ 8

*F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 965 (9th Cir. 2010) ............................ 8

*Feist Pubs., Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991) ...................................... 7, 8, 9

*Fonovisa, Inc. v. Cherry Auction, Inc*., 76 F.3d 259 (9th Cir. 1996) .......................................... 15

*Fox News Network, LLC v. TVEyes, Inc*., 883 F.3d 169, 177 (2nd Cir. 2018) ........................... 35

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc*., 443 F.2d 1159, 1162 (2nd
Cir. 1971) ...................................................................................................................................... 13

*Great Bowery v. Best Little Sites*, No. 2:21-cv-00567-DBB-JCB, 2023 U.S. Dist. LEXIS 77562,
at *25 (D. Utah May 2, 2023) ......................................................................................................... 9

*Greenberg v. Nat'l Geographic Soc'y*, 533 F.3d 1244, 1279 (11th Cir. 2008) ............... 19, 20, 25

*Iantosca v. Elie Tahari*, Ltd., 2020 U.S. Dist. LEXIS 171512, at *15 n.5; 2020 WL 5603538, at *6 (S.D.N.Y. Sep. 18, 2020) ........................................................................................... 38

*Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 945 (10th Cir. 2002) ........................................... 25

*Jarvis v. K2 Inc.*, 486 F.3d 526, 531 (9th Cir. 2007) .................................................................... 25

*Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y. 1921) ............... 10

*Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, at *32 (N.D. Tex. Nov. 22, 2017) ................................................................................................................................... 20

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, n.9 (2005) ....................... 13

*Michael Grecco Prods. v. Valuewalk LLC*, 345 F. Supp. 3d 482, 501 (S.D.N.Y., Nov. 6, 2018) 24

*Millennium Funding, Inc. v. Priv. Internet Access, Inc.*, 2022 U.S. Dist. LEXIS 187487, *23, 2022 WL 7560395 (D. Col., Oct. 13, 2022) ........................................................................... 11, 12

*N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001) ...................................................................... 20

*Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y., July 30, 2021).. 21, 23

*Oliver v. Meow Wolf, Inc.*, 2020 U.S. Dist. LEXIS 221367, *54, 2020 WL 6939875 (D. N.M., Nov. 25, 2020) ........................................................................................................................ 16

*Orth-O-Vision, Inc. v. Home Box Office*, 474 F. Supp. 672, 686 (S.D.N.Y. 1979)..................... 32

*Otto v. Hearst Communs., Inc.,* 345 F. Supp. 3d 412, 428 (S.D.N.Y. 2018)............................... 35

*Paramount Pictures Corp. v. Video Broad. Sys., Inc.*, 724 F. Supp. 808, 819 (D. Kan. 1989).... 11

*Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006) ....................................... 22

*Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007) ................................ 21

*Playboy Enters., Inc. v. Webbworld Inc.,* 991 F. Supp. 543, 554 (N.D. Tex. 1997) ................... 14

*Predator Int'l, Inc. v. Gamo Outdoor United States*, 2013 U.S. Dist. LEXIS 36866, *19, 2013 WL 1129404 (D. Col., Mar. 18, 2013) ...................................................................... 27, 29, 31, 38

*Pro Arts, Inc. v. Hustler Magazine, Inc.* 787 F.2d 592 (6th Cir. 1986) ........................................ 36

*Red Giant, Inc. v. Molzan, Inc.*, 2009 U.S. Dist. LEXIS 63990, at *20 (S.D. Tex. July 24, 2009) ................................................................................................................................................. 14

*Reliability Research, Inc. v. Computer Assocs. Int'l, Inc.*, 793 F. Supp. 68, 69 (E.D.N.Y. 1992) 32

*Ringgold v. Black Entm't TV, Inc.,* 126 F.3d 70, 79 (2nd Cir. 1997) ........................................... 36

*Rural Tel. Serv. Co., Inc. v. Feist Publications, Inc.*, 663 F. Supp. 214, 220 (D. Kan. 1987)...... 32

*Sanchez v. Hacienda Records & Recording Studio, Inc.*, 2013 2013 WL 529950, at *8 (S.D. Tex. Feb. 11, 2013) ................................................................................................................................ 17

*Sandoval v. New Line Cinema Corp.*, 147 F. 3d 215, 217 (2nd Cir. 1998)................................... 38

*Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 308 (2nd Cir. 1963) ....................... 14

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 471 U.S. 539, 565 (1985)........................................ 36

*Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89, 92 (2nd Cir. 1985) ............ 12

*The Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017) .............................................................................................................................. 20

*UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006) ............................................................................................................................................ 11

*Warner Records Inc. v. Charter Communs., Inc.*, 454 F. Supp. 3d 1069, 1074 (D. Col., April 15, 2020) ...................................................................................................................................... 15, 16

*Werner v. Evolve Media*, LLC, 2020 U.S. Dist. LEXIS 106477 at *21; 2020 WL 3213808, at *8 (C.D.Cal., 2020)........................................................................................................................... 39

**Statutes**

17 U.S.C. § 102(a)(5)................................................................................................................... 10

17 U.S.C. § 106(2) ................................................................................................................. 22, 24

17 U.S.C. § 106(5) ............................................................................................................. 11, 12, 18

17 U.S.C. § 410(c) ....................................................................................................................... 9, 10

17 U.S.C. § 412(2) ....................................................................................................................... 37, 38

**Treatises**

4 *Nimmer & Nimmer*, § 13.05[A][1][c], at 13-167........................................................................ 33

vi

## MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff Great Bowery, Inc., d/b/a Trunk Archive ("Trunk Archive") moves pursuant to Federal Rules of Civil Procedure 56 for summary judgment as to liability for copyright infringement against Defendant Best Little Sites d/b/a www.comicbookmovie.com ("CBM") and Defendant Nathan Best ("Best") as vicarious infringers, and against Defendant Mark Cassidy and Defendant Joshua Wilding as direct infringers for violation of the right to create derivative works and right to publicly display. Trunk Archive also moves for summary judgment as to its entitlement to statutory damages and attorneys' fees, as to Defendant Best and CBM's Counterclaim, and as to all affirmative defenses asserted by Defendants.

### II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff Trunk Archive is a full-service photography licensing agency representing some of the most prominent photographers and iconic images in the world. Exhibit 43 at ¶12. One of Trunk Archive's most prominent clients is American portrait photographer Annie Leibovitz. *Id.* at ¶14.

#### A.    Annie Leibovitz Created The Star Wars Photographs.

Between 2014 and 2019, Leibovitz took a series of photographs of the cast and crew of *Star Wars: The Last Jedi* and *Star Wars: The Rise of Skywalker*, 18 of which make up the subject matter of this lawsuit ("Star Wars Photographs"). Exhibit 42 at ¶ 3. The Star Wars Photographs are broken down as follows:

- A photograph of actress Laura Dern as Vice Admiral Amilyn Holdo ("Holdo Photograph"). Exhibit 1; Exhibit 42 at ¶ 4.

- A photograph of actor Benicio Del Toro as DJ ("DJ Photograph"). Exhibit 2; Exhibit 42 at ¶ 5.

- A photograph of actors Mark Hamil and Carrie Fisher as Luke Skywalker and Leia Organa ("Skywalker Photograph"). Exhibit 3; Exhibit 42 at ¶ 6.

- A photograph of actress Carrie Fisher and her daughter Billie Lourd as Leia Organa and Kaydel Ko Connix ("Connix Photograph"). Exhibit 4; Exhibit 42 at ¶ 7.

- A photograph of actors Oscar Isaacs, and Billy Dee Williams as Poe Dameron and Lando Calrissian aboard the Millennium Falcon with Chewbacca and BB-8 ("Millennium Falcon Photograph"). Exhibit 5; Exhibit 42 at ¶ 8.

- A photograph of actor Mark Hamil as Luke Skywalker with R2-D2 ("R2-D2 Photograph"). Exhibit 6; Exhibit 42 at ¶ 9.

- A photograph of actors John Boyega and Naomi Ackle as Finn and Jannah ("Finn Photograph"). Exhibit 7; Exhibit 42 at ¶ 10.

- A photograph of actors Domhnall Gleeson and Richard E. Grant as General Hux and Allegiant General Pryde ("Hux Photograph"). Exhibit 8; Exhibit 42 at ¶ 11.

- Eight photographs of behind-the-scenes production of Star Wars: The Rise of Skywalker ("Production Photographs"). Exhibit 9; Exhibit 42 at ¶ 12.

- A photograph of actors Adam Driver and Daisy Ridley as Kylo Ren and Rey ("Lightsaber Photograph"). Exhibit 10; Exhibit 42 at ¶ 13.

- A photograph of actors Oscar Issacs and John Boyega as Poe Dameron and Finn ("Dameron Photograph"). Exhibit 11; Exhibit 42 at ¶ 14.

Leibovitz registered the Star Wars Photographs with the United States Copyright Office. Leibovitz registered the Holdo Photograph, Skywalker Photograph, Connix Photograph, DJ Photograph, and Dameron Photograph as part of a group registration of photographs under registration certificate VA 2-111-252 with an effective registration date of July 10, 2017. Exhibit 12; Exhibit 42 at ¶¶ 17-18. Leibovitz also registered the Millennium Falcon Photograph, R2-D2 Photograph, Finn Photograph, Hux Photograph, Production Photographs, and Lightsaber Photograph as part of a group registration of photographs under registration certificate VA 2-192-380 with an effective registration date of January 16, 2020. Exhibit 13; Exhibit 42 at ¶¶ 19-20.

**B.    Trunk Archive Is The Exclusive Licensor Of The Star Wars Photographs.**

On or about November 12, 2014, Leibovitz entered into an agreement ("Artist Agreement") with Trunk Archive for exclusive worldwide representation to license her photographs. Exhibit 14; Exhibit 42 at ¶¶ 21-22. Under the terms of the Artist Agreement, Leibovitz granted Trunk Archive "the exclusive worldwide right to license, market, and promote" her photographs "for all uses in any and all media." Exhibit 14, ¶ 1.

On or about May 24, 2017, the publication Vanity Fair published an article titled "See Annie Leibovitz's Exclusive Cast Portraits of *Star Wars: The Last Jedi* for *Vanity Fair*" ("2017 Vanity Fair Article"). Exhibit 15. The Holdo, DJ, Skywalker, Connix, and Dameron Photographs were first published in the 2017 Vanity Fair Article as an exclusive. Exhibit 15; Exhibit 42 at ¶¶ 24-25.

After publication, Leibovitz provided the Holdo, DJ, Skywalker, Connix, and Dameron Photographs to Trunk Archive under the terms of the Artist Agreement so that Trunk Archive could be the exclusive licensor of these Photographs for any other publications that wished to license them. Exhibit 14; Exhibit 42 at ¶ 27.

On or about May 22, 2019, the publication Vanity Fair published an article titled "*Star Wars: The Rise of Skywalker* Photos: Meet the Characters and Go on Set" ("2019 Vanity Fair Article"). Exhibit 16. The Millennium Falcon, R2-D2, Finn, Hux, Production, and Lightsaber Photographs were first published in the 2019 Vanity Fair Article as an exclusive. Exhibit 16; Exhibit 42 at ¶ 30.

After publication, Leibovitz provided the Millennium Falcon, R2-D2, Finn, Hux, Production, and Lightsaber Photographs to Trunk Archive under the terms of the Artist Agreement so that Trunk Archive could be the exclusive licensor of these Photographs for any other publications that wished to license them. Exhibit 14; Exhibit 42 at ¶ 31.

### C.     Defendants Engaged In Mass Infringement Of The Star Wars Photographs.

Defendant CBM owns and operates the website www.comicbookmovie.com (the "Website"). Exhibit 43 at ¶25; Exhibit 44, ¶25. CBM's Website consists primarily of movie and television articles and related editorial content geared towards the comic book, graphic novel, sci-fi, fantasy, and horror genres. Exhibit 43 at ¶27; Exhibit 44 at ¶27. Content on CBM's Website is monetized through paid advertisements. Exhibit 43 at ¶28; Exhibit 44 at ¶28.

Defendant Best is the owner and President of Defendant CBM. Exhibit 43 at ¶26; Exhibit 44 at ¶26. Defendant Best has the ability to view all content posted on the Website, including

content queued for future posts, and can edit or delete the content of any post uploaded to the Website. Exhibit 38, Interrogatory No. 2.

Defendant Best is compensated from the revenues generated by the Website. Exhibit 38, RFA No. 2.

Defendant Mark Cassidy is a paid contributor to the CBM Website. Exhibit 43 at ¶37; Exhibit 46 at ¶37; *see also* Exhibit 19. Defendant Cassidy is expressly authorized by CBM to create editorial content for the Website. Exhibit 43 at ¶44; Exhibit 46 at ¶44. Defendant Cassidy posts to the CBM Website under the username "RorMachine." Exhibit 43 at ¶39; Exhibit 46 at ¶39; Exhibit 17. Defendant Cassidy has been a contributor to the CBM Website since November 9, 2008, and has contributed over 19,000[1] articles to the Website, averaging approximately 3.5 articles per day. Exhibit 43 at ¶38; Exhibit 46 at ¶38; Exhibit 17.

Defendant Joshua Wilding is a paid contributor to the CBM Website. Exhibit 43 at ¶37; Exhibit 45 at ¶37; *see also* Exhibit 20. Defendant Wilding is expressly authorized by CBM to create editorial content for the Website. Exhibit 43 at ¶55; Exhibit 45 at  ¶55. Defendant Wilding posts to the CBM Website under the username "JoshWilding." Exhibit 43 at ¶48; Exhibit 45 at ¶48; Exhibit 18. Defendant Wilding has been a contributor to the CBM Website since March 13, 2009, and has contributed over 34,000[2] articles to the Website, averaging approximately 6 articles per day. Exhibit 43 at ¶39; Exhibit 45 at  ¶39; Exhibit 18.

In February 2019, Trunk Archive began to discover a number of articles on the CBM Website that utilized unlicensed copies of the Star Wars Photographs ("Infringing Articles"). Exhibit 43 at ¶57. Nine of the Infringing Articles were authored by Defendant Cassidy, and six of

---

[1] At the time the Complaint was filed, Defendant Cassidy had contributed approximately 16,000 articles to the CBM Website. In the intervening time period, Cassidy has authored over 3,000 additional articles bringing his total to over 19,000 articles submitted.

[2] At the time the Complaint was filed, Defendant Wilding had contributed approximately 27,000 articles to the CBM Website. In the intervening time period, Cassidy has authored over 7,000 additional articles bringing his total to over 34,000 articles submitted.

the Infringing Articles were authored by Defendant Wilding. *See* Exhibits21-35. CBM monetized all of the Infringing Articles through advertising revenues based on the number of views generated by each Infringing Article. Exhibit 43 at ¶75; Exhibit 44 at ¶75; Exhibit 36. The 15 Infringing Articles are broken down as follows:

- An article titled "STAR WARS: THE LAST JEDI Actress Laura Dern Shares New Image Of Vice Admiral Amilyn Holdo" dated October 18, 2017, which utilized the Holdo Photograph. Exhibit 21; Exhibit 40, RFA Nos. 2-3. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 2, 7. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE LAST JEDI International TV Spot Features Benicio Del Toro As The Mysterious DJ" dated November 20, 2017, which utilized the DJ Photograph. Exhibit 22; Exhibit 40, RFA Nos. 8-9. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 8, 13. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE LAST JED's Mark Hamill Shares A Lovely Tribute To Carrie Fisher One Year After Her Passing" dated December 27, 2017, which utilized the Skywalker Photograph. Exhibit 23; Exhibit 40, RFA Nos. 14-15. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 14, 19. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "Billie Lourd Shares A Touching Tribute To Carrie Fisher On The Second Anniversary Of Her Passing" dated December 27, 2018, which utilized the Connix Photograph. Exhibit 24; Exhibit 40, RFA Nos. 20-21. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 20, 25. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER – 12 Biggest Reveals And Spoilers From Vanity Fair's Cover Story" dated May 22, 2019, which utilized the Millennium Falcon Photograph. Exhibit 25; Exhibit 41, RFA Nos. 2-3. Wilding was paid by CBM to author the article. Exhibit 41, RFA Nos. 2, 8. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER Behind The Scenes Video Features New Aliens And Cast Interviews" dated May 22, 2019, which utilized the R2-D2 Photograph, Finn Photograph, Hux Photograph, and Production Photographs. Exhibit 26; Exhibit 41, RFA Nos. 9-10, 12, 14, and 16. Wilding was paid by CBM to author the article. Exhibit 41, RFA Nos. 9, 27. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER Has A Very Interesting Alternate Title In Japan" dated June 25, 2019, which utilized the Lightsaber Photograph. Exhibit 27; Exhibit 41, RFA Nos. 28-29. Wilding was paid by CBM to author the article. Exhibit 41, RFA Nos. 28, 34. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER Star Daisy Ridley Promises A 'Brilliant End' To The Story" dated June 26, 2019, which utilized the

Lightsaber Photograph. Exhibit 28; Exhibit 40, RFA Nos. 26-27. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 26, 31. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER's Runtime Possible [sic] Revealed Along With Some Potential SPOILERS" dated August 12, 2019, which utilized the R2-D2 Photograph. Exhibit 29; Exhibit 41, RFA Nos. 35-36. Wilding was paid by CBM to author the article. Exhibit 41, RFA Nos. 35, 41. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER – Rey And Kylo Ren Clash On New Empire Magazine Covers" dated September 27, 2019, which utilized the Lightsaber Photograph. Exhibit 30; Exhibit 40, RFA Nos. 32-33. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 33, 37. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER Final Trailer Reportedly Scheduled For October 21" dated October 10, 2019, which utilized the Lightsaber Photograph. Exhibit 31; Exhibit 40, RFA Nos. 38-39. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 38, 43. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER's Oscar Issacs Blames 'Disney Overlords' For No Poe/Finn Romance" dated December 26, 2019, which utilized the Dameron Photograph. Exhibit 32; Exhibit 41, RFA Nos. 42-43. Wilding was paid by CBM to author the article. Exhibit 41, RFA Nos. 42, 48. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER Remains #1 At The Box Office As It Passes $900M Worldwide" dated January 5, 2020, which utilized the Lightsaber Photograph. Exhibit 33; Exhibit 40, RFA Nos. 44-45. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 44, 49. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "Luke Skywalker's Big STAR WARS: THE RISE OF SKYWALKER Scene Was The Result Of Reshoots" dated January 7, 2020, which utilized the R2-D2 Photograph. Exhibit 34; Exhibit 41, RFA Nos. 49-50. Wilding was paid by CBM to author the article. Exhibit 41, RFA Nos. 49, 55. The article generated advertising revenue for CBM. Exhibit 36.

- An article titled "STAR WARS: THE RISE OF SKYWALKER Passes $500 Million At The Domestic Box Office" dated January 26, 2020, which utilized the Lightsaber Photograph. Exhibit 35; Exhibit 40, RFA Nos. 50-51. Cassidy was paid by CBM to author the article. Exhibit 40, RFA Nos. 50, 55. The article generated advertising revenue for CBM. Exhibit 36.

According to Defendants, the Star Wars Photographs contained in the Infringing Articles "were displayed on CBM's website by embedding the image and linking back to a third-party server that was not owned or controlled by CBM" and that the Star Wars Photographs "are not and

were not stored on servers belonging to or controlled by CBM or Nathan Best." Exhibit 44
Counterclaim at ¶¶ 23-24.

Trunk Archive now moves for summary judgment against Defendants for infringement.

## III.     SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the pleadings and the evidence demonstrate "there is
no genuine issue as to any material fact and that the moving party is entitled to judgment as a
matter of law." Fed. R. Civ. P. 56. The party seeking summary judgment bears the initial burden
of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S.
317, 323 (1986). Summary judgment is appropriate if the non-moving party fails to offer "evidence
on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 252 (1986). The moving party need only point to the absence of evidence
proffered by the non-moving party. *Celotex*, 477 U.S. at 325.

## IV.     SUMMARY JUDGMENT SHOULD BE ENETERED AGAINST DEFENDANTS

The sole cause of action alleged against all Defendants is a cause of action for copyright
infringement. To establish a prima facie case of copyright infringement, a plaintiff must
demonstrate "(1) ownership of a valid copyright, and (2) copying of constituent elements of the
work that are original." *Feist Pubs., Inc. v. Rural Tel. Serv. Co*., 499 U.S. 340, 361 (1991).

Here, the undisputed facts establish that Trunk Archive, as the exclusive licensor to the
Star Wars Photographs, has standing to pursue a claim of copyright infringement against
Defendants, that the Star Wars Photographs qualify for the statutory presumption of validity, and
that Defendants are liable as direct and vicarious infringers for violation of Trunk Archive's
exclusive right to publicly display and to create derivative works of the Star Wars Photographs.

Thus, summary  judgment should be entered in favor of Trunk Archive and against
Defendants.

**A.     As The Exclusive Licensor Of The Photographs, Trunk Archive Has Standing To Pursue A Copyright Infringement Claim Against Defendants.**

The first element of a copyright infringement case requires a plaintiff to demonstrate ownership of a valid copyright. *Feist Pubs., Inc.*, 499 U.S. at  361. To have standing to bring the infringement claim alleged in the complaint, Trunk Archive must show that it is "[t]he legal or beneficial owner of an exclusive right under a copyright." 17 U.S.C. § 501(b). Pursuant to 17 U.S.C. § 204, "[A] transfer of copyright ownership, other than by operation of law is not valid unless an instrument of conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."

"Either an *assignment* (which transfers legal title to the transferee) or an *exclusive license* (which transfers an exclusive permission to use to the transferee) qualifies as a 'transfer' of a right in copyright for purpose of the Act." *DRK Photo v. McGraw-Hill Global Education Holdings, LLC*, 870 F.3d 978, 983 (9th Cir. 2017) (quoting *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1003 (9th Cir. 2015) (holding that Plaintiff has standing to bring an infringement action under the Copyright Act because the Agency Agreements conveyed rights via an "exclusive license")). "[A] license is an authorization by the copyright owner to enable another party to engage in behavior that would otherwise be the exclusive right of the copyright owner, but without transferring title in those rights." *F.B.T. Prods., LLC v. Aftermath Records*, 621 F.3d 958, 965 (9th Cir. 2010).

Here, Trunk Archive has standing to pursue its infringement claim based on the Artist Agreement it executed with Leibovitz, the creator of the Star Wars Photographs. On or about November 12, 2014, Leibovitz entered into the Artist Agreement with Trunk Archive for exclusive worldwide representation to license her photographs. Exhibit 14. Under the terms of the Artist Agreement, Leibovitz granted Trunk Archive "the exclusive worldwide right to license, market, and promote the Licensed Images … for all uses in any and all media." Exhibit 14, ¶ 1.

Because the Artist Agreement provides for Trunk Archive to hold "the *exclusive* worldwide right to license" images provided under the Artist Agreement, it constitutes a valid transfer of

rights pursuant to 17 U.S.C. § 204. After each of the Star Wars Photographs were first published in Vanity Fair, they were provided to Trunk Archive for licensing under the terms of the Artist Agreement. *See* Exhibit 14, ¶ 2 (The term "Licensed Image" is defined as "images provided to Trunk Archive by Artist or Artist's authorized agent for representation."). Because the Star Wars Photographs are "Licensed Images" as defined in the Artist Agreement, Trunk Archive possesses the exclusive right to license them to third parties and therefore possesses standing to pursue any infringements of the Star Wars Photographs. *See Great Bowery v. Best Little Sites*, No. 2:21-cv-00567-DBB-JCB, 2023 U.S. Dist. LEXIS 77562, at *25 (D. Utah May 2, 2023) ("Trunk Archive does not assert that it was the original copyright owner of the Subject Images. It asserts instead that Ms. Leibovitz granted it the exclusive right to license the images. As such, Trunk Archive has plausibly pled that it held all six rights under Section 106.").

In conclusion, summary judgment should be entered in favor of Trunk Archive as to the issue of standing.

> **B.      The Photographs Qualify For The Statutory Presumption Of Validity.**

In addition to ownership, the first element of a copyright infringement claim also requires that the copyrights at issue be valid. *Feist Pubs., Inc.*, 499 U.S. at  361. A copyright in a work is valid if the work itself is original. *Id.* at 345 ("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. [Citation]. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be. [Citation and quotation omitted].").

A certificate of registration validly obtained from the Copyright Office within five years of first publication of a work constitutes *prima facie* evidence of the originality of the work and of the facts stated therein. *See* 17 U.S.C. § 410(c).

Here, each of the Star Wars Photographs was registered with the United States Copyright Office within five years of first publication and therefore qualifies for the statutory presumption of validity.

On or about May 24, 2017, the Holdo, DJ, Skywalker, Connix, and Dameron Photographs were first published in the 2017 Vanity Fair Article. Exhibit 15. Leibovitz registered the Holdo Photograph, Skywalker Photograph, Connix Photograph, and Dameron Photograph as part of a group registration of photographs under registration certificate VA 2-111-252 with an effective registration date of July 10, 2017. Exhibit 12.

Likewise, on or about May 22, 2019, the Millennium Falcon, R2-D2, Finn, Hux, Production, and Lightsaber Photographs were first published in the 2019 Vanity Fair Article. Exhibit 16. Leibovitz registered the Millennium Falcon Photograph, R2-D2 Photograph, Finn Photograph, Hux Photograph, Production Photographs, and Lightsaber Photograph as part of a group registration of photographs under registration certificate VA 2-192-380 with an effective registration date of January 16, 2020. Exhibit 13.

Because all of the Star Wars Photographs were registered within five years of first publication and such registration was accepted by the United States Copyright Office, the Star Wars Photographs are presumptively valid, and the first element of Trunk Archive's infringement case is satisfied. *See* 17 U.S.C. § 410(c).

Even if Trunk Archive were not afforded the statutory presumption of validity, the Star Wars Photographs would easily make the grade. Photographs are generally viewed as creative, aesthetic expressions of a scene or image and have long been the subject of copyright. *See* 17 U.S.C. § 102(a)(5) (extending copyright protection to "pictorial, graphic, and sculptural works"); Indeed, the idea that photography is art deserving of copyright protection reflects a longstanding view of Anglo-American law. *See Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y. 1921) ("no photograph, however simple, can be unaffected by the personal influence of the author.") (Hand, J.).

10

In the seminal case affording copyright protection to photographs, the Supreme Court held that a photographic portrait of Oscar Wilde was entitled to copyright protection because of various creative elements employed by the photographer. *Burrow–Giles Lithographic Co. v. Sarony,* 111 U.S. 53 (1884); *see also Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1074 (9th Cir. 2000) (affirming copyrightability of photograph of vodka bottle and noting the "prevailing view" that "almost any[] photograph may claim the necessary originality to support a copyright merely by virtue of the photographers' [sic] personal choice of subject matter, angle of photograph, lighting, and determination of the precise time when the photograph is to be taken.").

Here, Trunk Archive has submitted copies of the Star Wars Photographs as part of the record. *See* Exhibits 1-11. It is clear that Leibovitz, one of the world's best known and most accomplished portrait photographers, imbued the Star Wars Photographs with numerous elements of creativity such that they meet the relatively low bar of originality. *Ibid.*

Thus, Trunk Archive has established that the Star Wars Photographs are valid for purposes of the first element of Trunk Archive's copyright infringement claim and summary judgment should be entered in Trunk Archive's favor.

### C.     Defendants Are Liable For Violation Of The Rights To Create Derivative Works And Public Display.

As to the second element of copyright infringement, the term copying "is a shorthand reference for the act of infringing any of the copyright owner's exclusive rights set forth in 17 U.S.C. § 106, which include the right to 'display' the copyrighted work publicly." *Paramount Pictures Corp. v. Video Broad. Sys., Inc.*, 724 F. Supp. 808, 819 (D. Kan. 1989); *see also* 17 U.S.C. § 106(5). In addition to the public display right, a separate actionable right is the right of the copyright holder to create derivative works. 17 U.S.C. § 106(2)

Copyright infringement is a strict-liability cause of action; a defendant may be held liable for the tort even absent an intent to infringe. *Millennium Funding, Inc. v. Priv. Internet Access, Inc.*, 2022 U.S. Dist. LEXIS 187487, *23, 2022 WL 7560395 (D. Col., Oct. 13, 2022) citing *UMG Recordings, Inc. v. Disco Azteca Distributors, Inc.*, 446 F. Supp. 2d 1164, 1172 (E.D. Cal. 2006);

*see also Sygma Photo News, Inc. v. High Soc. Magazine, Inc.*, 778 F.2d 89, 92 (2nd Cir. 1985) ("All persons and corporations who participate in, exercise control over, or benefit from the infringement are jointly and severally liable as copyright infringers.").

As explained more fully in Section V[3], Defendants are liable for the infringing public display of the Star Wars Photographs on the CBM Website. Even if Defendants are not liable for violation of the display right, Defendants are also liable for infringement based on the creation of unauthorized derivative works as a result of incorporating the Star Wars Photographs into the Infringing Articles.

Here, Defendants Cassidy and Wilding are both liable as direct infringers since they authored the Infringing Articles and caused the Star Wars Photographs to be included. Additionally, Defendants CBM and Best are liable as vicarious infringers because they had the ability to supervise and control the infringing acts and both financially benefitted from it.

As such, summary judgment should be entered in favor of Trunk Archive.

### 1.    *Defendants Cassidy And Wilding Are Liable As Direct Infringers.*

To succeed on a direct copyright infringement claim, the plaintiff must show "volitional conduct" by the defendant. *Millennium Funding, Inc.*, 2022 U.S. Dist. LEXIS 187487 at *40 (citing cases). "But 'volition' in this context does not really mean an 'act of willing or choosing' or an 'act of deciding.'" *Ibid.* (citation omitted). "Rather, the volitional-conduct requirement 'stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts.'" *Ibid.* (citation omitted). "As its name suggests, *direct* liability must be premised on conduct that can reasonably be described as the *direct* cause of the infringement." *Ibid.* (citation omitted, emphasis in original).

---

[3] This section of Trunk Archive's Motion focuses primarily on the theories of direct and vicarious infringement. Specific discussion of the merits of Defendants violation of the "display right" and "derivative works" right is described in Section V in the context of defeating Defendants' Counterclaim, however an identical argument can be advanced to support summary judgment in favor of Trunk Archive's infringement claim.

At issue in this case are fifteen Infringing Articles posted on the CBM Website which utilized copies of the Star Wars Photographs. Nine of the Infringing Articles were authored by Defendant Cassidy, and six of the Infringing Articles were authored by Defendant Wilding. *See* Exhibits 21-35.

As explained in Section 1.C, *supra*, Cassidy and Wilding have admitted that each of the Infringing Articles that they authored contained various iterations of the Star Wars Photographs, and have also admitted that their actions "caused a version of the image to be viewable from within th[e] article" on the CBM Website. *See* Exhibits 40-41. In other words, by authoring the Infringing Articles and "caus[ing] a version of the [Star Wars Photographs] to be viewable from within [each] article," Defendants Cassidy and Wilding directly caused the Star Wars Photographs to be exhibited on the CBM Website. *See* Exhibits 21-35.

Thus, Defendants Cassidy and Wilding are direct infringers of the Star Wars Photographs, and summary judgment should be entered in favor of Trunk Archive.

### 2.    *Defendants CBM And Best Are Liable As Vicarious Infringers.*

Vicarious liability attaches when the defendant has the right and ability to supervise the infringing activity and has a direct financial interest in such activities, even if he or she is not aware of the infringing activity. *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd*., 545 U.S. 913, n.9 (2005). When assessing vicarious liability, it does not matter whether the underlying direct infringer is an employee or an independent contractor. *See Gershwin Publishing Corp. v. Columbia Artists Management, Inc*., 443 F.2d 1159, 1162 (2nd Cir. 1971). (A "proprietor [is] liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhances income. *He is liable whether the band is considered, as a technical matter, an employee, or an independent contractor.*" [emphasis added]).

Thus, the imposition of vicarious liability "even in the absence of an intention to infringe or knowledge of infringement, is not unusual. *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 308 (2nd Cir. 1963) (citations omitted); *Broad. Music, Inc. v. Carey-On Saloon, LLC*, 2014 U.S. Dist. LEXIS 16312, *13-14 (D. Col., Feb. 7, 2014) ("Vicarious liability may also be found even when the defendant lacks knowledge of the copyrighted compositions to be played or any control over their selection by the direct infringer, [cite] lacks any intention to infringe, [cite] or instructs the performers to perform no infringing material.").

Here, Defendant CBM and Best both satisfy the two prongs of vicarious infringement. As to the first prong, both CBM and Best have the right and ability to supervise all content that is posted to the CBM Website. Defendant Best has the ability to view all content posted on the Website, including content queued for future posts, and can edit or delete the content of any post uploaded to the Website. Exhibit 38, Interrogatory No. 2. Because Defendant Best is the sole owner and President of Defendant CBM (Exhibit 43 at ¶26; Exhibit 44 at ¶26) his admittedly unfettered right and ability to supervise the content on the CBM Website is also attributable to CBM.

Whether or not CBM and Best chose to affirmatively exercise their right to supervise or control the content of the CBM Website is irrelevant; it only matters that such a right exists. *See Playboy Enters., Inc. v. Webbworld Inc.,* 991 F. Supp. 543, 554 (N.D. Tex. 1997) ("The reluctance of Ives to exercise his authority is not determinative of the issue. Courts that have examined the issue of vicarious liability have focused not on actual exercise of control but rather on the 'right and ability' to exercise control."); *Red Giant, Inc. v. Molzan, Inc.*, 2009 U.S. Dist. LEXIS 63990, at *20 (S.D. Tex. July 24, 2009) ("[I]t follows that Defendant Bruce had the right and ability to control the infringing activities at the Piano Room, regardless of whether or not he chose to exercise that right").

Thus, because CBM and Best have complete editorial authority and control over the CBM website, including the ability edit or delete content queued for future posts, the undisputed

evidence demonstrates that Defendants CBM and Best have satisfied the first prong of the vicarious liability analysis.

The second prong requires that Defendants Best and CBM have a direct financial interest in the infringing activity. The Ninth Circuit case *Fonovisa, Inc. v. Cherry Auction, Inc*., 76 F.3d 259 (9th Cir. 1996) is particularly instructive on this point. *See Warner Records Inc. v. Charter Communs., Inc*., 454 F. Supp. 3d 1069, 1074 (D. Col., April 15, 2020) (Citing *Fonovisa* and noting that "Tenth Circuit cases that address similar [vicarious liability] issues cite particular Ninth Circuit cases favorably.").

*Fonovisa*, involved a plaintiff (Fonovisa) that owned copyrights to Latin music recordings and a defendant (Cherry Auction) that operated a swap meet in Fresno, California. *Fonovisa, Inc.*, 76 F.3d at 261. Vendors paid Cherry Auction a daily rental fee in exchange for booth space. *Ibid.* Fonovisa brought an action against Cherry Auction alleging it was vicariously and contributorily liable for infringement of Fonovisa's copyrights through its vendors' sales of counterfeit recordings. The district court dismissed the complaint reasoning that Cherry Auction did not receive a direct financial benefit since it did not directly profit from the sales of the infringing recordings. *Id.* at 262.

On appeal, the Ninth Circuit reversed holding that a financial benefit exists where the availability of infringing material "acts as a 'draw' for customers." *Id.* at 263. The court noted that Fonovisa reaped numerous financial benefits from the sales of the infringing recordings including the daily rental fee from the vendors and incidental payments for admission, parking, food and other services by customers seeking to purchase infringing recordings. *Id.* at 263.

It is clear that the availability of the Star Wars Photographs in the Infringing Articles were meant to act as a "draw" for Internet users to visit the CBM Website. For example, the headline of one of the Infringing Articles -- "STAR WARS: THE LAST JEDI Actress Laura Dern Shares New Image Of Vice Admiral Amilyn Holdo" --- directly teased the inclusion of the infringing Holdo Photograph as a means to entice readers to view the article. *See* Exhibit 21.

Even if the inclusion of the Star Wars Photographs was not the main "draw" to the Infringing Articles, the financial benefit prong would still be satisfied. "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Warner Records Inc. v. Charter Communs., Inc.,* 454 F. Supp. 3d 1069, 1074 (D. Col. April 15, 2020) (citation and quotation omitted). "This language does not suggest that plaintiffs must show that the draw of infringing activity was '*the* attracting factor' [] but rather *an* attracting factor." *Ibid.* (citation and quotation omitted, emphasis in original).

In this case the financial benefits reaped by Defendants CBM and Best are much more direct than those in *Fonovisa*. Whereas the financial benefit in *Fonovisa* was realized through revenues that were incidental to the infringing conduct alleged, in this case the Infringing Articles containing the infringing Star Wars Photographs were *directly* monetized via advertising revenues based on the number of views. Exhibit 43 at ¶75; Exhibit 44 at ¶75; Exhibit 36. Not only would the views of the Infringing Articles themselves generate revenues, but once Internet users were drawn to the CBM Website, it is likely that they would view additional content on the Website resulting in even more revenue flowing directly into CBM's coffers. *See* Exhibit 36.

Because Defendant Best is compensated directly from the revenues generated by the Website (*see* Exhibit 38, RFA No. 2) he also stood to benefit financially from the successful monetization of the Infringing Articles.

Trunk Archive anticipates that Defendant Best will argue that he cannot be held vicariously liable because he was not acting in his individual capacity, but rather Best was acting in his capacity as owner of president of CBM. However, it is well established that vicarious liability may lie against an individual even if he is acting in his capacity as officer or agent of a corporation. *Carey-On Saloon, LLC*, 2014 U.S. Dist. LEXIS 16312, *16 (D. Col., Feb. 7, 2014) (finding vicarious liability for sole owner of saloon performing infringing songs based on "receipt of

income from Defendant LLC through the activities at the Saloon" and citing cases); *Oliver v. Meow Wolf, Inc.*, 2020 U.S. Dist. LEXIS 221367, *54, 2020 WL 6939875 (D. N.M., Nov. 25, 2020) (collecting cases); *see also Sanchez v. Hacienda Records & Recording Studio, Inc.*, 2013 2013 WL 529950, at *8 (S.D. Tex. Feb. 11, 2013) ("A controlling corporate officer or shareholder may be vicariously liable for infringement along with his or her corporation, despite any immunity provided by state corporation law."). Because Defendant Best satisfies both prongs of the vicarious infringement analysis, he may be held jointly and severally liable with Defendant CBM regardless of his status as a corporate officer of CBM.

Because Defendants CBM and Best have the right and ability to supervise the content on the CBM Website and both receive a direct financial benefit from the advertising revenues generated by content on the CBM Website, both are vicariously liable for the infringement of the Star Wars Photographs, and summary judgment should be entered in favor of Trunk Archive.

## V.   SUMMARY JUDGMENT MUST BE ENETERED AS TO THE COUNTERCLAIM

In addition to summary judgment as to Trunk Archive's copyright infringement claim, the Court should also enter summary judgment as to Defendant CBM and Best's Counterclaim filed at Dkt. #49 ("Counterclaim"). As relevant here[4], CBM and Best contend in their Counterclaim that the Star Wars Photographs "were displayed on CBM's website by embedding the image and linking back to a third-party server that was not owned or controlled by CBM" and that the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Exhibit 44 Counterclaim ¶¶ 23-24.

### A.   Embedding Is Not A Defense To Violation Of The Display Right.

At issue in this case is the practice of embedding. CBM and Best contend that they are not liable for infringement because the Star Wars Photographs "were displayed[5] on CBM's website

---

[4] The Counterclaim also alleges that Defendants CBM and Best are protected by DMCA safe harbor, however the Court has already entered judgment in favor of Trunk Archive on that issue.

[5] Notably, Best and CBM concede that the Star Wars Photographs were "displayed" on the CBM Website.

by embedding the image and linking back to a third-party server that was not owned or controlled by CBM" and that the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Exhibit 44 Counterclaim ¶¶ 23-24.

The court in *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018) provided the following explanation of the practice of "embedding" photographs on to a website:

> A webpage is made up of a series of instructions usually written by coders in Hypertext Markup Language ("HTML"). These instructions are saved to a server (a computer connected to the internet), and when a user wishes to view a webpage, his or her computer's browser connects with the server, at which point the HTML code previously written by the coder instructs the browser on how to arrange the webpage on the user's computer. The HTML code can allow for the arrangement of text and/or images on a page and can also include photographs. When including a photograph on a web page, the HTML code instructs the browser how and where to place the photograph. Importantly for this case, the HTML code could instruct the browser either to retrieve the photograph from the webpage's own server or to retrieve it from a third-party server.

> "Embedding" an image on a webpage is the act of a coder intentionally adding a specific "embed" code to the HTML instructions that incorporates an image, hosted on a third-party server, onto a webpage. To embed an image, the coder or web designer would add an "embed code" to the HTML instructions; this code directs the browser to the third-party server to retrieve the image. An embedded image will then hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website. The result: a seamlessly integrated webpage, a mix of text and images, although the underlying images may be hosted in varying locations. Most social media sites—Facebook, Twitter, and YouTube, for example—provide code that coders and web designers can easily copy in order to enable embedding on their own webpages.

*Goldman*, 302 F. Supp. 3d at 587.

The Copyright Act grants the owner of a copyright exclusive rights to, *inter alia*, "display the copyrighted work publicly." *See* 17 U.S.C. § 106(5). "To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, or any other device or process . . . ." 17 U.S.C. § 101. With regard to the meaning of 'publicly', the Copyright Act provides, in relevant part, that:

> [t]o perform or display a work 'publicly' means - -
> . . .

> (2) to transmit or otherwise communicate a performance or display of the work . . . to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101.

Cases interpreting this definition have held that a display occurs by "the projection of an image on a screen ... by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or similar viewing apparatus connected with any sort of information storage retrieval system." *Greenberg v. Nat'l Geographic Soc.*, 244 F.3d 1267, 1274 (11th Cir. 2001), *overruled on other grounds*, 533 F.3d 1244 (11th Cir. 2008). The definition's usage of the phrase "any other device or process" clearly brings showing a copy of a work through a computer within the statutory definition of "display." Thus, per the statutory definition, each unauthorized *showing* of a work through a computer infringes on the owner's right of public display.

Here, record contains copies of the articles from the CBM Website that displayed the Star Wars Photographs at issue. *See* Exhibits 21-35. Best and CBM concede that the Star Wars Photographs "were *displayed* on CBM's website" but alleges that they are not liable for violation of the display right because the Star Wars Photographs "are not and were not stored on servers belonging to or controlled by CBM or Nathan Best." Exhibit 44 Counterclaim ¶¶ 23-24. According to CBM and Best, the fact that the physical image file resides on a third-party server rather than a CBM server is enough to evade liability for infringement, regardless of the fact that this distinction is an "invisible, technical processes [that is] imperceptible to the viewer" since the viewer only sees the final integrated page on the CBM Website, which would appear identical whether or not an image is stored on a CBM controlled server or embedded from a third-party source. *See Goldman*, 302 F. Supp. 3d at 595.

Notably, the text of the Copyright Act does not make actual *possession* of a copy of a work a prerequisite[6] for infringement of the display right. To "display" a work, someone need only *show*

---

[6] Physical possession may be required in order to violate some exclusive rights such as the reproduction right (§106(1)) or distribution right (§106(3)). However physical possession of a work is clearly not a threshold requirement for violation of *all* the rights enumerated in section 106. For example, an infringer need not be in physical possession of a copy in order to create a

a copy[7] of the work via any device or process; a person need not actually physically possess the underlying copy to display it. *See* 17 U.S.C. § 101. And to display a work publicly, a person need only *transmit or communicate* a display to the public. *Ibid.* "The definition of 'transmit' is broad enough to include all conceivable forms and combinations of wired and wireless communications media." *Greenberg*, 533 F.3d at 1279-1280 citing H.R. Rep. No. 94-1476. Again, the person need not possess underlying copy in order unlawfully to transmit or communicate it to the public. *See Leader's Inst., LLC v. Jackson*, 2017 U.S. Dist. LEXIS 193555, at *32 (N.D. Tex. Nov. 22, 2017).

Under the express statutory definition, a website that utilizes embedding to point to a third-party server where a file is stored, publicly displays that image because the underlying HTML code initiates a *process* whereby the user's browser *device* is instructed to *show* the copy of the image to the website's visitor from the third-party server by *communicating* it to the user via a seamlessly integrated webpage presentation. *See Goldman,* 302 F. Supp. 3d at 590-93 (discussing cases and concluding that on the facts at bar, "when defendants caused the embedded Tweets to appear on their websites, their actions violated plaintiff's exclusive display right."); *Jackson*, 2017 U.S. Dist. LEXIS 193555, 2017 WL 5629514 (N.D. Tex. Nov. 22, 2017) (by "framing the defendant's copyrighted works, the plaintiffs impermissibly displayed the works to the public.").

This reading of the statute is consistent with the Supreme Court's prior admonition that, to determine whether a work is infringed under the Copyright Act, a court must "focus on the [work] as presented to, and perceptible by" the public. *N.Y. Times Co. v. Tasini*, 533 U.S. 483, 499 (2001). In *American Broadcasting Cos. v. Aereo, Inc.*, 573 U.S. 431 (2014) an Internet-based re-transmitter of over-the-air television signals argued that it did not "perform the copyrighted work publicly" because each transmission technically came from a miniature antenna assigned to each user and, therefore, was

---

derivative work (§106(2)) or to engage in a public performance (§106(6)) via an unauthorized rebroadcast. *See American Broadcasting Cos. v. Aereo, Inc.,* 573 U.S. 431 (2014).

[7] Notably the definition does not require that the copy shown be an *infringing* copy itself. Rather, the statute's use of the standalone word "show" without the qualifying word "infringing" further demonstrates that a prospective infringer can violate the display right by impermissibly appropriating what would otherwise be a lawfully stored copy of an image on a third-party server.

a "private" rather than "public" performance. *Id.* at 443-46. The Court rejected that argument, noting that the technical difference "means nothing to the subscriber. It means nothing to the broadcaster. We do not see how this single difference, invisible to subscriber and broadcaster alike, could transform a system" from infringing to non-infringing. *Id.* at 444. "Viewed in terms of Congress' regulatory objectives," the Court asked rhetorically, "why should any of these technological differences matter?" *Id.* at 446. *Aereo* therefore provides that it is a practical, functional perspective, and not hyper technicalities, that determine whether a particular mode of content delivery is infringing or not.

Here it is uncontested that visitors to the CBM Website could view the Star Wars Photographs directly on the CBM Website in the Infringing Articles even though the Star Wars Photographs themselves were displayed via the practice of "embedding." *See* Exhibits 21-35. It is also undisputed that the Infringing Articles generated advertising revenue for the CBM Website. Exhibit 36.

Defendant CBM and Best would have this Court adopted the "server test" which is only followed in the Ninth Circuit. Under this test, the determination of whether a website publisher is liable for infringement turns entirely on whether the image is hosted on the publisher's own server, or is embedded or linked from a third-party server. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159 (9th Cir. 2007).

The Ninth Circuit's approach, under which no display is possible unless the alleged infringer has also stored a copy of the work on the infringer's computer, makes the display right merely a subset of the reproduction right. *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 195 (S.D.N.Y., July 30, 2021). Congress did "not intend ... to freeze the scope of copyrightable technology" to then-existing methods of expression. H.R. Rep. 94-1476, 47, 51 (1976). Specifically, in considering the display right, Congress cast a very wide net, intending to include "[e]ach and every method by which the images ... comprising a ... display are picked up and conveyed," assuming that they reach the public. *Id.* at 64. It further noted that "'display' would include the projection of an image on a screen or other surface by any method, the transmission of an image by electronic or other means, and the showing of an image on a cathode ray tube, or

similar viewing apparatus connected with any sort of information storage and retrieval system." *Id.* Indeed, an infringement of the display right could occur "if the image were transmitted by any method (by closed or open circuit television, for example, or by a computer system) from one place to members of the public elsewhere." *Id.* at 80.

Under the server test, a photographer who allows his work to be distributed on the Internet "surrenders control over how, when, and by whom their work is subsequently shown — reducing the display right, effectively, to the limited right of first publication that the Copyright Act of 1976 rejects." *Nicklen*, 551 F. Supp. 3d 188.

Indeed, allowing the invisible process of "embedding" to control the determination of liability would invite website publishers to abuse and circumvent copyright protection by simply adjusting a few lines of code. *See Perfect 10 v. Google, Inc.*, 416 F. Supp. 2d 828, 839 (C.D. Cal. 2006) ("[S]omeone could create a website entitled 'Infringing Content For All!' with thousands of in-line links to images on other websites that serve infringing content. That website, however, would be immune from claims of direct infringement because it does not actually *serve* the images." [emphasis in original]). By exploiting this hyper technical loophole, websites such as CBM would be able to retain all benefits of placing desirable copyrighted content on its Website --- increased visitor traffic which ostensibly would increase the potential to monetize the CBM Website via advertising – all the while avoiding legal liability or the obligation to pay the content creators the customary price for using their copyrighted content.

Thus, under the definition of "public display" enumerated in the Copyright Act, the mere "embedding" of the Star Wars Photographs onto the CBM Website is not a defense to liability. Therefore, the Court should enter summary judgment in favor of Trunk Archive.

**B.    Even If Embedding Is A Defense To Violation Of The Display Right, Defendants Could Still Be Liable For Creating An Unauthorized Derivative.**

Although Trunk Archive's primary theory on summary judgment is that Defendants have violated the display right, to the extent that the Court concludes that embedding is not a violation

22

of the display right Trunk Archive would submit that Defendants could still be liable for infringement based on the creation of an unauthorized derivative works of the Star Wars Photographs by incorporating them into the Infringing Articles.

The Copyright Acts provides for protection against the preparation of unauthorized derivatives of a copyrighted work. 17 U.S.C. § 106(2). A "derivative work" is a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. 17 U.S.C. § 101.

Under the "server test," a public display of a photographic image on an Internet website cannot occur unless the infringer reproduces a copy of that photographic image onto a server controlled by the infringer. See *Nicklen*, 551 F. Supp. 3d 188, 195 (Observing that the Ninth Circuit's approach, under which no display is possible unless the alleged infringer has also stored a copy of the work on the infringer's computer, makes the display right merely a subset of the reproduction right.). Unlike the "server test" which requires physical reproduction and possession of an infringing copy to facilitate a public display, the textual definition of "derivative work" does not require an infringer to be in possession of a physical copy in order to violate the right. That is because the "display right" can only be applied to "pictorial, graphic, and sculptural works" since a display only occurs when one "show[s] a copy of" a work which involves the actual manipulation of a physical work itself[8]. In contrast, the creation of a derivative can be applied to practically all copyrighted works whatsoever their nature, and does not require an infringer to make or possess a copy[9] to violate the right.

---

[8] For example, one could "display" a photograph but could not "display" a musical work.

[9] For example, one could create an unauthorized derivative literary work by recasting, transforming, or adapting the copyrighted characters from the Harry Potter franchise into a new book without actually possessing or making a copy of the books from the original series.

According to the legislative history of the Copyright Act, the exclusive right to prepare derivative works in §106(2) is broader than the reproduction right in §106(1) "in the sense that reproduction requires fixation in copies or phonorecords, whereas the preparation of a derivative work . . . may be an infringement even though nothing is ever fixed in tangible form." House Report No. 94-1476. Rather, "the definition in section 101 refers to 'a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted.' Thus, to constitute a violation of section 106(2), the infringing work must incorporate a portion of the copyrighted work in some form." *Ibid.*

As the legislative history makes clear, Defendants' utilization of "embedding" to incorporate the Star Wars Photographs on to the CBM Website as part of the Infringing Articles constitutes a violation of the exclusive right to prepare derivative works, even though "embedding" does not result in physical reproduction or fixation of the Star Wars Photographs onto the servers of the CBM Website since "fixation" is not a prerequisite to a violation of §106(2).

An identical scenario occurred in the case *Michael Grecco Prods. v. Valuewalk LLC*, 345 F. Supp. 3d 482, 501 (S.D.N.Y., Nov. 6, 2018).

In *Valuewalk*, the plaintiff owned the rights to a photograph of Jeffrey Gundlach, a prominent bond trader. *Id.* at 493. The defendant, an online financial news outlet, created a series of "Resource Pages" — essentially news articles profiling a notable person — including one illustrated by the plaintiff's photograph. *Id.* at 502. In entering summary judgment for the plaintiff, the *Valuewalk* court noted that the Resource Page "was precisely the type of work for which [Plaintiff] created the photograph" and that because the photograph was used to illustrate the page and was not authorized by the plaintiff "the Resource Pages are unauthorized derivatives as a matter of law." *Ibid.*

Here, like the Resource Pages in *Valuewalk*, the Star Wars Photographs were clearly used by Defendants to illustrate the Infringing Articles. *See* Exhibits 21-35. The Infringing Articles

24

themselves constitute unauthorized derivative works because they recast the Star Wars Photographs without authorization as a means of illustration. It does not matter whether the Star Wars Photographs that were integrated into the Infringing Articles were placed there as a result of embedding them from a third-party server. Rather, the act of adapting them for use within the Infringing Articles without authorization violated §106(2). *See Greenberg*, 244 F.3d at 1274 (11th Cir. 2001) ("The Society has selected ten preexisting works, photographs included in covers of ten issues of the Magazine, including Greenberg's, and transformed them into a moving visual sequence that morphs one into the other over a span of approximately 25 seconds. Moreover, the Society repositioned Greenberg's photograph from a horizontal presentation of the diver into a vertical presentation of that diver. Manifestly, this Sequence, an animated, transforming selection and arrangement of preexisting copyrighted photographs constitutes … a derivative work."); *Jarvis v. K2 Inc.*, 486 F.3d 526, 531 (9th Cir. 2007) (Derivative work found where infringing ads utilized the copyrighted images "while also combining them with photos taken by other photographers, additional graphics, the K2 logo and marketing slogans.")

Thus, to the extent that the Counterclaim asserts that the practice of "embedding" constitutes a complete defense to infringement, it must fail.

Finally, when determining whether Defendants' conduct constituted the creation of an infringing derivative, it does not matter whether the Infringing Articles contained additional non-infringing material:

> As Judge Learned Hand cogently remarked, "no plagiarist can excuse the wrong by showing how much of his work he did not pirate." [cite]. "The question in each case is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work - not whether such material constitutes a substantial portion of defendant's work." [cite].

*Jacobsen v. Deseret Book Co*., 287 F.3d 936, 945 (10th Cir. 2002).

Thus, as the Tenth Circuit has instructed, the Court should not concern itself with whether or not the Star Wars Photographs constitute a substantial part of the Infringing Articles. Rather, the Court must consider only whether Defendants utilized a substantial portion of the Star Wars

Photographs in the Infringing Articles. *Ibid*. As the evidence clearly demonstrates, the entirety of the unaltered Star Wars Photographs was visible in the Infringing Articles, rendering the usage clearly substantial.

In conclusion, the Counterclaim's reliance on embedding as a defense to a violation of the display right does not pass legal muster because the act of embedding the Star Wars Photographs within the Infringing Articles still meets the statutory definition of public display. Even if embedding were a defense to the public display right, the act of embedding the Star Wars Photographs into the Infringing Articles without permission also violates Trunk Archive's right to create derivative works.

As such, summary judgment should be entered in favor of Trunk Archive.

## VI.    DEFENDANTS AFFIRMATIVE DEFENSES ALSO FAIL

Each Defendant also raised a number of affirmative defenses to Trunk Archive's infringement claim. Defendants bear the burden of production, and if Defendants fail to meet that burden as to some of all of the affirmative defenses, the Court must enter summary judgment in favor of Trunk Archive. Nonetheless, for the sake of completeness, Trunk Archive will briefly address Defendants' affirmative defenses.

### A.    Failure To State A Claim.

As a first affirmative defense, all Defendants contend that Trunk Archive has failed to state a claim. As demonstrated in Section III above, Trunk Archive has stated a claim for copyright infringement against all defendants.

As such, summary judgment should be entered in favor of Trunk Archive.

### B.    No Damages.

As a second affirmative defense, all Defendants contend that Trunk Archive's claim is barred for lack of damages.

Entitlement to monetary damages is not an element of a copyright claim. *Predator Int'l, Inc. v. Gamo Outdoor United States*, 2013 U.S. Dist. LEXIS 36866, *19, 2013 WL 1129404 (D.

Col., Mar. 18, 2013). Because it is not an element of an infringement claim, lack of damages is not a valid affirmative defense.

As such, summary judgment should be entered in favor of Trunk Archive.

**C.     Public Policy.**

As a third affirmative defense, all Defendants contend that Trunk Archive's claim is barred because it runs contrary to public policy.

The Court has already stricken this defense as insufficient. *See* Dkt. #70.

As such, summary judgment should be entered in favor of Trunk Archive.

**D.     Failure To Mitigate.**

As a fourth affirmative defense, all Defendants contend that Trunk Archive's claim is barred  for failure to mitigate damages.

The Court has already stricken this defense as insufficient. *See* Dkt. #70.

As such, summary judgment should be entered in favor of Trunk Archive.

**E.     DMCA Safe Harbor.**

As a fifth affirmative defense, all Defendants contend that Trunk Archive's claim is barred by DMCA Safe Harbor protection.

The Court has already entered judgment on the pleadings in favor of Trunk Archive on this issue. *See* Dkt. #85.

As such, summary judgment should be entered in favor of Trunk Archive.

**F.     Res Judicata.**

As a sixth affirmative defense, all Defendants contend that Trunk Archive's claim is barred by collateral estoppel, res judicata, and claim splitting.

Defendants have not specifically explained how or why collateral estoppel, res judicata, and/or claim splitting apply in this context. The Court has already ruled that claim splitting is inapplicable here. Dkt. # 48. Absent a more specific showing from Defendants, this affirmative defense must fail.

As such, summary judgment should be entered in favor of Trunk Archive.

### G.     Lack Of Actual Knowledge.

As a seventh affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they lacked actual knowledge of the infringing activity.

As explained in Section III above, copyright infringement is a strict-liability regime, and Defendants can be held liable absent actual knowledge of the infringement.

As such, summary judgment should be entered in favor of Trunk Archive.

### H.     Lack Of Material Contribution.

As an eighth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they did not materially contribute to the infringing acts alleged.

As explained in Section III above, Trunk Archive seeks to hold defendants liable on a theory of direct and vicarious infringement. Material contribution is not an element of either of these theories, but rather is an element of contributory liability, which is not a theory advanced here.

As such, summary judgment should be entered in favor of Trunk Archive.

### I.     Lack Of Intent.

As a ninth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they lacked intent to infringe.

As explained in Section III above, copyright infringement is a strict-liability regime, and Defendants can be held liable absent actual intent to infringe.

As such, summary judgment should be entered in favor of Trunk Archive.

### J.     Expeditious Removal.

As a tenth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they acted expeditiously to remove the infringing content.

While removal of the infringing content is certainly welcome, it does not absolve Defendants of their originally infringing acts. Defendants cite no authority stating otherwise.

As such, summary judgment should be entered in favor of Trunk Archive.

### K.     No DMCA Takedown Notification.

As an eleventh affirmative defense, all Defendants contend that Trunk Archive's claim is barred for failure to submit a DMCA takedown request.

The Court has already entered judgment on the pleadings in favor of Trunk Archive on the DMCA. *See* Dkt. #85.

As such, summary judgment should be entered in favor of Trunk Archive.

### L.     Embedding.

As a twelfth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because the photographs at issue do not reside on a system or network operated by Defendants.

As explained in Section IV above, this is not a defense to copyright infringement.

As such, summary judgment should be entered in favor of Trunk Archive.

### M.     No Proximate Damages.

Similar to the second affirmative defense, Defendants' thirteenth affirmative defense contends that Trunk Archive's claim is barred because any damages were caused by third parties and not Defendants.

Entitlement to monetary damages is not an element of a copyright claim. *Predator Int'l, Inc. v. Gamo Outdoor United States*, 2013 U.S. Dist. LEXIS 36866, *19, 2013 WL 1129404 (D. Col., Mar. 18, 2013). Because damages is not an element of an infringement claim this affirmative defense fails.

As such, summary judgment should be entered in favor of Trunk Archive.

### N.     Bad Faith.

As a fourteenth affirmative defense, all Defendants contend that Trunk Archive's claim is barred by bad faith conduct.

Defendants have not specifically identified the bad faith conduct in question or cited any authority as to why it bars Trunk Archive's claims. Absent a more specific showing from Defendants, this affirmative defense must fail.

29

As such, summary judgment should be entered in favor of Trunk Archive.

**O.     Unjust Enrichment.**

As a fifteenth affirmative defense, all Defendants contend that Trunk Archive's claim is barred by the doctrine of unjust enrichment.

The Court has already stricken this defense as insufficient. *See* Dkt. #70.

As such, summary judgment should be entered in favor of Trunk Archive.

**P.     Lack Of Malice.**

As a sixteenth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they did not act with malice.

As explained in Section III above, copyright infringement is a strict-liability regime, and Defendants can be held liable absent actual intent to infringe.

As such, summary judgment should be entered in favor of Trunk Archive.

**Q.     Unclean Hands.**

As a seventeenth affirmative defense, all Defendants contend that Trunk Archive's claim is barred by unclean hands.

Defendants have not specifically identified the bad faith conduct in question or cited any authority as to why it bars Trunk Archive's claims. Absent a more specific showing from Defendants, this affirmative defense must fail.

As such, summary judgment should be entered in favor of Trunk Archive.

**R.     Good Faith.**

As an eighteenth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because Defendants acted in good faith.

As explained in Section III above, copyright infringement is a strict-liability regime, and Defendants can be held liable absent actual intent to infringe.

As such, summary judgment should be entered in favor of Trunk Archive.

**S.     Infliction Of Own Harm.**

As a nineteenth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because Trunk Archive inflicted its own harm and damages.

Entitlement to monetary damages is not an element of a copyright claim. *Predator Int'l, Inc. v. Gamo Outdoor United States*, 2013 U.S. Dist. LEXIS 36866, *19, 2013 WL 1129404 (D. Col., Mar. 18, 2013). Because damages is not an element of an infringement claim this affirmative defense fails.

As such, summary judgment should be entered in favor of Trunk Archive.

**T.     No Ability To Supervise Or Control.**

As a twentieth affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they did not have the right and ability to supervise the infringing content.

As explained in Section III, Defendants CBM and Best can both be held vicariously liable for the infringement alleged. Trunk Archive has not advanced a theory of vicarious infringement against Defendants Cassidy and Wilding, and therefore this affirmative defense is irrelevant as to those defendants.

As such, summary judgment should be entered in favor of Trunk Archive.

**U.     No Financial Benefit.**

As a twenty-first affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they did not have a financial interest in the infringing content sufficient to confer vicarious liability.

As explained in Section III, Defendants CBM and Best can both be held vicariously liable for the infringement alleged. Trunk Archive has not advanced a theory of vicarious infringement against Defendants Cassidy and Wilding, and therefore this affirmative defense is irrelevant as to those defendants.

As such, summary judgment should be entered in favor of Trunk Archive.

## V.     Laches And Waiver.

As a twenty-second affirmative defense, all Defendants contend that Trunk Archive's claim is barred because they did not have a financial interest in the infringing content sufficient to confer vicarious liability.

The Court has already stricken the defense of laches as insufficient. *See* Dkt. #70. As to waiver, "Waiver or abandonment of copyright occurs if there is an intent by the copyright proprietor to surrender rights in his work." *Bell v. Mowad Group, LLC*, 326 F. Supp. 3d 918 (9th Cir. 2018) (citation and quotation omitted). Defendants have not demonstrated intent to surrender rights in the Star Wars Photographs. Rather, the record demonstrates the opposite.

Shortly after the Star Wars Photographs were published, they were registered with the United States Copyright Office --- a necessary prerequisite to enforcement. *See* Exhibits 12-13. Likewise, it is undisputed that immediately after publication, Leibovitz granted Trunk Archive rights to license the Star Wars Photographs via the Artist Agreement. Exhibit 14. Additionally, as this copyright infringement action makes clear, both Trunk Archive and Leibovitz take copyright protection and enforcement seriously. Thus, actions taken by Leibovitz and Trunk Archive demonstrate that neither had intended to surrender or waive the copyrights to the Star Wars Photographs.

As such, summary judgment should be entered in favor of Trunk Archive.

## W.     Copyright Misuse.

As a twenty-third affirmative Defendant Cassidy and Wilding allege that Trunk Archive has engaged in copyright misuse.

As an initial matter, some courts have flatly rejected the existence of the "copyright misuse" doctrine. *See, e.g., Rural Tel. Serv. Co., Inc. v. Feist Publications, Inc*., 663 F. Supp. 214, 220 (D. Kan. 1987); *Orth-O-Vision, Inc. v. Home Box Office*, 474 F. Supp. 672, 686 (S.D.N.Y. 1979); *Reliability Research, Inc. v. Computer Assocs. Int'l, Inc*., 793 F. Supp. 68, 69 (E.D.N.Y. 1992) ("Neither the Supreme Court nor the Second Circuit has addressed the issue of the existence and extent of a misuse of copyright defense.")

Assuming *arguendo* that the doctrine does exist, the defense of copyright misuse is based upon the principle that copyright holders may not leverage their copyright monopoly to allow them to control of areas outside the monopoly. *Bourne v. Walt Disney Co*., 2003 U.S. Dist. LEXIS 2818, at *10; 2003 WL 721405, at *4 (S.D.N.Y. Mar. 3, 2003) citing *A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1026 (9th Cir. 2001). The Copyright Act sets forth a number of exclusive rights of a copyright holder. *See* 17 U.S.C. § 106.

In *Practice Mgmt. Info. Corp. v. AMA*, 121 F.3d 516 (9th Cir. 1997) the American Medical Association ("AMA") licensed a copyrighted coding system to the Health Care Financing Administration ("HCFA"). *Id.* at 517-8. The agreement granted HCFA a royalty-free, non-exclusive license to use the AMA's coding system. *Ibid.* In return, HCFA promised not to use any other coding system and also promised to use its powers as a regulatory agency to require use of the AMA's system in programs administered by its agents. *Ibid.*

A separate dispute arose between Practice Management, the largest reseller of books of the AMA's coding system, and the AMA. *Id.* at 518. Practice Management argued in its action for declaratory relief that the AMA was misusing its copyrights because the licensing agreement between HCFA and the AMA was unduly restrictive. *Ibid.* The Ninth Circuit looked closely at the licensing agreement and sided with Practice Management. *Id.* at 521. In particular, the court held that the requirement that HCFA not use competing coding systems represented an expansion of the monopoly power of the AMA's copyright. *Ibid.* The court labeled this exclusivity clause the "controlling fact." *Ibid.* (copyright misuse is implicated by "the limitation imposed by the AMA licensing agreement on HCFA's rights to decide whether or not to use other forms as well").

In this instance, Cassidy and Wilding cannot allege a copyright misuse because Trunk Archive is not attempting to do anything other than enforce the exclusive rights granted to it by the Copyright Act. Indeed, Trunk Archive's claim merely attempts to restrict Cassidy and Wilding from their unauthorized copying of the photographs at issue  which fall squarely within the scope of Trunk Archive's exclusive rights. *See* 17 U.S.C. § 106. "The copyright misuse doctrine does

not prohibit using conditions to control use of copyrighted material." *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1159 (9th Cir. 2011).

As such, summary judgment should be entered in favor of Trunk Archive.

## X.       First Amendment.

As a twenty-fourth affirmative defense Defendants Cassidy and Wilding contend that Trunk Archive's claim is barred by the First Amendment.

The Court has already stricken this defense as insufficient. *See* Dkt. #70.

As such, summary judgment should be entered in favor of Trunk Archive.

## Y.       Fair Use

As a twenty-third affirmative defense Defendants Cassidy and Wilding contend that Trunk Archive's claim is barred by the doctrine of fair use.

The Copyright Act lists four factors non-exclusive factors that a court must weigh when determining whether a use is fair: (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work. 17 U.S.C. § 107.

Here, all four factors weigh against a finding of fair use.

### 1.       *The Purpose And Character Of The Use Weighs Against Fair Use.*

The first fair use factor is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." §107(1). This factor considers the reasons for, and nature of, the copier's use of an original work. *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 143 S. Ct. 1258, 1274 (2023).

The "central" question it asks is "whether the new work merely 'supersede[s] the objects' of the original creation . . . ('supplanting' the original), or instead adds something new, with a further purpose or different character." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579, (1994). In that way, the first factor relates to the problem of substitution—copyright's bête noire.

34

*Goldsmith*, 143 S. Ct. at 1274. The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or supplant the work. *Ibid.*

Commercial use is an important consideration in the first fair use factor, and a profit motivation may weigh heavily against fair use. *See Harper & Row*, 471 U.S. at 562 (explaining that even straight reporting may, in some cases, be "commercial" for purposes of this factor); *see also* 4 *Nimmer & Nimmer*, § 13.05[A][1][c], at 13-167 (noting that "[e]ven if the defendant's purpose in copying is news reporting -- one of the characteristically fair purposes set forth in the preamble to Section 107 -- its profit motivation may negate the fairness of its use under this factor.")

Applying those standards here, the first factor cuts strongly against a finding of fair use. Defendants clearly sought to use the Star Wars Photographs to monetize the CBM Website. It is undisputed that Defendants Cassidy and Wilding were paid for authoring the Infringing Articles. *See* Section I.C; *see also* Exhibits 19-20. It is also undisputed that the Infringing Articles containing the Star Wars Photographs generated revenues for CBM and Best. *See* Exhibit 36.

Additionally the use of the Star Wars Photographs was not transformative in any material way. To the contrary, The Star Wars Photographs were used solely "for illustrative purposes without adding new information, new aesthetics, new insights and new understandings." *Otto v. Hearst Communs., Inc.,* 345 F. Supp. 3d 412, 428 (S.D.N.Y. 2018) ("the use of an image solely to illustrate the content of that image, in a commercial capacity, has yet to be found as fair use"); *see also Fox News Network, LLC v. TVEyes, Inc*., 883 F.3d 169, 177 (2nd Cir. 2018) ("[A] use of copyrighted material that merely repackages or republishes the original is unlikely to be deemed a fair use." (quotation omitted))

To nonetheless find that the use of the Star Wars Photographs were fair would "eliminate copyright protection any time a copyrighted photograph was used in conjunction with a news story

about the subject of that photograph. That is plainly not the law." *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) .

Thus, the first factor weighs against a finding of fair use.

### 2.   The Nature Of The Copyrighted Work Weighs Against Fair Use.

The second factor considers "the nature of the copyrighted work." In so doing, the court may consider, among other things, whether the work was creative, imaginative, and original, . . . and whether it represented a substantial investment of time and labor made in anticipation of financial return. *Pro Arts, Inc. v. Hustler Magazine, Inc*. 787 F.2d 592 (6th Cir. 1986) (quotation omitted).

The Star Wars Photographs are clearly subject to protectable copyright. *See* 17 U.S.C. § 102(a)(5). Leibovitz is one of the most accomplished photographers of all time. It would defy reason to suggest that her works, including the Star Wars Photographs were not highly creative in nature. Additionally, it is clear that Leibovitz and Trunk Archive expect to reap a financial return from licensing such sought after works to various publications. Indeed, "visual works are created, and sold or licensed, usually for repetitive viewing." *Ringgold v. Black Entm't TV, Inc.,* 126 F.3d 70, 79 (2nd Cir. 1997).

Thus, the second factor weighs against a finding of fair use.

### 3.   The Substantiality Of The Portions Used Weighs Against Fair Use.

The third fair use factor directs courts to examine the amount and substantiality of the portion used in relation to the copyrighted work as a whole. *See Sheldon v. Metro-Goldwyn Pictures Corp*., 471 U.S. 539, 565 (1985) ("no plagiarist can excuse the wrong by showing how much of his work he did not pirate"). Generally speaking, "the more of a copyrighted work that is taken, the less likely the use is to be fair." *Infinity Broad. Corp. v. Kirkwood*, 150 F.3d 104, 109 (2nd Cir. 1998).

Here, it is undisputed that complete versions of the Star Wars Photographs were incorporated into the Infringing Articles on the CBM Website. *See Bill Graham Archives v.*

*Dorling Kindersley Ltd.*, 448 F.3d 605, 613 (2nd Cir. 2006) ("Neither our court nor any of our sister circuits has ever ruled that copying of an entire work favors fair use.").

Thus, the third factor weighs against a finding of fair use.

### 4.       The Effect On The Market Place Weighs Against Fair Use.

The final factor — "the effect of the use upon the potential market for or value of the copyrighted work" — looks "to not only the market harm caused by the particular infringement, but also to whether, if the challenged use becomes widespread, it will adversely affect the potential market for the copyrighted work." *Bill Graham Archives*, 448 F.3d at 613; *see also Harper & Row*, 471 U.S. at 568 ("[T]o negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." (internal quotation marks omitted)).

This factor "is undoubtedly the single most important element of fair use," because "[f]air use, when properly applied, is limited to copying by others which does not materially impair the marketability of the work which is copied." *Id.* at 566-67; *see also* S. Rep. No. 94-473 (1975) ("[A] use that supplants any part of the normal market for a copyrighted work would ordinarily be considered an infringement.").

Here, Trunk Archive's business depends on its ability to convince publications to pay a licensing fee to use its photographs. Because the Star Wars Photographs were used for the very purpose for which they was originally intended, its use necessarily "usurp[ed]" the function of the original works in the market. *Cariou v. Prince*, 714 F.3d 694, 708 (2nd Cir. 2013). Moreover, if this  practice of Internet publications using photographs without licensing were to become widespread, it is intuitive that the market for such images would diminish correspondingly: If entertainment websites could use such images for free, there would be little or no reason to pay for a license to Trunk Archive.

In conclusion, all four of the fair use factors weigh against a finding of fair use.  Thus, summary judgment should be entered in favor of Trunk Archive.

Z.      **Invalid Copyrights.**

As a twenty-sixth affirmative defense Defendants Cassidy and Wilding contend that Trunk Archive's claim is barred because the copyrights at issue are invalid.

As explained in Section III the copyrights to the Star Wars Photographs are valid.

As such, summary judgment should be entered in favor of Trunk Archive.

**AA.     Speculative Damages.**

As a twenty-seventh affirmative defense Defendants Cassidy and Wilding contend that Trunk Archive's claim is barred because the damages are speculative.

Entitlement to monetary damages is not an element of a copyright claim. *Predator Int'l, Inc. v. Gamo Outdoor United States*, 2013 U.S. Dist. LEXIS 36866, *19, 2013 WL 1129404 (D. Col., Mar. 18, 2013). Because damages is not an element of an infringement claim this affirmative defense fails.

As such, summary judgment should be entered in favor of Trunk Archive.

**BB.     De Minimis Use.**

As a twenty-eighth affirmative defense Defendants Cassidy and Wilding contend that Trunk Archive's claim is barred by the doctrine of de minimis use.

"To establish that the infringement of a copyright is de minimis, and therefore not actionable, the alleged infringer must demonstrate that the copying of the protected material is so trivial 'as to fall below the quantitative threshold of substantial similarity, which is always a required element of actionable copying.'" *Sandoval v. New Line Cinema Corp.*, 147 F. 3d 215, 217 (2nd Cir. 1998) (quoting *Ringgold v. Black Entertainment TV*, 126 F.3d 70, 74 (2nd Cir. 1997)). In making this assessment, "courts often look to the amount of the copyrighted work that was copied." *Ibid.*

Use of an entire photograph cannot be de minimis. *See Iantosca v. Elie Tahari*, Ltd., 2020 U.S. Dist. LEXIS 171512, at *15 n.5; 2020 WL 5603538, at *6 (S.D.N.Y. Sep. 18, 2020); *Werner v. Evolve Media*, LLC, 2020 U.S. Dist. LEXIS 106477 at *21; 2020 WL 3213808, at *8 (C.D.Cal.,

2020) ("Defendants displayed Plaintiff's photographs in their entirety. Clearly, this is not a 'meager' or 'fragmentary' use, and the de minimis use defense fails.").

Here, the use of the Star Wars Photographs cannot be de minimis, since the entirety of each Photograph was incorporated on the CBM Website via the Infringing Articles. *Compare* Exhibits 1-11 *with* Exhibits 15-35.

As such, summary judgment should be entered in favor of Trunk Archive.

## VII.   TRUNK ARCHIVE IS ENTITLED TO SEEK STATUTORY DAMAGES

Trunk Archive is also entitled to summary judgment that it is eligible to pursue statutory damages for some of the infringements. Under the Copyright Act, an infringement is eligible for statutory damages if the work at issue is registered within three months of first publication or if the infringement occurred after registration has been made. 17 U.S.C. § 412(2).

Here, the Holdo, DJ, Skywalker, Connix, and Dameron Photographs were first published in the 2017 Vanity Fair Article on or about May 24, 2017. Exhibit 15. Leibovitz registered the Holdo Photograph, Skywalker Photograph, Connix Photograph, and Dameron Photograph as part of a group registration of photographs under registration certificate VA 2-111-252 with an effective registration date of July 10, 2017, which is less than three months from first publication. Exhibit 12. Because these images are timely registered, Trunk Archive is entitled summary judgment that is eligible to recover statutory damages for the infringements of the Holdo Photograph, Skywalker Photograph, Connix Photograph, and Dameron Photograph as follows:

- One award of statutory damages against CBM, Best, and Cassidy for infringement of the Holdo Photograph in the article titled "STAR WARS: THE LAST JEDI Actress Laura Dern Shares New Image Of Vice Admiral Amilyn Holdo" dated October 18, 2017. Exhibit 21; Exhibit 40, RFA Nos. 2-3, 7.

- One award of statutory damages against CBM, Best, and Cassidy for infringement of the DJ Photograph in the article titled "STAR WARS: THE LAST JEDI International TV Spot Features Benicio Del Toro As The Mysterious DJ" dated November 20, 2017. Exhibit 22; Exhibit 40, RFA Nos. 8-9, 13.

- One award of statutory damages against CBM, Best, and Cassidy for infringement of the Skywalker Photograph in the article titled "STAR WARS: THE LAST JED's Mark Hamill Shares A Lovely Tribute To Carrie Fisher One Year After Her Passing" dated December 27, 2017. Exhibit 23; Exhibit 40, RFA Nos. 14-15, 19.

39

- One award of statutory damages against CBM, Best, and Cassidy for infringement of the Connix Photograph in the article titled "Billie Lourd Shares A Touching Tribute To Carrie Fisher On The Second Anniversary Of Her Passing" dated December 27, 2018. Exhibit 24; Exhibit 40, RFA Nos. 20-21, 25.

- One award of statutory damages against CBM, Best, and Wilding for infringement of the Dameron Photograph in the article titled "STAR WARS: THE RISE OF SKYWALKER's Oscar Issacs Blames 'Disney Overlords' For No Poe/Finn Romance" dated December 26, 2019. Exhibit 32; Exhibit 41, RFA Nos. 42-43, 48.

Leibovitz also registered the Millennium Falcon Photograph, R2-D2 Photograph, Finn Photograph, Hux Photograph, Production Photographs, and Lightsaber Photograph as part of a group registration of photographs under registration certificate VA 2-192-380 with an effective registration date of January 16, 2020. Exhibit 13. However, such registration was done more than three months after first publication. *See* Exhibit 16. As such, Trunk Archive is only entitled to seek statutory damages related to uses of those photographs occurring after January 16, 2020 (*see* 17 U.S.C. § 412(2)) as follows:

- One award of statutory damages against CBM, Best, and Cassidy for infringement of the Lightsaber Photograph in the article titled "STAR WARS: THE RISE OF SKYWALKER Passes $500 Million At The Domestic Box Office" dated January 26, 2020. Exhibit 35; Exhibit 40, RFA Nos. 50-51, 55.

## VIII.   CONCLUSION

In conclusion, Plaintiff Great Bowery Inc. d/b/a Trunk Archive respectfully requests that the Court enter summary judgment in its favor.

Dated: November 3, 2023                              Respectfully submitted,

**/s/ Mathew K. Higbee**
Mathew K. Higbee, SBN 11133
**HIGBEE & ASSOCIATES**
(714) 617-8373
mhigbee@higbee.law

**/s/ Ryan E. Carreon**
Ryan E. Carreon, *pro hac vice*
**HIGBEE & ASSOCIATES**
(714) 617-8373
rcarreon@higbee.law
*Attorneys for Plaintiff Trunk Archive*