THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| GREAT BOWERY, d/b/a TRUNK ARCHIVE,<br><br>Plaintiff,<br><br>v.<br><br>BEST LITTLE SITES, d/b/a www.comicbookmovie.com; NATHAN BEST; MARK CASSIDY; JOSHUA WILDING; and DOES 1 through 10, inclusive,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [102] PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00567-DBB-JCB<br><br>District Judge David Barlow |

In this case, Plaintiff Great Bowery, d/b/a Trunk Archive ("Trunk Archive") alleges that Defendants Best Little Sites, d/b/a www.comicbookmovie.com ("CBM"), Nathan Best, Mark Cassidy, and Joshua Wilding infringed its copyright of various photographs taken by Annie Leibovitz.[1] Now, Truck Archive moves for summary judgment on its claim, Defendants' counterclaim, Defendants' affirmative defenses, and on the issue of damages.[2] For the following reasons, the court grants Trunk Archive's motion in part and denies it in part.

**BACKGROUND**

In 2014, Ms. Annie Leibovitz entered into an agreement with Trunk Archive, under which Ms. Leibovitz granted Trunk Archive "the exclusive worldwide right to license, market,

---

[1] Compl. ¶¶ 77–85, ECF No. 2.
[2] Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 102.

and promote" those images that she provided to Trunk Archive.[3] This "Artist Agreement" was signed on behalf of Ms. Leibovitz by her manager.[4] Between 2014 and 2019, Ms. Leibovitz created a series of photographs of the cast and crew of the films *Star Wars: The Last Jedi* and *Star Wars: The Rise of Skywalker*.[5] Ms. Leibovitz registered these photographs with the U.S. Copyright Office.[6] On May 24, 2017, Vanity Fair published an article containing the photographs from *The Last Jedi*.[7] Ms. Leibovitz then provided these photographs to Trunk Archive.[8] This set of photographs includes the following: a photograph of actress Laura Dern as Vice Admiral Amilyn Holdo ("Holdo Photograph")[9]; a photograph of actor Benicio Del Toro as DJ ("DJ Photograph")[10]; a photograph of actor Mark Hamill and actress Carrie Fisher as Luke Skywalker and Leia Organa respectively ("Skywalker Photograph")[11]; a photograph of actresses Carrie Fisher and Billie Lourd as Leia Organa and Kaydel Ko Connix respectively ("Connix Photograph")[12]; and a photograph of actors Oscar Isaac, John Boyega, and Kelly Marie Tran as Poe Dameron, Finn, and Rose Tico respectively ("Dameron Photograph").[13]

Next, on May 22, 2019, Vanity Fair published an article containing the photographs from *The Rise of Skywalker*.[14] Ms. Leibovitz then provided this second set of photographs to Trunk

---

[3] Decl. of Annie Leibovitz ("Leibovitz Decl.") ¶ 21, ECF No. 102-1 Ex. 42; Artist Agreement ¶¶ 1–2, ECF No. 104.
[4] Artist Agreement; Leibovitz Decl. ¶ 23.
[5] Leibovitz Decl. ¶¶ 3–14.
[6] *See id.* ¶¶ 16–20; Copyright Registration No. VA 2-111-252 (July 10, 2017), ECF No. 102-1 Ex. 12; Copyright Registration No. VA 2-192-380 (Jan. 16, 2020), ECF No. 102-1 Ex. 13.
[7] Leibovitz Decl. ¶ 24; *see also* See Annie Leibovitz's Exclusive Cast Portraits of *Star Wars: The Last Jedi* for *Vanity Fair*, ECF No. 102-1 Ex. 15.
[8] Leibovitz Decl. ¶ 27.
[9] *Id.* ¶ 4; Holdo Photograph, ECF No. 102-1 Ex. 1.
[10] Leibovitz Decl. ¶ 5; DJ Photograph, ECF No. 102-1 Ex. 2.
[11] Leibovitz Decl. ¶ 6; Skywalker Photograph, ECF No. 102-1 Ex. 3.
[12] Leibovitz Decl. ¶ 7; Connix Photograph, ECF No. 102-1 Ex. 4.
[13] Leibovitz Decl. ¶ 14; Dameron Photograph, ECF No. 102-1 Ex. 11.
[14] Leibovitz Decl. ¶ 28; *Star Wars: The Rise of Skywalker* Photos: Meet the Characters and Go on Set, ECF No. 102-1 Ex. 16.

2

Archive.[15] This set of photographs includes: a photograph of actors Oscar Isaac and Billy Dee Williams as, respectively, Poe Dameron and Lando Calrissian aboard the Millennium Falcon ("Millennium Falcon Photograph")[16]; a photograph of actor Mark Hamill as Luke Skywalker with R2-D2 ("R2-D2 Photograph")[17]; a photograph of actor John Boyega and actress Naomi Ackie as Finn and Jannah respectively ("Finn Photograph")[18]; a photograph of actors Domhnall Gleeson and Richard E. Grant as General Hux and Allegiant General Pryde respectively ("Hux Photograph")[19]; a photograph of actor Adam Driver and actress Daisy Ridley as Kylo Ren and Rey fighting with lightsabers ("Lightsaber Photograph")[20]; and a series of eight photographs of the production of *Star Wars: The Rise of Skywalker* ("Production Photographs").[21] The court will refer to both sets of photographs as the "Star Wars Photographs."

CBM owns and operates a website, www.comicbookmovie.com, that features articles and editorials about science fiction movies, among other things.[22] Mr. Best owns CBM.[23] Articles and editorials on CBM's website are all user-generated.[24] Mr. Best "has the ability to view all content posted on the website and all content queued for future posts," including the ability to

---

[15] Leibovitz Decl. ¶ 31.
[16] *Id.* ¶ 8; Millennium Falcon Photograph, ECF No. 102-1 Ex. 5.
[17] Leibovitz Decl. ¶ 9; R2-D2 Photograph, ECF No. 102-1 Ex. 6.
[18] Leibovitz Decl. ¶ 10; Finn Photograph, ECF No. 102-1 Ex. 7.
[19] Leibovitz Decl. ¶ 11; Hux Photograph, ECF No. 102-1 Ex. 8.
[20] Leibovitz Decl. ¶ 13; Lightsaber Photograph, ECF No. 102-1 Ex. 10
[21] Leibovitz Decl. ¶ 12; Production Photographs, ECF No. 102-1 Ex. 9.
[22] *See* Answer & Counterclaim ("CBM's and Best's Answer & Counterclaim") ¶¶ 25, 27, ECF No. 49.
[23] *Id.* ¶ 26.
[24] Decl. of Nathan Best in Support of Defs.' Opp'n to Pl.'s Mot. for Summ. J ("Best Decl.") ¶ 5, ECF No. 109-1 Ex. A.

"edit the content of any post or delete any post."[25] Both Mr. Cassidy and Mr. Wilding have the

ability to create content for CBM's website.[26]

Between October 2017 and January 2020, CBM published 15 articles that contained the

various individual images from the Star Wars Photographs.[27] Nine articles were authored by Mr.

Cassidy and six were authored by Mr. Wilding.[28] However, each of the 15 articles at issue

incorporated the given photograph by utilizing HTML code that directed the webpage to a server

where the given image was stored, which caused the image to appear in the article hosted on

CBM's website.[29] This process is called "embedding." Generally, the articles discussed bits of

---

[25] Def. Nathan Best's Responses to Pl.'s First Set of Interrogatories 3, ECF No. 102-1 Ex. 38.

[26] *See* CBM's and Best's Answer ¶¶ 44, 55; Def. Mark Cassidy's Answer to Compl. ("Cassidy's Answer") ¶ 44, ECF No. 55; Def. Joshua Wilding's Answer to Compl. ("Wilding's Answer") ¶ 55, ECF No. 56.

[27] "STAR WARS: THE LAST JEDI Actress Laura Dern Shares New Image of Vice Admiral Amilyn Holdo," ECF No. 102-1 Ex. 21 (using the Holdo Photograph); "STAR WARS: THE LAST JEDI International TV Spot Features Benicio Del Toro As the Mysterious DJ," ECF No. 102-1 Ex. 22 (using the DJ Photograph); "STAR WARS: THE LAST JEDI's Mark Hamill Shares a Lovely Tribute to Carrie Fisher One Year After Her Passing," ECF No. 102-1 Ex. 23 (using the Skywalker Photograph); "Billie Lourd Shares A Touching Tribute to Carrie Fisher On the Second Anniversary of Her Passing," ECF No. 102-1 Ex. 24 (using the Connix Photograph); "STAR WARS: THE RISE OF SKYWALKER – 12 Biggest Reveals and Spoilers From Vanity Fair's Cover Story," ECF No. 102-1 Ex. 25 (using the Millennium Falcon photograph); "STAR WARS: THE RISE OF SKYWALKER Behind The Scenes Videos Features New Aliens And Cast Interviews," ECF No. 102-1 Ex. 26 (using the R2-D2 Photograph, Production Photographs, Finn Photograph, and Hux Photograph); "STAR WARS: THE RISE OF SKYWALKER Has A Very Interesting Alternate Title In Japan," ECF No. 102-1 Ex. 27 (using the Lightsaber Photograph); "STAR WARS: THE RISE OF SKYWALKER Star Daisy Ridley Promises A 'Brilliant End' to the Story," ECF No. 102-1 Ex. 28 (using the Lightsaber Photograph); "STAR WARS: THE RISE OF SKYWALKER's Runtime Possible Revealed Along With Some Potential SPOILERS," ECF No. 102-1 Ex. 29 (using the R2-D2 Photograph); "STAR WARS: THE RISE OF SKYWALKER – Rey And Kylo Ren Clash On New Empire Magazine Covers," ECF No. 102-1 Ex. 30 (using the Lightsaber Photograph); "STAR WARS: THE RISE OF SKYWALKER Final Trailer Reportedly Scheduled for October 21," ECF No. 102-1 Ex. 31 (using the Lightsaber Photograph); "STAR WARS: THE RISE OF SKYWALKER's Oscar Isaac Blames 'Disney Overlords' For No Poe/Finn Romance," ECF No. 102-1 Ex. 32 (using a cropped version of the Dameron Photograph); "STAR WARS: THE RISE OF SKYWALKER Remains #1 At the Box Office As It Passes $900M Worldwide," ECF No. 102-1 Ex. 33 (using the Lightsaber Photograph); "Luke Skywalker's Big STAR WARS: THE RISE OF SKYWALKER Scene Was The Result of Reshoots," ECF No. 102-1 Ex. 34 (using the R2-D2 Photograph); "STAR WARS: THE RISE OF SKYWALKER Passes $500 Million At the Domestic Box Office," ECF No. 102-1 Ex. 35 (using the Lightsaber Photograph); *see also* CBM Article Data, ECF No. 104-3.

[28] *See sources cited supra* note 26.

[29] *See* Def. Mark Cassidy's Responses to Pl.'s First Set of Requests for Admission ("Cassidy's Admissions"), Responses 3, 9 15, 21, 27, 33, 39, 45, 51, ECF No. 102-1 Ex. 40; Def. Joshua Wilding's Responses to Pl.'s First Set of Requests for Admission ("Wilding's Admissions"), Responses 3, 4, 10, 12, 13, 14, 15, 16, 17, 29, 30, 36, 37, 43, 44, 50, 51 ECF No. 102-1 Ex. 41.

information or gossip about a given upcoming *Star Wars* film or the cast's reaction to certain events. For instance, one article is titled "STAR WARS: THE RISE OF SKYWALKER Star Daisy Ridley Promises a 'Brilliant End' to the Story" and discusses Ms. Ridley's appearance on a talk show,[30] while another is titled "STAR WARS: THE LAST JEDI's Mark Hamill Shares A Lovely Tribute to Carrie Fisher One Year After Her Passing" and discusses a post on social media made by Mr. Hamill.[31]

Trunk Archive filed this suit in September 2021, alleging copyright infringement against CBM, Mr. Best, Mr. Cassidy, and Mr. Wilding.[32] In June 2022, CBM and Mr. Best filed a counterclaim, seeking a declaratory judgment of non-infringement.[33] Notably, there is another case between Trunk Archive and CBM pending in this district, which also involves allegations of copyright infringement.[34] Up to this point, there has been substantial motion practice; the court has denied Defendants' motion to dismiss,[35] granted in part and denied in part Trunk Archive's motion to dismiss the counterclaim and to strike certain affirmative defenses,[36] and granted in part and denied in part Trunk Archive's motion for judgment on the pleadings.[37] Now, Trunk Archive moves for summary judgment on the issue of liability as well as Defendants' counterclaim and affirmative defenses.[38] This motion was fully briefed on December 31, 2023.[39]

---

[30] ECF No. 102-1 Ex. 28.
[31] ECF No. 102-1 Ex. 23.
[32] *See* Compl.
[33] *See* CBM's and Best's Answer & Counterclaim.
[34] *See Best Little Sites v. Great Bowery*, No. 2:19-cv-00319 (D. Utah).
[35] Mem. Dec. and Order Denying [16] Defs.' Mot. to Dismiss Compl. or Suspend Case, ECF No. 48.
[36] Order Granting in Part and Denying in Part [52] Mot. to Dismiss the Counterclaim and to Strike Certain Affirmative Defenses and [58] Motion to Strike Certain Affirmative Defenses, ECF No. 70.
[37] Mem. Dec. and Order Denying in Part and Granting in Part Plaintiff's Mot. for Partial J. on the Pleadings and Denying Defendants' Mot. for J. on the Pleadings ("Court's Order on Judgment on the Pleadings"), ECF No. 85.
[38] *See* Pl.'s Mot.
[39] Defs.' Opp'n to Mot. for Summ. J. and Supporting Memorandum ("Defs.' Opp'n"), ECF No. 109; Reply in Support for Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 110.

Given new arguments raised on reply, the court granted Defendants the opportunity to file a sur-reply addressing those arguments,[40] which Defendants filed on July 1, 2024.[41]

**STANDARD**

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[42] "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented."[43] When the moving party bears the ultimate burden of proof at trial, the party must make an initial showing sufficient to show that "no reasonable trier of fact could find other than for the moving party."[44] However, when the moving party does not bear the ultimate burden of proof at trial, the moving party satisfies its initial burden by pointing out the lack of evidence to support the nonmoving party's case.[45] If the moving party carries its initial burden, the burden then shifts to the nonmoving party to demonstrate that there is a genuine dispute of material fact for trial.[46]

---

[40] *See* ECF No. 114.

[41] Resp. to Pl.'s Reply in Support of Mot. for Summ. J. ("Defs.' Sur-Reply"), ECF No. 117.

[42] Fed. R. Civ. P. 56(a).

[43] *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).

[44] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

[45] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[46] *See id.* at 324.

## DISCUSSION

### I.   Failure to Cite Facts in Statement of Undisputed Material Facts

At several points throughout their opposition, Defendants argue that the court should deny Trunk Archive's motion solely on the basis that Trunk Archive failed to include facts in its statement of undisputed material facts, in accordance with local rules.[47] It is true that the court's local rules require that a motion for summary judgment be accompanied by a statement of undisputed material facts, and the rule implies that all facts necessary to decide the motion should be included in that statement.[48] And indeed, Trunk Archive's motion includes a section titled "Statement of Undisputed Material Facts."[49] Defendants, however, point to no authority that suggests that the court should deny a motion for summary judgment solely for failure to include all facts necessary for resolution of the motion within the statement of undisputed material facts. Local rules provide that "the court *may* impose sanctions against an attorney, a party, or both for violating these rules," which may include any sanction the court deems appropriate.[50]

Even if it is true that Trunk Archive failed to comply with local rules, the Defendants have not offered the court any persuasive reason why denial of the entire motion would be an appropriate sanction. Defendants have filed a responsive brief making arguments on the law and facts; they have not been apparently prejudiced in any way by Trunk Archive's putative non-

---

[47] Defs.' Opp'n 2, 11, 13, 18–20, 22–23, 27.
[48] *See* DUCivR 56-1(b)(3).
[49] *See* Pl.'s Mot. 1–7. Notably, Trunk Archive included this section only after its original motion for summary judgment was stricken. *See* ECF No. 101.
[50] DUCivR 1-2.

compliance with the local rules. The court declines to deny or strike Trunk Archive's motion on this basis.

## II.   Copyright Infringement

"To establish [copyright] infringement, two elements must be proven: [A] ownership of a valid copyright, and [B] copying of the constituent elements of the work that are original."[51]

### A.   Ownership of a Valid Copyright

#### 1.   Valid Copyright

A valid copyright requires an "original work[] of authorship fixed in any tangible medium of expression," including "pictorial" works.[52] Originality requires "only that the work was independently created by the author . . . and that it possesses at least some minimal degree of creativity."[53] Photographs are copyrightable "only for the 'incremental contribution' represented by their interpretation or expression of the objects of their attention."[54] Photographs of unadorned facts, however, are not eligible for copyright protection.[55] A certificate of registration "made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."[56]

---

[51] *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *accord Craft Smith, LLC v. EC Design, LLC*, 969 F.3d 1092, 1099 (10th Cir. 2020).

[52] 17 U.S.C. § 102(a).

[53] *Feist Pubs.*, 499 U.S. at 345.

[54] *Meshwerks, Inc. v. Toyota Motor Sales U.S.A., Inc.*, 528 F.3d 1258, 1264 (10th Cir. 2008) (quoting *SHL Imaging, Inc. v. Artisan House, Inc.*, 117 F.Supp.2d 301, 311 (S.D.N.Y. 2000)) (citations omitted); *see also Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 58 (1884) (upholding the constitutionality of copyrighting photographs "so long as they are representations of original intellectual conceptions of the author"); 2 William F. Patry, Patry on Copyright § 3:118 (March 2024 Update); 1 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 2A.08[E] (Rev. Ed. April 2024 Update).

[55] *Meshwerks*, 528 F.3d at 1266.

[56] 17 U.S.C. § 410.

For starters, the photographs at issue were registered with the Copyright Office within five years of publication with Vanity Fair and as such are prima facie valid.[57] Regardless, the court finds that each of the Star Wars Photographs possess the required minimal degree of creativity. Many of the photographs are portraits, in which creative choices by Ms. Leibovitz are evident.[58] Likewise, several photographs apparently depict action sequences taken during filming.[59] These photographs still possess minimal creativity, however, as they express the filmed sequence in a particular way, independent of the film itself.[60] Finally, a series of photographs depict the production of the films.[61] Though a closer question, these photographs still contain sufficient expression to be copyrightable. The photographs depict the cast and crew during the process of filming, but also reflect Ms. Leibovitz's choices concerning when to take a given shot and the subjects of the shot, as well as the technical aspects of the photograph (lighting, angle, framing, etc.).[62] Indeed, Defendants apparently concede the issue of validity in their brief.[63]

Accordingly, the court finds that no reasonable jury could conclude other than that the copyright for each of the Star Wars Photographs is valid. There are two certificates of registration covering each of the images, and each photograph possesses at least a minimal degree of creativity warranting copyright protection.

---

[57] *See* Certificate of Registration No. VA 2-111-252; Certificate of Registration No. VA 2-192-380.
[58] *See* Holdo Photograph; DJ Photograph; Skywalker Photograph; Connix Photograph; Millennium Falcon Photograph; Hux Photograph; Dameron Photograph.
[59] *See* R2-D2 Photograph; Finn Photograph; Lightsaber Photograph.
[60] *See Meshwerks*, 528 F.3d at 1264.
[61] *See* Production Photographs.
[62] *See id.*
[63] *See* Defs.' Opp'n 36.

### 2.    Ownership

Under 17 U.S.C. § 101, "copyright owner" is defined as the owner of "any one of the exclusive rights comprised in a copyright."[64] Ownership is initially vested in the author of the copyrighted work.[65] However, the statute contemplates that the ownership of a copyright may be transferred.[66] A "transfer of copyright ownership" includes an "exclusive license [] or any other conveyance . . . ."[67] It "is not valid unless an instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent."[68]

Here, Ms. Leibovitz held a registered copyright in the photographs at issue.[69] She granted Trunk Archive "the exclusive worldwide right to license, market, and promote" certain images via a written agreement signed by her manager.[70] The Agreement covers "those images provided to Trunk Archive" by Ms. Leibovitz.[71] Ms. Leibovitz declares that she provided Trunk Archive with the photographs at issue in this case following their publication with Vanity Fair.[72]

Defendants do not argue that Trunk Archive does not own the photographs, nor do they otherwise challenge the underlying facts regarding registration or licensing. Accordingly, the

---

[64] 17 U.S.C. § 101.
[65] *Id.* § 201(a).
[66] *Id.* § 201(d)(1) ("The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law[.]").
[67] *Id.* § 101.
[68] *Id.* § 204(a).
[69] *See* Certificate of Registration No. VA 2-111-252; Certificate of Registration No. VA 2-192-380.
[70] *See* Artist Agreement ¶ 1; *see also* Leibovitz Decl. ¶¶ 21–31.
[71] Artist Agreement ¶ 2.
[72] Leibovitz Decl. ¶¶ 27, 31. Defendants apparently object to Trunk Archive's proffered fact that Ms. Leibovitz "provided" it the photographs after they were published in Vanity Fair. *See* Resp. to Pl.'s Statement of Undisputed Material Facts ¶¶ 22, 25, ECF No. 109-3 Ex. R. The stated basis of this objection is hearsay, given that there is no "contemporaneous corroborating document produced by Plaintiff of the transfer of the photographs to Plaintiff." *Id.* Ms. Leibovitz's declaration is sufficient for purposes of summary judgment. *See* Fed. R. Civ. P. 56(c) (establishing that affidavits or declarations are proper evidence to consider on a motion for summary judgment and establishing that an objection to evidence must show that "a fact *cannot* be presented in a form that would be admissible in evidence" (emphasis added)). At a trial, Ms. Leibovitz could testify as to the transfer; the transfer itself does not implicate the rule against hearsay.

court concludes Trunk Archive has carried its burden in showing that there is no genuine dispute of material fact on this element.

### B. Copying of Original Elements

The second element generally requires two inquiries: first, whether, as a factual matter the defendant copied the plaintiff's work; and second, whether, as a mixed question of law and fact, whether the elements copied by the defendant are protected by copyright.[73] In this case, only the fact of copying is at issue.[74]

"Copying" occurs when the defendant infringes any of the copyright owner's exclusive rights established by the Copyright Act.[75] These exclusive rights contain, among other things, the right to display a work publicly and the right to create derivative works.[76] Trunk Archive asserts that Mr. Cassidy and Mr. Wilding are liable as direct infringers for violating these two rights, while CBM and Mr. Best are liable as vicarious infringers.[77] Defendants contest both arguments.[78]

---

[73] *Paycom Payroll, LLC v. Richison*, 758 F.3d 1198, 1204 (10th Cir. 2014) (quoting *Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1370 (10th Cir. 1997)).

[74] "In essence, [the] second consideration asks whether defendant took 'too much' of plaintiff's work; it asks what level of 'sameness' is between the two works." *Id.* It is undisputed that the articles on CBM's website embedded links to full-sized images of the Star Wars Photographs, without significant alteration. *See supra* notes 27, 29 and accompanying text. Accordingly, if there is no genuine dispute of material fact regarding the fact of copying, then the extent of copying would be no barrier to liability. Indeed, neither party briefs this issue.

[75] *See Paramount Pictures Corp. v. Video Broad. Sys., Inc.*, 724 F.Supp. 808, 819 (D. Kan. 1989) (citing *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1085 n.3 (9th Cir. 1989)); *see also Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 154–55 (1975) ("The Copyright Act does not give a copyright holder control over all uses of his copyrighted work. Instead, . . . the Act enumerates several 'rights' that are made 'exclusive' to the holder of the copyright. If a person, without authorization from the copyright holder, puts a copyrighted work to use within the scope of one of those 'exclusive rights,' he infringes the copyright." (quoting *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 393–95 (1968)).

[76] 17 U.S.C. § 106.

[77] Pl.'s Mot. 11–17.

[78] Defs.' Resp. 10–17.

### 1.   Direct Infringement – Display Right

17 U.S.C. § 106 provides that the "the owner of copyright under this title has the exclusive rights to do and to authorize any of the following: . . . in the case of . . . pictorial, graphic, or sculptural works, . . . to [1] display the copyrighted work [2] publicly."[79] In addition, any act of infringement must be volitional.[80]

### i.   Display

The Act defines "display" as "to show a copy of [the work], either directly or by means of a film, slide, television image, or any other device or process[.]"[81] "Copies" are defined as "material objects . . . in which a work is fixed by any method now known or later developed, and from which the work can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device."[82] In addition, the definition of "copies" includes the original: "The term 'copies' includes the material object . . . in which the work is first fixed."[83] Finally, "[a] work is 'fixed' in a tangible medium of expression when its embodiment in a copy . . . is sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."[84]

---

[79] 17 U.S.C. § 106(5). Pictorial works include photographs. *See id.* § 101.

[80] *Millennium Funding, Inc. v. Private Internet Access, Inc.*, No. 21-cv-01261, 2022 WL 7560395, at *11–12 (D. Colo. Oct. 13, 2022) ("The Court is persuaded by this weight of authority and predicts that the Tenth Circuit would follow the other Circuit courts holding that causation is a requisite element of a copyright infringement claim, [which in turn requires volitional conduct].") (citing *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008); *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 550–51 (4th Cir. 2004); *BWP Media USA, Inc. v. T&S Software Assocs., Inc.*, 852 F.3d 436, 443–44 (5th Cir. 2017); *Perfect 10 v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)).

[81] *Id.* § 101.

[82] *Id.*

[83] *Id.*

[84] *Id.*

Defendants argue that summary judgment is inappropriate on Trunk Archive's direct infringement claim because they have not displayed the Star Wars Photographs, but rather have embedded a link to those photographs in the articles published on CBM's website.[85] Trunk Archive argues that embedding a link to a photograph constitutes a display of that photograph.[86]

Earlier, the court denied Trunk Archive's motion for partial judgment on the pleadings as to Defendant's "embedding defense."[87] The earlier ruling found that "Trunk Archive has not persuaded the court to ignore the 'server' test."[88]  On summary judgment, Trunk Archive urges the court to reconsider. Defendants were afforded, and provided, an additional brief to respond on this issue.

"Generally, the 'law of the case' doctrine dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case."[89] However, Federal Rule of Civil Procedure 54(b) "expressly allows for revision of an interlocutory order before entry of final judgment."[90] Thus, the "law of the case doctrine [i]s inapplicable to reconsideration of interlocutory orders in the district court without regard to the basis for reconsideration."[91] The Rule provides:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the

---

[85] Defs.' Opp'n 10–12.

[86] Pl.'s Mot. 13, 17–22.

[87] Court's Order on Judgment on the Pleadings. The issue was pled and briefed as an affirmative defense. The court notes that the issue is not properly an affirmative defense, but rather an element of a copyright claim.

[88] *Id.* at 14.

[89] *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1224 (10th Cir. 2007) (citing *Homans v. City of Albuquerque,* 366 F.3d 900, 904 (10th Cir. 2004)).

[90] *Luo v. Wang*, 71 F.4th 1289, 1297 (10th Cir. 2023) (quoting *Elephant Butte Irr. Dist. of N.M. v. U.S. Dep't of Interior*, 538 F.3d 1299, 1306 (10th Cir. 2008)).

[91] *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1252 (10th Cir. 2011) (citing *Wilson v. Merrell Dow Pharms., Inc.*, 160 F.3d 625, 628 (10th Cir. 1998)).

entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.[92]

And when invited to reconsider a prior ruling, "'the district court is not bound by the strict standards for altering or amending a judgment encompassed in Federal Rules of Civil Procedure 59(e) and 60(b),' which govern a district court's reconsideration of its final judgments."[93] While reconsideration under Rules 59(e) and 60(b) requires at least "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice,"[94] reconsideration under Rule 54(b) does not.[95] Accordingly, the court reviews the issue of embedding.

The Ninth Circuit adopted the "server" test in *Perfect 10, Inc. v. Amazon.com, Inc.*[96] There, Google operated a search engine that provided thumbnail images that were stored on Google's servers in response to an image search.[97] In addition, when a user clicked on the thumbnail image, the user's browser interpreted HTML instructions from Google to show a full-sized image from the third-party website.[98] However, the full-sized image was not stored on Google's servers, and instead, Google "simply provide[d] HTML instructions directing a user's browser to access a third-party website."[99] The Ninth Circuit held that Perfect 10 had not stated a prima facie case of copyright infringement for violation of its display right for the display of the full-sized image.[100] It reasoned that, under the definitions of "display" and "copies," a defendant

---

[92] Fed. R. Civ. P. 54(b).

[93] *Spring Creek Expl. & Prod. Co., LLC v. Hess Bakken Inv., II, LLC*, 887 F.3d 1003, 1024 (10th Cir. 2018).

[94] *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[95] *Luo*, 71 F.4th at 1298–99.

[96] 508 F.3d 1146, 1159–60 (9th Cir. 2007).

[97] *Id.* at 1155.

[98] *Id.*

[99] *Id.* at 1156.

[100] *Id.* at 1159–62.

committed infringement only when the defendant owned the server on which the copy was stored.[101] "Because Google's computers [did] not store the [full-sized] photographic images, Google does not have a copy of the images for purposes of the Copyright Act."[102] Put another way, "Google does not have any 'material objects . . . in which a work is fixed . . . and from which the work can be perceived, reproduced, or otherwise communicated' and thus cannot communicate a copy."[103]

The Ninth Circuit has applied the server test several times since *Perfect 10*.[104] Of particular note is *Hunley v. Instagram, LLC*.[105] In *Hunley*, the plaintiffs posted some of their copyrighted photography on Instagram, and defendants Time and BuzzFeed published articles that embedded plaintiffs' photographs.[106] There, the Ninth Circuit rejected the argument that the server test applied only to search engines.[107] It then rejected the plaintiffs' arguments urging reconsideration of the server test, given that it was bound by *Perfect 10*.[108] Finally, it rejected the contention that the server test had been impliedly overruled by the Supreme Court in *American Broadcasting Co. v. Aereo*,[109] given that *Aereo* dealt with the right to perform rather than the right to display.[110] Accordingly, the Ninth Circuit held that Time and BuzzFeed did not display a

---

[101] *Id.* at 1160 (reciting the definitions of "display," "copies," and "fixed"; noting precedent that an image stored on a computer is a "copy"; then concluding that "[t]he computer owner shows a copy . . . when the owner uses the computer to fill the computer screen with the photographic image stored on that computer, or by communicating the stored image electronically to another person's computer.").

[102] *Id.*

[103] *Id.* 1160–61.

[104] *E.g.*, *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1072–74 (9th Cir. 2021); *Evox Prods., LLC v. Verizon Media, Inc.*, No. 21-56046, 2022 WL 17430309, at *1 (9th Cir. Dec. 6, 2022).

[105] 73 F.4th 1060 (9th Cir. 2023).

[106] *Id.* at 1065–67.

[107] *Id.* at 1070.

[108] *Id.* at 1071–72, 1076.

[109] 573 U.S. 431 (2014).

[110] *Hunley*, 73 F.4th at 1072–76. The Ninth Circuit reasoned that Copyright Act defines "display" with reference to a "copy" of the work, while the definition of "perform" does not have such a limitation. *See id.* at 1074 ("[I]n *Aereo*

copy of the plaintiffs' photographs, given that neither defendant stored plaintiffs' photographs.[111] The Ninth Circuit denied rehearing *en banc* in *Hunley*.[112]

The Tenth Circuit has not spoken one way or the other on the server test.[113] Other circuits have largely been silent as well. The First Circuit has avoided the issue.[114] And the Seventh Circuit cited *Perfect 10* with approval in an opinion focused on allegations of contributory infringement of the right to perform—not the right to display—a copyrighted work.[115] Beyond that, the few district courts not bound by *Perfect 10* to have considered the issue are split. A handful have rejected the server test outright or distinguished *Perfect 10* on the facts.[116] Others have considered the server test to be persuasive for the purposes of other rights codified in the

---

[111] *Id.* at 1077.

[112] Order Denying Rehearing En Banc, *Hunley v. Instagram, LLC*, No. 22-15293 (9th Cir. May 1, 2024).

[113] *Cf. Greer v. Moon*, 83 F.4th 1283, 1294 n.12 (10th Cir. 2023) (citing *Perfect 10* but not discussing the server test).

[114] *See Soc'y of Holy Transfiguration Monastery, Inc. v. Gregory*, 689 F.3d 29, 54 (1st Cir. 2012) ("Although the question of whether a computer has 'displayed' a copyrighted work may be a difficult one in other contexts, it is beyond question here that the Archbishop has 'displayed' the Works on his website. We need not delineate the outer bounds of the scope of the term 'display' where, as here, the fact that the Works were 'displayed' on the Archbishop's website is undisputed." (citing *Perfect 10*, 508 F.3d at 1160–62) (citations omitted)).

[115] *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 760–61 (7th Cir. 2012).

[116] *See McGucken v. Newsweek LLC*, No. 19 Civ. 9617, 2022 WL 836786, at *5–6 (S.D.N.Y. 2022) (rejecting the server test for purposes of the right to display); *Nicklen v. Sinclair Broadcast Grp., Inc.*, 551 F.Supp.3d 188, 194–95 (S.D.N.Y. 2021) (rejecting the server test for purposes of the right to display); *Goldman v. Breitbart News Network, LLC*, 302 F.Supp.3d 585, 595–96 (S.D.N.Y. 2018) (noting that "this Court is skeptical that *Perfect 10* correctly interprets the display right of the Copyright Act" and distinguishing *Perfect 10* on the facts); *Leader's Inst., LLC v. Jackson*, No. 3:14-cv-3572, 2017 WL 5629514, at *11 (N.D. Tex. Nov. 22, 2017) (distinguishing *Perfect 10* on the facts, and noting that "to the extent *Perfect 10* makes actual possession of a copy a necessary condition to violating a copyright owner's exclusive right to display her copyrighted works, the Court respectfully disagrees with the Ninth Circuit").

Copyright Act—for instance, the reproduction right[117]—though none outside the Ninth Circuit have apparently adopted the server test for purposes of the display right.[118]

The court now finds the "server" test to be unpersuasive. The *Perfect 10* court reasoned that Google did not "display" the copyrighted works at issue through embedded links because it did not possess a copy of the works on its servers.[119] But possession of a physical copy is not a prerequisite to displaying a copyrighted work. Instead, the plain text of the Act makes clear that "[t]o 'display' a work means to *show* a copy of it, either directly or by . . . *any other device or process*[.]"[120] And while it is true that the copy being shown must be a material object in which the copyrighted work is fixed,[121] nothing in the text of the statute requires that the alleged infringer itself possess the material object. The word "show" is itself undefined, but nothing in its ordinary meaning necessitates physical possession or control.[122] The Ninth Circuit found that a computer owner only shows a copy of the copyrighted work "when the owner uses the computer to fill the computer screen with the photographic image stored on the computer, or by

---

[117] *Microsoft Corp. v. Softicle.com*, No. 16-2762, 2017 WL 5517379, at *2–3 (D.N.J. Sept. 29, 2017) (holding, for purpose of the reproduction and distribution rights, that alleging providing a link to a website from which copies of software could be made did not state a claim for copyright infringement); *Grady v. Iacullo*, No. 13-cv-00624, 2016 WL 1559134, at *5–7 (D. Colo. Apr. 18, 2016) (holding that for purposes of the rights to reproduce, prepare derivative works, and distribute copies the "plaintiff was required to present some evidence that its photographs and videos were placed on [the] defendant's computer and remained placed there for a period of more than transitory duration."); *MidlevelU, Inc. v. ACI Info. Grp.*, No. 18-80843, 2019 WL 7371835, at *4 (S.D. Fla. Sept. 10, 2019) (holding a factual dispute existed regarding whether the defendant hosted the allegedly infringing content on its website, thereby preventing summary judgment for the defendant, in a case apparently focused on the right to reproduce copies).

[118] *Cf. Bell v. Merchants Bank of Indiana*, 456 F.Supp.3d 1046, 1049–50 (S.D. Ind. 2020) (noting *Perfect 10* and holding that the defendant committed infringement at least because the copyrighted material was stored on its servers).

[119] *Perfect 10*, 508 F.3d at 1160.

[120] 17 U.S.C. § 101 (emphases added).

[121] *See id.*

[122] *See Show*, Merriam-Webster, https://www.merriam-webster.com/dictionary/show#word-history [https://perma.cc/79LB-AJTR] (last visited July 15, 2024) ("1. to cause or permit to be seen.").

communicating the stored image electronically to another person's computer."[123] But this court finds no basis in the text for the stored image requirement. Indeed, the definitions of "display" and "publicly" confirm a broad reading of the statute, as both emphasize that *any* means— including both direct and indirect means—by which a copy is shown are covered by the exclusive rights of Section 106(5).[124] The Act specifically states display includes using "*any device or process*" to show a work.[125] In sum, neither Section 106(5), nor the Copyright Act's definitions, create a requirement that in order to "display" a copyrighted work the alleged infringer must possess a physical copy of that work.

An example helps illustrate the text of the statute. Imagine that a famous painter has licensed a gallery that is open to the public to display her work. The painter has not permitted anyone to photograph or otherwise duplicate the work. An attendee attends the gallery wearing a hidden camera that is broadcasting live to a television being viewed by numerous members of the public. The attendee points the camera at the painting, and an image of the painting is broadcast to the television screen. The attendee is not recording the broadcast, and as such, the only physical embodiment of the painting remains the original. In such a scenario, the attendee has displayed the painting. First, the painting is the relevant copy under the Copyright Act. The painting is a material object that is "fixed" in a tangible medium, and the Copyright Act expressly provides that originals are "copies."[126] Second, by broadcasting an image of the

---

[123] *Perfect 10*, 508 F.3d at 1160.
[124] *See* 17 U.S.C. § 101 ("To 'display' a work means to show a copy of it, either directly or by means of a film, slide, television image, *or any other device or process*[.] . . . To perform or display a work 'publicly' means-- . . . (2) to transmit or otherwise communicate a . . . display of the work . . . to the public, by means of *any device or process*[.]" (emphases added)).
[125] *Id.* (emphasis added).
[126] *See id.*

18

painting, the attendee has shown the painting by causing or permitting it to be seen by others.[127] And finally, the attendee has shown the painting by means of "television image[] or any other device or process[.]"[128] That the attendee is not recording the broadcast, and does not herself possess a copy of the painting is irrelevant to the inquiry compelled by the text.

It its sur-reply, Defendants argue only that because the Ninth Circuit declined rehearing *en banc*, thereby confirming the validity of the server test in that circuit, and because policy rationales support the server test, the court should decline to reconsider it.[129] Defendants offer no textual analysis of their own. At best, Defendants point to the Ninth Circuit's statement that it was relying on the "plain language" of the Copyright Act.[130] But, as discussed above, the court now is no longer persuaded by the reading set forth in *Perfect 10* and its progeny. Similarly, while the policies or purposes of a statute may illuminate the text,[131] they do not overcome it.[132]

Accordingly, the court concludes that a defendant who embeds a copyrighted image on a webpage, without hosting the image on its servers, may infringe the copyright holder's display rights. That conclusion is compelled by the text of the Copyright Act, and the court is no longer persuaded by the server test. Whether this conclusion makes for good policy is not for the court to decide; it is for Congress. Congress codified an exclusive right of copyright owners to display their work publicly, and the definitions it chose for that right cover means by which a defendant shows the work without exercising physical control over it. That other means may exist for

---

[127] *Show*, Merriam-Webster, https://www.merriam-webster.com/dictionary/show#word-history [https://perma.cc/79LB-AJTR] (last visited July 15, 2024).
[128] 17 U.S.C. § 101.
[129] Defs.' Sur-Reply 3–9.
[130] *Id.* at 6 (quoting *Hunley*, 73 F.4th at 1070).
[131] *See, e.g.*, *United States v. Tinklenberg*, 563 U.S. 647, 655 (2011).
[132] *Patel v. Garland*, 596 U.S. 328, 346 (2022) ("[P]olicy concerns cannot trump the best interpretation of the statutory text.").

copyright owners to control their works and that they may also have copyright infringement claims against those who also host a copyrighted work on their servers is immaterial to the issue at hand.

Turning to the facts, there is no genuine dispute of fact that Mr. Cassidy and Mr. Wilding published articles on CBM's website that contained embedded links to the Star Wars Photographs that were hosted on a third-party's server, which caused those images to appear in a given article hosted on CBM's website.[133] Put another way, a reader who interacted with any of the articles at issue that Mr. Cassidy or Mr. Wilding authored would have seen one of the copyrighted Star Wars Photographs.[134] Under the plain meaning of the word "show," Mr. Cassidy and Mr. Wilding "showed" the Star Wars Photographs by embedding them in such a way that a user would see the image while reading the article.[135] And while the record is silent as to where these images are stored, that fact is immaterial; in order to embed a photograph, one must necessarily link to a location in which it is stored.

### ii.   Publicly

To display a work "publicly" includes "to transmit or otherwise communicate a . . . display of the work . . . to the public, by means of any device or process, whether the members of

---

[133] *See supra* note 29 and accompanying text.

[134] *See* sources cited *supra* note 27.

[135] The Ninth Circuit held that providing HTML instructions that direct a user's browser to another website that stores the copyrighted image "is not the equivalent of showing a copy" because "HTML instructions do not themselves cause infringing images to appear on the user's computer screen." *Perfect 10*, 508 F.3d at 1161. Instead, "[t]he HTML merely gives the address of the image to the user's browser. The browser then interacts with the computer that stores the infringing image. It is this interaction that causes an infringing image to appear on the user's computer screen." *Id.* The court is not persuaded by this reasoning. The process of embedding at issue here involves a short causal chain, where the only volitional conduct at issue is the Defendants' use of embedded links. In other words, there are no intervening causes between embedding a link and an image appearing in the article. Of course, this conclusion would be different if the Defendants had simply provided a URL link for a website that hosted the images, as the images would not appear within the articles at issue.

the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times."[136]

There is no genuine dispute of fact that Mr. Cassidy and Mr. Wilding published their articles on a publicly accessible website. Accordingly, they transmitted or otherwise communicated their articles to the public, and it is immaterial whether the members of the public accessed those articles. Indeed, Defendants do not argue that their display was not public.

### iii.    Volitional Conduct

"While the Copyright Act does not require that the infringer know that he is infringing . . . it nonetheless requires *conduct* by a person who causes in some meaningful way an infringement."[137] Here, Mr. Cassidy and Mr. Wilding authored articles that contained embedded links to the Star Wars Photographs and posted those articles on CBM's website.[138] As such, there is no genuine dispute of material fact that Mr. Cassidy's and Mr. Wilding's volitional conduct caused the infringement at issue here.

In sum, there are no genuine disputes of material fact on any of the elements to Trunk Archive's direct infringement claim against Mr. Cassidy and Mr. Wilding. No reasonable jury could hold otherwise than for Trunk Archive on this claim. Accordingly, summary judgment in favor of Trunk Archive is appropriate. By embedding links to copyrighted photographs onto a publicly accessible webpage, Mr. Cassidy and Mr. Wilding infringed Trunk Archive's exclusive right to display the Star Wars Photographs under 17 U.S.C. § 106(5).

---

[136] 17 U.S.C. § 101.
[137] *CoStar Grp.*, 373 F.3d at 549.
[138] *See* Cassidy's Admissions, Response Nos. 2, 3, 8, 9, 14, 15, 20, 21, 26, 27, 32, 33, 38, 39, 44, 45, 50, 51; Wildings Admissions, Response Nos. 2, 3, 9–17, 28, 29, 35, 36, 42, 43, 44, 49, 50, 51.

### 2. Direct Infringement – Derivative Works

17 U.S.C. § 106 provides the owner of a copyrighted work the exclusive right "to prepare derivative works based upon the copyrighted work."[139] Defendants argue that Trunk Archive did not allege a copyright infringement claim based upon preparing derivative works, and in the alternative, that embedding links to photographs into articles does not create a derivative work.[140] Trunk Archive argues that it did not specifically limit its claim to infringement on the display right, and that Rule 15 permits amendment of its claim.[141]

The court first considers whether Trunk Archive's Complaint alleged a copyright infringement claim based upon the creation of derivative works. In the Complaint, Trunk Archive alleges only that Defendants committed copyright infringement "by causing [the Star Wars Photographs] to be displayed as part of [various articles] on [CBM's website] without authorization[.]"[142] Trunk Archive does not allege in its Complaint that Defendants infringed its copyrights by creating derivative works. According to Trunk Archive, however, "it never limited its complaint to a violation of any one specific right under [Section] 106 of the Copyright Act, but rather generally alleged that the Defendants' use of the Star Wars Photographs in the [articles] constituted infringement, generally."[143] And while generally speaking, "a complaint need not set forth the plaintiff's legal theories," the Tenth Circuit has held that a plaintiff may not raise a new theory of the case late in the litigation, even when that theory is potentially supported by the factual allegations of the complaint.[144] Here, Trunk Archive did not raise its derivative

---

[139] 17 U.S.C. § 106(2).
[140] Def.'s Opp'n 17–21.
[141] Pl.'s Reply 11.
[142] Compl. ¶ 80.
[143] Pl.'s Reply 11.
[144] *Zokari v. Gates*, 561 F.3d 1076, 1084, 1085–87 (10th Cir. 2009).

works theory until its motion for summary judgment, over three years after it filed its Complaint. Fairness prevents construing Trunk Archive's Complaint as proceeding under a second variety of copyright infringement that was not disclosed until Trunk Archive's motion for summary judgment.[145]

Trunk Archive asserts that Rule 15 permits a party to amend their pleadings even at summary judgment.[146] The court need not reach that issue here, however, as Trunk Archive has not moved to amend its Complaint to add a new legal theory. Trunk Archive simply "request[s] that it be allowed to pursue" a derivative works theory. Under the court's local rules, a reply brief may not include a motion.[147]

Therefore, because Trunk Archive has not stated a claim for copyright infringement based upon Defendants' creation of derivative works, the court need not reach whether embedding a copyrighted photograph into an article would be sufficient to trigger liability for the preparing of a derivative work.

### 3. Vicarious Infringement

"[A] defendant can . . . be secondarily liable for another's copyright infringement under principles of vicarious and contributory liability."[148] Vicarious liability for copyright infringement "attaches when the secondary infringer has 'an obvious and direct financial interest in the exploitation of the copyrighted materials' and 'the right and ability to supervise' the direct

---

[145] *See id.* at 1084–87 (emphasizing that the court's task is to determine whether it is in the interests of justice to permit the new legal theory to move forward).
[146] Pl.'s Reply 11.
[147] *See* DUCivR 7-1(a)(3) ("A party may not make a motion . . . in a response or reply. Any motion must be separately filed.").
[148] *Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013).

infringer."[149] Trunk Archive argues that CBM and Mr. Best are liable for vicarious infringement.[150] Defendants argue that there are genuine disputes of fact on both elements.[151]

### i.   Right and Ability to Supervise the Infringing Activity

Defendants argue that CBM and Mr. Best do not have the ability to supervise the infringing activities because users can post articles without their knowledge or consent.[152] Trunk Archive argues that CBM and Best have "the right and ability to supervise all content that is posted to" CBM's website, and that it is irrelevant whether they chose to exercise that right at any given time.[153]

There is no genuine dispute of fact that CBM and Mr. Best have the *right* to supervise the direct infringers here. Notably, it is immaterial for purposes of this prong whether the direct infringer "is considered, as a technical matter, an employee or an independent contractor[.]"[154] CBM operates a website on which users can post articles.[155] Mr. Best is the owner and president of CBM.[156] In response to Trunk Archive's interrogatories, Mr. Best stated that he "has the ability to view all content posted on the website and all content queued for future posts," and that

---

[149] *Greer*, 83 F.4th at 1287 (quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)); *accord Diversey*, 738 F.3d at 1196 ("Vicarious liability attaches when the defendant 'has the right and ability to supervise the infringing activity' and 'has a direct financial interest in such activities.' (quoting *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971))); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (noting that vicarious infringement occurs when the defendant profits from direct infringement "while declining to exercise a right to stop or limit it"); *see also* 6 Patry on Copyright §§ 21:62, 21:66–21:68.

[150] Pl.'s Mot. 13–17.

[151] Def.'s Opp'n 12–17.

[152] *Id.* 14.

[153] Pl.'s Mot. 14; *see also* Pl.'s Reply 8–11.

[154] *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963).

[155] *See* Best Decl. ¶ 5; Def. Best Little Sites Responses to Pl.'s First Set of Interrogatories, Response No. 2, ECF No. 102-1 Ex. 37.

[156] CBM's and Best's Answer & Counterclaim ¶¶ 25–27.

he has the ability to "edit the content of any post or delete any post."[157] Furthermore, in his

declaration submitted along with his opposition to Trunk Archive's motion for summary

judgment, Mr. Best declared that "CBM has strict policies regarding copyrighted images or

content. Any content found to contain copyrighted content or copyrighted images is removed

immediately."[158] CBM's Terms of Service make clear that CBM forbade users from posting

copyrighted content and that CBM could remove content posted in violation of its policies.[159]

Accordingly, there is no genuine dispute that Mr. Best had the right to control content posted by

freelance contributors, such as Mr. Cassidy and Mr. Wilding, at least when that content included

copyrighted material. As an officer of CBM, Mr. Best's rights can be imputed to CBM.[160]

The next question is whether CBM and Mr. Best had the *ability* to supervise the direct

infringement here. According to CBM and Mr. Best, they lacked the ability to supervise the

direct infringement because it is practically impossible to review each article before it is

published, and indeed, they do not review the work of freelance users before it is published.[161]

Put another way, CBM and Best suggest that their lack of actual knowledge as to the content of

the articles posted on CBM's website negates any vicarious liability for copyright infringement.

However, "[v]icarious liability has no knowledge requirement, based as it is on the common law

---

[157] Defendant Nathan Best's Responses to Pl.'s First Set of Requests for Admission, Response No. 2, ECF No. 102-1 Ex. 39. However, in his response to interrogatories, Mr. Best also stated that he did not have the "absolute right to reject any content" appearing on CBM's website. *Id.* Response No. 25. In light of the facts showing that Mr. Best and CBM could remove copyrighted content from the website, the court finds this statement to be irrelevant.

[158] Decl. of Nathan Best in Support of Defendants' Opp'n to Pl.'s Mot. for Summ. J. ¶ 6, ECF No. 109-1 Ex. A; *see also* Comic Book Movie Copyright Policies, ECF No. 109-1 Ex. D.

[159] *See* CBM Terms of Service, ECF No. 109-1 Ex. F.

[160] An entity, of course, can only act through its officers or agents. *E.g.*, *Lane v. Provo Rehabilitation & Nursing*, 2018 UT App 10, ¶ 27, 414 P.3d 991.

[161] Defs.' Opp'n 14; Best Decl. ¶ 5 ("Because users can immediately publish or post their content on the website, I am unable to monitor and proofread every article prior to its publishing."); *id.* ¶ 10 ("Defendants Cassidy and Wilding are freelance journalists and users of CBM's Website who post content. CBM and I do not directly supervise their work and we do not review their work prior to them publishing.").

doctrine of *respondeat superior*."[162] And as Mr. Best's responses to Trunk Archive's interrogatories and his declaration show, Mr. Best and CBM could and did supervise activity on CBM's website, including conduct that amounted to copyright infringement. Contrary to their suggestion, the inquiry is not whether they are "capable of preventing all infringing activity on the website."[163] Indeed, seminal cases in this area have found vicarious liability despite any lack of actual temporal control over the infringing activity.[164]

Accordingly, there is no genuine dispute of material fact on this element.

### ii.     Direct Financial Interest

Defendants argue this element requires that the infringing material act as a draw for readers, and that such a fact is not supported by the record here.[165] Trunk Archive argues that it must only show that the infringing material was a draw, not necessarily the main draw, for readers.[166] "The essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits."[167] The Ninth Circuit has explored this issue in the context of websites a handful of times, and has held that "[a] website owner can receive a direct financial benefit from the presence of infringing

---

[162] *Greer*, 83 F.4th at 1287 (citing *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 262 (9th Cir. 1996)).
[163] Defs.' Opp'n 14.
[164] *Shapiro, Bernstein & Co.*, 316 F.2d at 307 ("[T]he cases are legion which hold the dance hall proprietor liable for the infringement of copyright resulting from the performance of a musical composition by a band or orchestra whose activities provide the proprietor with a source of customers and enhanced income. He is liable whether the bandleader is considered, as a technical matter, an employee or an independent contractor, and whether or not the proprietor has knowledge of the compositions to be played or any control over their selection." (citing *Buck v. Jewell-LaSalle Realty Co.*, 283 U.S. 191, 198–99 (1931))); *see also Greer*, 83 F.4th at 1287 (citing *Shapiro, Bernstein & Co* with approval in setting forth the rule regarding vicarious liability).
[165] Defs.' Opp'n 15–17.
[166] Pl.'s Mot. 13–16.
[167] *Giganews*, 847 F.3d at 673 (quoting *Ellison*, 357 F.3d at 1079) (emphasis removed); *see also Shapiro, Bernstein & Co.*, 316 F.2d at 307.

material on his or her website, but only 'where the availability of infringing material acts as a draw for customers.'"[168]

The undisputed material facts make clear that CBM and Mr. Best had a financial interest in articles posted on CBM's website. CBM received revenue from advertisers for the articles at issue.[169] Likewise, Mr. Best was compensated as the owner of CBM.[170] Trunk Archive, however, has failed to present evidence that shows that there is no genuine dispute of fact that the Star Wars Photographs were a draw for readers. While some articles directly call attention to a given photograph,[171] others do not.[172] Put another way, for the bulk of the articles at issue, it is not sufficiently clear that readers would have visited CBM's website partly to view the Star Wars Photographs. Trunk Archive has not made a sufficient showing on this element to justify summary judgment in its favor.

In sum, though Trunk Archive has shown that there is no genuine dispute that CBM and Mr. Best had the right and ability to supervise the infringing activity, a genuine dispute of fact

---

[168] *Erickson Productions, Inc. v. Kast*, 921 F.3d 822, 829 (9th Cir. 2019) (quoting *Ellison*, 357 F.3d at 1078)).

[169] *See* CBM's and Best's Answer and Counterclaim ¶¶ 28, 75; *see also* ECF no. 104-3 Ex. 36.

[170] *See* Best's Resp. to Pl.'s First Set of Requests for Admission, Response No. 2.

[171] *See* "STAR WARS: THE LAST JEDI Actress Laura Dern Shares New Image of Vice Admiral Amilyn Holdo"; "STAR WARS: THE RISE OF SKYWALKER – 12 Biggest Reveals and Spoilers From Vanity Fair's Cover Story"; "STAR WARS: THE RISE OF SKYWALKER Behind The Scenes Videos Features New Aliens And Cast Interviews."

[172] *See* "STAR WARS: THE LAST JEDI International TV Spot Features Benicio Del Toro As the Mysterious DJ"; "STAR WARS: THE LAST JEDI's Mark Hamill Shares a Lovely Tribute to Carrie Fisher One Year After Her Passing"; "Billie Lourd Shares A Touching Tribute to Carrie Fisher On the Second Anniversary of Her Passing"; "STAR WARS: THE RISE OF SKYWALKER Has A Very Interesting Alternate Title In Japan"; "STAR WARS: THE RISE OF SKYWALKER Star Daisy Ridley Promises A 'Brilliant End' to the Story"; "STAR WARS: THE RISE OF SKYWALKER's Runtime Possible Revealed Along With Some Potential SPOILERS"; "STAR WARS: THE RISE OF SKYWALKER – Rey And Kylo Ren Clash On New Empire Magazine Covers"; "STAR WARS: THE RISE OF SKYWALKER Final Trailer Reportedly Scheduled for October 21"; "STAR WARS: THE RISE OF SKYWALKER's Oscar Isaac Blames 'Disney Overlords' For No Poe/Finn Romance"; "STAR WARS: THE RISE OF SKYWALKER Remains #1 At the Box Office As It Passes $900M Worldwide"; "Luke Skywalker's Big STAR WARS: THE RISE OF SKYWALKER Scene Was The Result of Reshoots"; "STAR WARS: THE RISE OF SKYWALKER Passes $500 Million At the Domestic Box Office."

remains as to whether CBM and Mr. Best had a direct financial interest in the infringing activities. Accordingly, while summary judgment in favor of Trunk Archive is appropriate on its copyright infringement claim against Mr. Cassidy and Mr. Wilding, it is inappropriate on Trunk Archive's copyright infringement claim against CBM and Mr. Best.[173]

### III. Defenses

Trunk Archive also moves for summary judgment as to each of Defendants' affirmative defenses.[174] The court addresses only those affirmative defenses that could preclude entry of judgment for Trunk Archive.[175] Put another way, the court considers only those items Defendants pled as affirmative defenses that indeed are affirmative defenses to Trunk Archive's copyright infringement claim.

---

[173] Trunk Archive also moves for summary judgment on CBM's and Mr. Best's counterclaim, which seeks a declaration of non-infringement. *See* Pl.'s Mot. 17–26. Given that the court has denied Trunk Archive summary judgment on its claim of vicarious infringement, it likewise denies Trunk Archive summary judgment on this counterclaim.

[174] Pl.'s Mot. 26–39. In their pleadings, Defendants collectively proliferate 28 affirmative defenses: failure to state a claim; lack of damages; public policy; failure to mitigate damages; DMCA safe harbor; res judicata and claim splitting; lack of knowledge; lack of material contribution to infringement; lack of intent; takedown of copyrighted material; lack of DMCA take-down notice; embedding; proximate cause and third-party acts; Plaintiff's bad faith; unjust enrichment; lack of Defendants' bad faith; unclean hands; Defendants acted in good faith; self-inflicted harm; lack of vicarious liability; latches and waiver; copyright misuse; First Amendment; fair use; invalid copyrights; speculative damages; de minimis use. CBM's and Best's Answer 11–14; Cassidy's Answer 13–16; Wilding's Answer 12–16. The court struck a number of these defenses under Federal Rule of Civil Procedure 12(f). *See* Order Granting in Part and Denying in Part [52] Mot. to Dismiss the Counterclaim and to Strike Certain Affirmative Defenses and [58] Motion to Strike Certain Affirmative Defenses, ECF No. 70.

[175] *See Valley Fresh Produce, Inc. v. W. Skyways, Inc.*, No. 17-cv-01450, 2019 WL 4695668 (D. Colo. Sept. 25, 2019) ("[A] plaintiff moving for summary judgment is not obligated to negate affirmative defenses, but an affirmative defense will negate summary judgment where each element of the affirmative defense is supported by summary judgment evidence." (quoting *McCollough v. Johnson, Rodenberg & Lauinger*, 587 F.Supp.2d 1170, 1176 (D. Mont. 2008)); *see also Assessment Techs. Inst., LLC v. Parkes*, 588 F.Supp.3d 1178, 1189 (D. Kan. 2022).

### A.    Fair Use

Mr. Cassidy's and Mr. Wilding's twenty fifth defenses assert the doctrine of fair use.[176]

"[F]air use is an affirmative defense" to copyright infringement.[177] 17 U.S.C. § 107 provides that

notwithstanding the exclusive rights of the copyright owner, "the fair use of a copyrighted work

. . . for purposes such as criticism, comment, news reporting, teaching . . . , scholarship, or

research, is not an infringement of copyright."[178] The statute specifies four factors to consider in

determining whether the use of a work was fair use: "(1) the purpose and character of the use,

including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in

relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential

market for or value of the copyrighted work."[179] Trunk Archive argues that all four factors weigh

against a finding of fair use, and that summary judgment is appropriate on this affirmative

defense.[180] Defendants counter that the undisputed facts show that their use of the Star Wars

Photographs was fair use.[181]

### 1.    Purpose and Character of Use

The first fair use factor "considers the reasons for, and nature of, the copier's use of an

original work. The 'central' question it asks is 'whether the new work merely "supersede[s] the

objects" of the original creation . . . or instead adds something new, with a further purpose or

---

[176] Cassidy's Answer 16; Wilding's Answer 15.
[177] *Cambell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 590 (1994).
[178] 17 U.S.C. § 107.
[179] *Id.*
[180] Pl.'s Mot. 34–37.
[181] Defs.' Opp'n 21–28.

different character.'"[182] "A use that has a further purpose or different character is said to be 'transformative.'"[183] Notably, "[m]any secondary works add something new. That alone does not render such uses fair."[184] Likewise, courts should consider whether the work is commercial or nonprofit in nature: "The commercial nature of the use is not dispositive. But it is relevant."[185] The purposes listed in the preamble to Section 107 guide this inquiry.[186]

The court considers first whether the use of copyrighted images in the articles transformed the purpose of the photographs. According to Defendants, the Star Wars Photographs were added to the articles in order to contribute to their function in providing news, information, and entertainment.[187] They also assert that "Trunk Archive's intended purpose is to monetize the [Star Wars Photographs] by obtaining licensing fees."[188] That a copyright owner has an interest in obtaining licensing fees says nothing about the purpose of the work itself. Next, that the articles themselves might serve news and entertainment purposes does not necessarily mean that the use of the copyrighted works in the articles transformed the copyrighted works themselves. Indeed, "the use of an image solely to illustrate the content of that image, in a commercial capacity," is not necessarily fair use.[189] Put another way, unless Defendants' articles "comment on, criticize, or report news about the [Star Wars Photographs] themselves," the purpose and function factor will not weigh in their favor.[190] This conclusion is compelled by

---

[182] *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 527–28 (2023) (quoting *Campbell*, 510 U.S. at 579.

[183] *Id.* at 529 (quoting *Campbell*, 510 U.S. at 579).

[184] *Id.* at 529.

[185] *Id.* at 531 (citations omitted).

[186] *Id.* at 528.

[187] Defs.' Opp'n 24.

[188] *Id.*

[189] *Otto v. Hearst Commc'ns, Inc.*, 345 F.Supp.3d 412, 428 (S.D.N.Y. 2018).

[190] *Barcroft Media, Ltd v. Coed Media Grp., LLC*, 297 F.Supp.3d 339, 352 (S.D.N.Y. 2017) (emphasis removed); *accord Werner v. Red v. Blue Media Inc.*, No. 2:20-cv-01024, 2021 WL 3560588, at *3 (C.D. Cal.. Aug. 9, 2021)

the text of Section 107, which focuses on the "use" of the copyrighted work itself. Here, while

some of the articles at issue were indeed dedicated to sharing news about the photographs

themselves,[191] most plainly were not.[192]

The court also considers the commercial nature of the photographs' use in the articles.

Defendants suggest that to the extent that the articles were monetized via advertisements, they

had a fairly limited commercial nature.[193] Some courts have found that when a defendant

receives only a small amount of money generated through online advertising from articles

---

("A defendant's use of a copyrighted image in news reporting will generally not tip the first factor in favor of fair use where the image simply illustrates the subject matter of a report." (citing *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1173 (9th Cir. 2012); *Los Angeles News Serv. v. KCAL-TV Channel 9*, 108 F.3d 1119, 1121–22 (9th Cir. 1997))).

[191] *See* "STAR WARS: THE LAST JEDI Actress Laura Dern Shares New Image of Vice Admiral Amilyn Holdo" (sharing news about the Holdo Photograph); "STAR WARS: THE RISE OF SKYWALKER Behind The Scenes Videos Features New Aliens And Cast Interviews" (commenting on the R2-D2 Photograph, Production Photographs, Finn Photograph, and Hux Photograph).

[192] *See* "STAR WARS: THE LAST JEDI International TV Spot Features Benicio Del Toro As the Mysterious DJ" (describing Mr. Del Toro's character DJ and using the DJ Photograph as illustration); "STAR WARS: THE LAST JEDI's Mark Hamill Shares a Lovely Tribute to Carrie Fisher One Year After Her Passing" (sharing news about Mark Hamill's social media post on the one-year anniversary of Carrie Fisher's death and using the Skywalker Photograph as illustration); "Billie Lourd Shares A Touching Tribute to Carrie Fisher On the Second Anniversary of Her Passing" (sharing news about Billie Lourd's social media post on the two-year anniversary of Carrier Fisher's death and using the Connix Photograph as illustration); "STAR WARS: THE RISE OF SKYWALKER – 12 Biggest Reveals and Spoilers From Vanity Fair's Cover Story" (using the Millennium Falcon photograph as illustration for an article discussing potential spoilers revealed by the Vanity Fair article); "STAR WARS: THE RISE OF SKYWALKER Has A Very Interesting Alternate Title In Japan" (using the Lightsaber Photograph as illustration in an article discussing the title of *Star Wars: The Rise of Skywalker*); "STAR WARS: THE RISE OF SKYWALKER Star Daisy Ridley Promises A 'Brilliant End' to the Story" (using the Lightsaber Photograph as illustration in an article about Ms. Ridley's comments on a talk show); "STAR WARS: THE RISE OF SKYWALKER's Runtime Possible Revealed Along With Some Potential SPOILERS" (using the R2-D2 Photograph as illustration in an article discussing the score to *Star Wars: The Rise of Skywalker*); "STAR WARS: THE RISE OF SKYWALKER – Rey And Kylo Ren Clash On New Empire Magazine Covers" (using the Lightsaber Photograph as illustration in an article discussing magazine covers showing characters Kylo Ren and Rey); "STAR WARS: THE RISE OF SKYWALKER Final Trailer Reportedly Scheduled for October 21" (using the Lightsaber Photograph as illustration in an article discussing a movie trailer); "STAR WARS: THE RISE OF SKYWALKER's Oscar Isaac Blames 'Disney Overlords' For No Poe/Finn Romance" (using the Dameron Photograph as illustration discussing Mr. Isaac's comments in an interview with IGN); "STAR WARS: THE RISE OF SKYWALKER Remains #1 At the Box Office As It Passes $900M Worldwide" (using the Lightsaber Photograph as illustration in an article discussing worldwide ticket sales); "Luke Skywalker's Big STAR WARS: THE RISE OF SKYWALKER Scene Was The Result of Reshoots" (using the R2-D2 Photograph as illustration in an article discussing a scene in *Star Wars: The Rise of Skywalker*); "STAR WARS: THE RISE OF SKYWALKER Passes $500 Million At the Domestic Box Office" (using the Lightsaber Photograph as illustration in an article discussing domestic ticket sales).

[193] Defs.' Opp'n 25.

incorporating copyrighted works, and does not charge fees to access the articles or sell the copyrighted works directly, the commercial nature of the use is minimal.[194] Here, 15 articles generated $1,166.93, with a mean revenue generated per article of $77.79.[195] That the commercial nature was only minimal does not affect the analysis for those articles that plainly did not use the photographs for a transformed purpose. Both facts point in the same direction, notwithstanding that the commercial nature was minimal. But for those articles that plainly had a purpose of sharing news or commenting on the images themselves, commercial use may overcome the transformative nature of the use.[196] Here, the article containing the Holdo Photograph generated only $27.24 in revenue for CBM, while the article containing the Production Photographs, among others, generated $51.43 in revenue for CBM.[197] While not particularly significant, the court finds that whether the commercial nature of the use outweighs its purpose is a jury question.

The court finds that for the bulk of the articles, the purpose and character of the use weighs against a finding of fair use.[198] Defendants have not pointed to evidence that would create a genuine dispute of material fact as to those articles. However, for those articles that comment directly on the images themselves, the court finds that there is at least a jury question whether the purpose and character of the use weighs in favor of a finding of fair use.[199]

---

[194] *Philpot v. Media Rsch. Ctr. Inc.*, 279 F.Supp.3d 708, 717–18 (E.D. Va. 2018).
[195] *See* ECF No. 104-3 Ex. 36 (listing the revenue generated per article).
[196] *See Andy Warhol Found.*, 598 U.S. at 531 ("[Commercial nature] is to be weighed against the degree to which the use has a further purpose or different character.").
[197] *See* ECF No. 104-3 Ex. 36.
[198] *See* sources cited *supra* note 192.
[199] *See* sources cited *supra* note 191.

### 2.    Nature of the Copyrighted Work

The Supreme Court has observed, for purposes of the second fair use factor, that "fair use is more likely to be found in factual works than in fictional works."[200] Put another way, the more creative a copyrighted work is, the more this factor tilts in favor of the copyright owner.[201] Trunk Archive argues that the Star Wars Photographs were "highly creative in nature."[202] Defendants do not discuss whether the Star Wars Photographs are factual or creative works.[203] Therefore, Defendants have failed to carry their burden in resisting summary judgment on this point, and the court will treat the Star Wars Photographs as more creative than factual.

Defendants argue that the fact that the photographs were previously published in Vanity Fair tilts this factor in their favor.[204] While some cases have embraced this proposition,[205] the court declines to do so. The Supreme Court has held that "Congress intended the unpublished nature of the work to figure prominently in fair use analysis," and that "the scope of fair use is narrower with respect to unpublished works."[206] However, that use of an unpublished work is less likely to be fair, under Section 107, does not necessarily mean that use of a published work is more likely to be fair.[207] If such were the case, then while the copyright holder's right to first

---

[200] *Stewart v. Abend*, 495 U.S. 207, 237 (1990) (citing 3 Nimmer on Copyright § 1305[A]); *see also* 4 Patry on Copyright § 10.138.

[201] *See Katz v. Google Inc.*, 802 F.3d 1178, 1183 (11th Cir. 2015) (per curiam).

[202] Pl.'s Mot. 36.

[203] *Cf.* Defs.' Opp'n 25–26.

[204] Defs.' Opp'n 25–26.

[205] *E.g.*, *Katz*, 802 F.3d at 1183; *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 810 (9th Cir. 2003).

[206] *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 553, 564 (1985); *see also id.* at 554 ("We conclude that the unpublished nature of a work is '[a] key, though not necessarily determinative, factor' tending to negate a fair use." (quoting S. Rep. No. 94-473, at 64 (1975))).

[207] *See Dr. Seuss Enters., L.P. v. ComicMix LLC*, 983 F.3d 443, 456 (9th Cir. 2020) ("But the converse is not necessarily true; neither *Harper & Row* nor any principle of fair use counsels that the publication of the copyrighted work weighs in favor of fair use." (citing 4 Patry on Copyright § 10:139.30)).

publication would be protected,[208] a copyright holder's other rights—for instance, the exclusive

right to display one's work publicly—would lose some of their force. That makes little sense in

the context of the Copyright Act. Accordingly, on this record, the publication status of the

photographs does not weigh in either side's favor.

Next, Defendants suggest that because Trunk Archive has "allowed the widespread

dissemination of the [Star Wars] Photographs across the internet," this factor should tilt in their

favor.[209] Defendants cite no caselaw for this proposition. For starters, Defendants offer no

evidence that the "widespread dissemination" they refer to was not authorized by Trunk Archive.

Next, even assuming that others' use was unauthorized, that does not explain why this factor—

the nature of the copyrighted work—should tilt in their favor. Indeed, Defendants' argument

appears to imply that if a copyright holder either licenses its material to others or fails to

successfully curb dissemination of the work through infringement actions, it will lose some of its

exclusive rights. How a copyright holder has chosen to handle either licensing or infringement

with other entities does not inform the fair use inquiry.

Therefore, the court finds that this factor tilts against a finding of fair use for all the Star

Wars Photographs.

### 3.    Amount and Substantiality

"The third factor asks whether 'the amount and substantiality of the portion used in

relation to the copyrighted work as a whole' . . . are reasonable in relation to the purpose of the

---

[208] *See Harper & Row*, 471 U.S. at 552–53 (suggesting that the right of first publication is a primary driver for considering the unpublished nature of the copyrighted work in the fair use analysis).
[209] Defs.' Opp'n 26.

copying."[210] Therefore, this factor often hinges on the first factor.[211] Here, Defendants displayed nearly all of the Star Wars Photographs without alteration.[212] For those images that Defendants were commenting on directly,[213] Defendants necessarily must have displayed the whole of each photograph in order to achieve their legitimate purposes. However, for those images that Defendants used only for illustration of their article,[214] displaying the whole image for this purpose was unreasonable. Accordingly, this factor is balanced the same as the first factor.

### 4.     Effect of the Use on the Value of the Work

The fourth factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market' for the original."[215] "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets."[216]

Defendants argue that because Trunk Archive failed to point to evidence that might tilt this factor in its favor, this factor therefore tilts towards Defendants.[217] Not so. As the parties

---

[210] *Campbell*, 510 U.S. at 586 (citations omitted).

[211] *See, e.g.*, *Tresóna Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 953 F.3d 638, 650 (9th Cir. 2020) ("Even 'entire verbatim reproductions are justifiable where the purpose of the work differs [enough] from the original.'" (quoting *Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 n.8 (9th Cir. 2003))).

[212] *But see* "STAR WARS: THE RISE OF SKYWALKER'S Oscar Isaac Blames 'Disney Overlords' For No Poe/Finn Romance" (cropping the image).

[213] *See* sources cited *supra* note 191.

[214] *See* sources cited *supra* note 192.

[215] *Cambpell*, 510 U.S. at 590 (quoting 3 Nimmer on Copyright § 13.05[A][4] (1993)); *accord Harper & Row*, 471 U.S. at 568 ("[T]o negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the *potential* market for the copyrighted work.'" (quoting *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984))).

[216] *Campbell*, 510 U.S. at 590.

[217] Defs.' Opp'n 27.

asserting an affirmative defense, Defendants have the burden of establishing its applicability.[218] Defendants have not done so. Instead, Defendants discuss the other websites on which Trunk Archive's photographs are displayed, and the steps Trunk Archive could take to protect them.[219] Those arguments do not aid Defendants in establishing this factor, as they do not speak to whether widespread infringement would result in an impact on the market for the original. At best, this factor is neutral, as neither party has presented evidence one way or the other.[220]

In sum, for the group of articles in which Defendants used the Star Wars Photographs to merely illustrate their articles,[221] at least the first, second, and third factors lean against a finding of fair use. Therefore, the factors considered together do not support a fair use defense for those articles. No reasonable jury could conclude otherwise, and Defendants have not shown that there are genuine factual disputes for trial on those articles. Accordingly, for this group of articles, Trunk Archive is entitled to summary judgment. However, for those articles in which Defendants comment on the Star Wars Photographs directly,[222] only the second factor tilts in favor of Trunk Archive; the first and third factors tilt toward a finding of fair use. For those articles, there is a jury question as to whether this use of the Star Wars Photographs was fair use.

### B.    DMCA Safe Harbor

The Digital Millennium Copyright Act ("DMCA") exempts service providers from liability for copyright infringement related to certain acts.[223] One such safe harbor provision

---

[218] *Campbell*, 510 U.S. at 590.
[219] *See* Defs.' Opp'n 27–28.
[220] *Cf. Campbell*, 510 U.S. at 594 ("[I]t is impossible to deal with the fourth factor except by recognizing that a silent record on an important factor bearing on fair use disentitled the proponent of the defense . . . to summary judgment.").
[221] *See* sources cited *supra* note 192.
[222] *See* sources cited *supra* note 191.
[223] *See* 17 U.S.C. § 512(a)–(d).

provides that "[a] service provider shall not be liable . . . for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider" if certain conditions are met.[224] The court granted Trunk Archive judgment on the pleadings on this affirmative defense, given that CBM and Mr. Best have consistently disclaimed ownership of the servers on which the Star Wars Photographs are stored.[225] The undisputed material facts show that the Star Wars Photographs were not stored on servers owned by CBM and Mr. Best. Accordingly, this DMCA safe harbor defense is inapplicable. Defendants make no argument and present no evidence to show that the DMCA safe harbor provision is applicable in this case.[226] Accordingly, this defense does not preclude entry of summary judgment on Trunk Archive's claims.

### C.    Res Judicata

Defendants' sixth affirmative defense asserts that Trunk Archive's claims are barred by claim preclusion, issue preclusion, or claim splitting.[227] Claim preclusion requires three elements: "(1) a judgment on the merits in the earlier action; (2) identity of the parties or their privies in both suits; and (3) identity of the cause of action in both suits."[228] Similarly, issue preclusion requires: (1) identity of issues; (2) final judgment on the merits in the earlier action; (3) identity of parties; and (4) a full and fair opportunity to litigate the issue in the prior action.[229]

---

[224] 17 U.S.C. § 512(c)(1). In earlier briefing Defendants "effectively conceded the other three safe harbor defenses," *see* Court's Order on Judgment on the Pleadings 15, so the court does not reach whether they might be applicable here.

[225] *See* Court's Order on Judgment on the Pleadings 16–17, 18.

[226] *Cf.* Defs.' Opp'n 31.

[227] CBM's and Best's Answer & Counterclaim 11; Cassidy's Answer 13; Wilding's Answer 13.

[228] *Hatch v. Boulder Town Council*, 471 F.3d 1142, 1149 (10th Cir. 2006) (quoting *Yapp v. Excel Corp.*, 186 F.3d 1222, 1226 (10th Cir. 1999)).

[229] *Park Lake Res. Ltd. Liab. v. U.S. Dep't of Agr.*, 387 F.3d 1132, 1136 (10th Cir. 2004) (quoting *Dodge v. Cotter Corp.*, 203 F.3d 1190, 1198 (10th Cir. 2000)).

Finally, claim splitting occurs when two lawsuits involving the same parties and a common set of facts are filed.[230] Unlike claim preclusion, however, the rule against claim splitting is used primarily by courts to efficiently control their dockets, and therefore, does not require a final judgment on the merits.[231]

There is indeed another case, before this court, between Trunk Archive and CBM, in which copyright infringement is at issue.[232] However, the court denied an earlier motion to dismiss on the issue of claim splitting.[233] Specifically, the court found that the claims at issue in the two cases were not identical, as they arose from separate transactions, and therefore did not involve a common set of facts.[234] In addition, the other case has not reached a final judgment on the merits, as it is currently pending trial. Finally, it is worth note that no dispositive motions were filed in the previous case, meaning that the court has not resolved any legal issues that might have a preclusive effect in this case. Accordingly, claim preclusion, issue preclusion, and claim splitting do not affect Trunk Archive's motion for summary judgment.

Defendants point the court to their earlier opposition to Trunk Archive's motion to strike and note that the court declined to strike this defense.[235] However, Defendants' earlier opposition is inapposite. The only arguments raised in that briefing were specific to why striking a res judicata defense under Rule 12(f) was inappropriate.[236] Those arguments no longer carry any weight at the summary judgment stage. The Rule 12(f) standard is very different from the Rule

---

[230] *See Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011).
[231] *Id.* at 1217–18.
[232] *See Best Little Sites v. Great Bowery*, No. 2:19-cv-00319 (D. Utah).
[233] *See* Mem. Dec. and Order Denying [16] Defs.' Mot. to Dismiss Compl. or Suspend Case 4–8.
[234] *Id.* at 7.
[235] Def.'s Opp'n 31.
[236] *See* Best Little Sites and Nathan Best's Opp'n to Mot. to Dismiss Counterclaim and Strike Certain Affirmative Defenses 10–11, ECF No. 64.

56 standard.[237] As the parties with the burden of proof on this affirmative defense, Defendants must point to facts that create a genuine dispute of fact for trial in order to preserve this defense at this stage in the case. They have not done so. Accordingly, this defense does not preclude entry of summary judgment on Trunk Archive's claim.

### D. Copyright Misuse

Defendants assert a defense of copyright misuse.[238] Trunk Archive argues that the court should not recognize such a defense, and that even assuming it does, the defense would not apply to Mr. Cassidy and Mr. Wilding's conduct.[239] Defendants make no substantive argument in opposition.[240]

Assuming that copyright misuse or abuse is indeed an affirmative defense to an infringement claim,[241] it would require proof that Trunk Archive violated antitrust laws through its copyright, or that it violated the public policies underlying copyright law.[242] Defendants have not pointed to any genuine dispute of fact that would be material to this defense. Accordingly, this putative defense does not preclude entry of summary judgment on Trunk Archive's claim.

---

[237] *Compare Tiscareno v. Frasier*, No. 2:07-cv-336, 2012 WL 1377886, at *13 (D. Utah 2012) ("[M]otions to strike are disfavored and striking a defense is a drastic remedy. Generally, motions to strike are not granted unless the questionable material is prejudicial to the moving party." (citations omitted)) *with* Fed. R. Civ. P. 56(a).

[238] Cassidy's Answer 16; Wilding's Answer 15.

[239] Pl.'s Mot. 32–34.

[240] *See* Defs.' Opp'n 35 ("For the same reasons as discussed above in connection with its defenses of failure to state a claim, no damages, lack of knowledge, lack of intent, expeditions [sic] removal, embedding, no proximate damage, [and] bad faith, [sic] there remain disputed factual issues as to this defense.").

[241] *But see Reliability Rsch. Inc. v. Comput. Assocs. Int'l, Inc.*, 793 F.Supp. 68, 69 (E.D.N.Y. 1992) (suggesting that the existence of a defense of copyright misuse has not been solidly established). Neither the Tenth Circuit nor the Supreme Court has approved of the defense. *See also* 4 Nimmer on Copyright § 13.09[2][a].

[242] *See Energy Intel. Grp., Inc. v. CHS McPherson Refinery, Inc.*, 300 F.Supp.3d 1456, 1373 (D. Kan. 2018); *see also Live Face on Web, LLC v. Integrity Sols. Grp., Inc.*, 421 F.Supp.3d 1051, 1067 (D. Colo. 2019).

### E.   Statute of Limitations

In their opposition, Defendants raise for the first time a statute of limitations defense to their use of the Star Wars Photographs in three of the articles at issue.[243] The Copyright Act provides for a three-year statute of limitations for civil actions.[244] Defendants argue this point as a subset of their failure to state a claim defense.[245] However, the two defenses are separate matters.[246] And under the Federal Rules of Civil Procedure, a statute of limitations defense is an affirmative defense that is waived if it is not pled.[247] The court declines to consider this belated defense.

---

[243] Defs.' Opp'n 28–30.
[244] 17 U.S.C. § 507(b).
[245] *Id.*
[246] *See* Fed. R. Civ. P. 8(c), 12(b).
[247] *See Youren v. Tintic Sch. Dist.*, 343 F.3d 1296, 1302–04 (10th Cir. 2003).

## ORDER

The court GRANTS IN PART and DENIES IN PART Plaintiff's motion for summary

judgment.[248] Summary judgment in favor of Plaintiff is GRANTED against Defendants Cassidy

and Wilding on Plaintiff's claim for direct copyright infringement of its display right as related

to the copyrighted photographs contained in articles that use the copyrighted photograph merely

as illustration.[249] Summary judgment in favor of Plaintiff is DENIED as to Plaintiff's claim for

direct copyright infringement of its display right as related to the copyrighted photographs

contained in articles that comment on the photographs themselves.[250] Summary judgment in

favor of Plaintiff is likewise DENIED as to Plaintiff's claim for vicarious copyright infringement

against CBM and Mr. Best. The court VACATES the portion of its prior opinion relating to the

issue of embedding.[251]

Signed July 15, 2024.

BY THE COURT

David Barlow
United States District Judge

---

[248] ECF No. 102.
[249] *See* ECF No. 102-1, Exs. 22–25, 27–35.
[250] *See* ECF No. 102-1, Exs. 21, 26.
[251] ECF No. 85.